UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

SAMHITA GERA, Individually and on Behalf :   Civil Action No.    1:23-cv-07908
of All Others Similarly Situated,              :
                                        :   __CLASS ACTION__
                 Plaintiff,        :
                                          :   COMPLAINT FOR VIOLATIONS OF THE
      vs.                      :   FEDERAL SECURITIES LAWS
                                          :
UiPATH, INC., DANIEL DINES, and ASHIM :
GUPTA,                                  :
                                          :
                Defendants.      :
                                          :

———————————————————— x   __DEMAND FOR JURY TRIAL__

Plaintiff Samhita Gera ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by UiPath, Inc. ("UiPath" or the "Company"), Company earning calls, and analyst and media reports about the Company.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of UiPath common stock between April 21, 2021 and March 30, 2022 inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against UiPath and certain of the Company's senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company resides in this District, and the events and omissions giving rise

---

[1]      Emphasis has been added throughout unless otherwise noted.

to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District. UiPath is headquartered in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased UiPath common stock during the Class Period and has been damaged thereby.

7.      Defendant UiPath is a global provider of robotic process automation ("RPA") software. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "PATH."

8.      Defendant Daniel Dines ("Dines") is a co-founder of UiPath and served as the Company's Chief Executive Officer ("CEO") from October 2005 to April 2022. Beginning in May 2022, defendant Dines assumed the role of Co-CEO, serving alongside Robert Enslin who was also appointed to the role of Co-CEO in May 2022. UiPath has stated defendant Dines will resign from his Co-CEO position effective January 2024. Defendant Dines has also served as Chairman of the Company's Board of Directors (the "Board") since October 2005.

9.      Defendant Ashim Gupta ("Gupta") has served as Chief Financial Officer ("CFO") of UiPath since November 2019. Prior to his role as CFO, defendant Gupta had served as the Company's Chief Customer Success Officer from February 2018 to November 2019.

10.     Defendants referenced above in ¶¶8-9 are referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "defendants." Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' misrepresentations during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class

Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

13.    Founded in 2005, UiPath is a global provider of RPA software.  RPA software allows companies to use installed "robots" to execute mundane and menial tasks on behalf of their employees, freeing up those employees to perform more valuable tasks.  Such tasks include, for example, logging into applications, extracting information from documents, moving folders, filling in forms, and updating information and databases.  UiPath markets its software platform as an "end-to-end" solution that allows its customers to discover novel automation opportunities, as well as build, manage, run, engage, and govern their automations.

14.    UiPath has three reportable revenue segments: (i) licenses; (ii) maintenance and support; and (iii) services and other.[2]  License revenues consist of fees generated from the sale of software licenses, which historically were offered primarily on annual or multi-year terms.  Maintenance and support revenues consist of fees generated from technical support services and through the provision of updates and upgrades to UiPath's software, when and if such updates and

---

[2]    During the third quarter of its fiscal 2022, UiPath renamed "maintenance and support revenue" as "subscription services revenue" and renamed "services and other revenue" as "professional services and other revenue."  UiPath's fiscal year ends on January 31 of the calendar; so, for example, UiPath's fiscal year 2022 ended on January 31, 2022.

upgrades become available.  Services and other revenues consist of fees generated from process automation, customer education, and training services.

15.     Revenues from UiPath's license sales are recognized at the point in time when a customer is able to use and benefit from the software, which is generally upon delivery to the customer or upon commencement of the renewal term.  By contrast, maintenance and support revenues are recognized ratably over the term of the arrangement, and services and other revenues are recognized as the services are rendered.

16.     UiPath generates the majority of its revenues from the sale of software licenses.  In fiscal year 2021, UiPath earned approximately $340 million in license revenue, representing approximately 57% of the Company's total revenues.

17.     UiPath instructs investors to focus on the Company's annualized renewal run-rate ("ARR") as an important indicator of the Company's success.  The Company employs a relatively unique definition of ARR, which it defines as annualized invoice amounts per solution SKU from subscription licenses and maintenance obligations assuming no increases or reductions in customer subscriptions.  As a result, ARR more evenly distributes the income that UiPath purportedly anticipates from a particular contract over an annualized period as compared to ordinary revenue recognition practices, which, as is the case with the Company's license sales, are recognized upon delivery and thus may result in more variability.  Notably, ARR does not reflect any actual or anticipated reductions in invoiced value due to contract non-renewals or service cancelations other than for specific bad debt or disputed amounts.  UiPath also publicly reports Net New ARR, which represents incremental growth of ARR during a particular quarter relative to the prior quarter. Each of these operational metrics serve as important indicators of UiPath's ability to acquire new subscription customers and to maintain and expand existing subscription contracts.

18.    UiPath relies in part on a direct sales team to generate sales, which are comprised of three segments: (i) enterprise sales, which focuses on large businesses and public sector organizations; (ii) high-velocity inside sales, which focuses on high volume midsized customers; and (iii) global strategic sales, which focuses on the largest strategic accounts.  In addition to the direct sales team, UiPath relies substantially on external partnerships with systems integrators, regional developers, business process outsourcing providers, and distributors to drive sales in markets where UiPath has a smaller direct sales presence.  UiPath's partnership agreements are generally non-exclusive and do not prohibit partners from working with UiPath's competitors or from recommending competing products.  External partnership sales are a critical component of UiPath's overall sales strategy, as the Company generates substantial revenues from these channel sales.

19.    Due to challenges created by the COVID-19 pandemic, demand for automation software, including RPA software, increased in 2020 as businesses sought to mitigate various logistical and financial setbacks created by lockdowns, worker shortages, and remote work mandates.  As a result, the automation industry was widely viewed as a burgeoning industry. Despite these trends, UiPath claimed that it had not received any substantial boost to its overall business from the pandemic.  As defendant Dines summarized during a September 7, 2021 earnings call: "We always said that COVID was net neutral for us.  We've seen some business industries accelerating, [we've seen] some deceleration in other industries."

20.    The large-scale shift towards digitization by enterprise organizations prompted established providers of enterprise software like Microsoft, IBM, Oracle, and Salesforce to make inroads into the automation industry.  Most notably, in May 2020 Microsoft announced its acquisition of Softomotive – a provider of robotic process automation software – to supplement

Microsoft Power Automate, Microsoft's existing process automation offering.  Although UiPath was generally viewed as the category leader given the robust functionality of its so-called "end-to-end" platform, Microsoft's acquisition of Softomotive expanded Microsoft's "low-code" automation capabilities, allowing Microsoft to offer automation with relatively greater ease of use. In addition, the ubiquity of Microsoft's enterprise software enabled Microsoft, like certain other large scale office software providers, to bundle its automation software within its broader suite of enterprise software for lower prices.  Throughout the Class Period, however, defendants claimed that Microsoft was not a significant competitor with UiPath, as UiPath purportedly offered enterprise automation solutions while Microsoft offered products primarily focused on enhancing individual user capabilities.  Rather than portray Microsoft as a major rival, defendants emphasized Microsoft's status as a valuable business partner that offered complimentary products and assisted in the sale of UiPath products and services.

21.    On April 21, 2021, defendants conducted UiPath's initial public offering ("IPO"), selling over 27.5 million UiPath shares at a price of $56 per share for over $1.5 billion in gross offering proceeds.  Notably, more than half of all shares sold in the IPO were sold by Company insiders, including defendant Dines – UiPath's founder, CEO, and Chairman – who sold over $77 million worth of UiPath shares in the offering.  Even more unusual, defendants structured the IPO so as to grant themselves the ability to dump substantial UiPath shares soon after the offering was completed, rather than subjecting themselves to a full 180-day lockup period as is customary in IPOs.  The Individual Defendants and other UiPath insiders continued to sell UiPath shares almost immediately after the partial lockup period ended.  Specifically, defendant Dines sold nearly $2.6 million worth of UiPath shares in November 2021 at prices above the IPO price, and UiPath's

CFO defendant Gupta sold over $13 million worth of UiPath shares between June 2021 and January 2022 at prices as high as $70.76 per share.

22.     Leading up to the IPO, defendants claimed that UiPath was experiencing exceptional growth and was competitively positioned to continue these robust growth trends into the future.  For example, IPO documents highlighted UiPath's "rapid growth" and claimed that the Company, which had yet to turn a profit, had "accelerated its path to profitability."  IPO documents represented that the Company had grown its ARR to more than $580 million in the fiscal year ended January 31, 2021, representing 65% year-over-year growth, and its revenues to more than $600 million during this same period, representing 81% year-over-year growth.

23.     Following the IPO, defendants continued to claim that UiPath was undergoing "record" growth and attributed UiPath's apparent success in the burgeoning automation industry to the competitive superiority of UiPath's technology.  For example, during a June 8, 2021 conference call, defendant Gupta stated that "as our results underscore, *we are consistently winning these competitive evaluations*" with other automation companies.  He further stated: "[W]e continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee . . . .  So you can see also *customers migrating away from our competitors and to us*."  Defendants also downplayed competitive threats facing UiPath, in particular by Microsoft, with defendant Dines stating during the June 8, 2021 conference call that UiPath's products were "very differentiated" from those offered by Microsoft and claiming that comparing the two was "like comparing apples to oranges" because the two were not significant competitive rivals.

24.     Unbeknownst to investors, however, these and similar statements made by defendants during the Class Period were materially false and misleading when made.  UiPath's

products had a smaller addressable market than defendants portrayed, because the relatively high

cost of the Company's products limited the use case for many businesses that did not need full

RPA software.  UiPath was also losing market share to established enterprise software vendors

such as Microsoft, IBM, and Salesforce who were capable of bundling their low-code automation

products into their enterprise software suites, lessening the need for add-on automation software.

In addition, rival low-code automation solutions such as Power Automate were capable of

addressing the majority of customer use cases at a substantially lower price point, which further

exacerbated UiPath's struggles to generate client demand and maintain robust growth.

Compounding the problem, UiPath began to compete with its own integration systems partners,

which strained these critical relationships and prompted the Company's partners to divert business

to UiPath's competitors, in particular Microsoft.

25.    Defendants engaged in a two-step scheme to conceal these adverse demand and

competition trends until after they had dumped tens of millions of dollars' worth of UiPath shares

at fraud-inflated prices.  First, leading up to the IPO UiPath enacted widespread discounts to

artificially – albeit temporarily – boost client demand.  These discounts were unsustainable given

the Company's negative cash flow position and also had the effect of pulling forward future sales

(thereby cannibalizing sales in later periods), eroding margins, and increasing the risk of customer

churn upon contract renewal.  Second, because this strategy was unsustainable, soon after the IPO

UiPath switched tactics, instead offering its customers "ramping" contracts in which they signed

up for a relatively modest initial RPA commitment which would then ostensibly grow over time.

This created a market perception of high ARR growth, as relatively lucrative later portions of the

contracts' terms were averaged over the initial term pursuant to the method by which UiPath

calculated its ARR metric.  However, UiPath risked ultimately not obtaining the purported

annualized revenue from these contracts in the event customers canceled their contracts or opted not to renew during the "ramp" phase or otherwise, even though that projected revenue was reflected in the initial ARR figures provided to the market.

26.    Defendants' fraudulent scheme eventually came to light in UiPath's worsening financial results, which occurred less than a year after the IPO, but not before defendants were able to conduct the IPO and sell tens of millions of dollars' worth of their personal UiPath shares at fraud-inflated prices.  As a result of defendants' Class Period misrepresentations, the price of UiPath stock initially soared above its IPO price, reaching a Class Period high of $90 per share in May 2021.  Capitalizing on this artificial inflation, Company insiders, including defendant Dines and UiPath's largest equity backers, collectively sold **_more than $810 million in the IPO_**. Defendants also caused UiPath to forgo a customary lockup period, instead enacting a partial lockup which ultimately enabled defendants Dines and Gupta to collectively dump more than $15 million worth of additional UiPath shares during the Class Period.

27.    Then, on September 7, 2021, UiPath announced its quarterly results for the second quarter of fiscal year 2022, revealing a dramatic slowdown in the growth of the Company's revenue and ARR metrics.  On the corresponding conference call, defendant Gupta indicated that UiPath's financial results provided to investors in connection with the IPO had been boosted by previously undisclosed discounting, stating that UiPath was shifting away from discounted multi-year contracts as the Company was no longer "compelled to trade any type of discount."  Instead, defendants announced they were moving to a "ramping" contract model.  For the next quarter, UiPath reported lackluster net new ARR growth of just 42%.  On the corresponding conference call, defendant Gupta reiterated that the Company would continue to "reduce [its] dependency" on discounted multiyear contracts now that the Company had "cash in the bank."  Then, on March

30, 2022, UiPath provided deeply disappointing revenue and ARR guidance for its fiscal 2023,

revealing that the Company's downward growth trajectory was expected to continue.

28.     As a result of these revelations, the price of UiPath stock declined to a low of less

than $22 per share, more than *75% below* the Class Period high, causing plaintiff and the Class

(defined herein) to suffer hundreds of millions of dollars in losses and economic damages under

the federal securities laws.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

29.     The Class Period begins on April 21, 2021.  On that date, UiPath filed with the SEC

a Prospectus on Form 424B4 (the "Prospectus").  The Prospectus highlighted UiPath's purportedly

robust growth rate, stating in pertinent part as follows:

> ***We have experienced rapid growth***.  Our ARR was $351.4 million and
> $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively,
> ***representing a growth rate of 65%***.  We generated revenue of $336.2 million and
> $607.6 million, representing a growth rate of 81%, and a net loss of $519.9 million
> and $92.4 million in the fiscal years ended January 31, 2020 and 2021, respectively.

30.     The Prospectus further emphasized UiPath's commitment to achieving "hyper

growth," stating in pertinent part as follows:

> In fiscal year 2020, we continued to make investments that ***enabled our hyper-
> growth and market capture***, and began to focus on realizing the operational
> leverage inherent in our business model and customer economics.  In fiscal year
> 2021, we continued our focus on demonstrating the operational leverage in our
> business model, ***while prioritizing investments that will allow us to continue to
> achieve best-in-class growth and business scale and to capitalize on our
> significant market opportunity***.
>
> We have made incredible progress in building a world-class business.
> Today, we are a company committed to solving for both growth and efficiency and
> have accelerated our path to profitability while continuing to deliver hyper-growth.

31.     The Prospectus also emphasized UiPath's revenue growth, stating in pertinent part

as follows:

*Total revenue increased by $271.5 million, or 81%, for the fiscal year ended January 31, 2021 compared to the fiscal year ended January 31, 2020, primarily due to an increase in our licenses revenue of $144.4 million*, an increase in our maintenance and support revenue of $112.9 million and an increase in services and other revenues of $14.2 million. Approximately 75% of the increase in revenue was attributable to growth from existing customers, and the remaining increase in revenue was attributable to new customers. As we continued to expand our sales efforts in the United States and internationally, our increase in total revenue was consistent across all regions.

32.     On June 8, 2021, UiPath issued a release announcing its financial results for the quarter ended April 30, 2021 (the "1Q22 Release"). The 1Q22 Release stated that UiPath had achieved ARR of $652.6 million during the quarter, representing a 64% year-over-year increase. The 1Q22 Release further stated that UiPath had earned revenues of $186.2 million during the quarter, representing a 65% year-over-year increase. The 1Q22 Release quoted defendant Dines, who attributed UiPath's "'*exceptionally strong*'" ARR growth to the superiority of UiPath's products, stating that the growth was "'*a testament to our leadership position in enterprise software automation*.'" The 1Q22 Release also quoted defendant Gupta, who stated: "'We have experienced rapid growth and now have over 8,500 customers worldwide, including 1,105 customers with ARR of $100,000 or greater and 104 customers with ARR of $1 million or greater.'"

33.     Also on June 8, 2021, defendants Dines and Gupta hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter of fiscal 2022. During his prepared remarks, defendant Dines highlighted UiPath's "record" ARR growth, stating: "Our leadership position in the RPA market is again demonstrated by our ARR growth . . . . *We continue to grow multiples of the market and take market share*." Defendant Gupta similarly highlighted UiPath's "meaningful growth at scale" and attributed the results to the Company's competitive advantage, stating: "And as our results underscore, *we are consistently winning these competitive evaluations* . . . ." Defendant Gupta continued: "[T]he

opportunity in front of us is enormous and growing.  ***Our strong first quarter results and guidance***

***reflect the growing momentum in our business and the power of our automation flywheel***."

34.     In response to an analyst question regarding his expectations for the rest of the year,

defendant Gupta emphasized that UiPath's "pipeline continue[d] to be strong," stating in pertinent

part as follows:

> I just want to start by emphasizing the strength of our quarter.  $653 million of ARR
> and a record quarter of incremental ARR breaking $70 million at $72 million total
> incremental ARR.  When you look at that growth, it was really founded on the fact
> ***that we're continuing to add customers at a really fast pace***.  So our customer
> count is now greater than 8,500 customers.  That's up more than 600 sequentially
> and 2,400 year-over-year.  Quite frankly, ***this has exceeded our expectations***, and
> we're looking forward as ***our pipeline continues to be strong***.

35.     During the call, an analyst inquired as to the "competitive threat" posed by

Microsoft.   In response, defendant Dines downplayed Microsoft as a competitor and assured

investors that UiPath was "beat[ing]" out all competition based on its "very differentiated"

technology, stating in pertinent part as follows:

> ***I would start by saying that we are very differentiated, first of all, in our
> philosophy towards automation.  We have a unique platform that aims to emulate
> people and their work.  Microsoft has built a low-code/no-code platform whose
> main goal is to provide new applications and analytics to the people.  They are
> like comparing apples to oranges***.
>
>             ***Our approach is extremely difficult to replicate.   It requires a huge
> experience curve that we have built over the last 15 years.  Our platform is a
> combination of UI, API and computer vision AI, that is, again, extremely difficult
> to replicate and it is our secret sauce***.
>
>             Moreover, I would say that our differentiations come from the 3 major
> directions.  First of all, ***we have this unique end-to-end horizontal platform that is
> really necessary to win in this space***.  And this is a space that is about the highest
> return on investment and the fastest time to value that I've seen almost ever in the
> world of enterprise software.  We are in a business where we can improve the return
> of investment.  And that was very beneficial throughout our history.
>
>             We consistently have proven, and ***we have beaten our competitors with our
> technology***.  If you go there and if you can show that you are able to implement in
> half time, imagine the exponential return on investment that happens when you

deploy at scale.  And by the way, *we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments*.

36.     Moreover, defendant Gupta represented that UiPath's pipeline was "enrich[ed]" by gaining share from its competitors, stating in pertinent part as follows:

> [W]e continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee.  *We see that enrich in really the pipeline of what we look at.  So you can see also customers migrating away from our competitors and to us*.  And that is not just necessarily just about the strength of our individual components, but that is *the strength of our entire platform*.

37.     On June 9, 2021, UiPath filed with the SEC a quarterly report on Form 10-Q for the quarter ended April 30, 2021, which was signed by defendants Dines and Gupta.  The Form 10-Q contained the financial information provided in the 1Q22 Release.

38.     The statements referenced in ¶¶29-37 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

        (a)     that UiPath had enacted a widespread discounting program prior to the IPO, which had the effect of temporarily boosting the Company's revenue and ARR metrics, cannibalizing its future sales, eroding the Company's margins, and increasing the risk of client churn;

        (b)     that UiPath's actual total addressable market was not as large as portrayed by defendants, because many companies included in the market survey did not need the type of high-cost, high-functionality automation products offered by the Company;

(c)     that UiPath was losing customers to Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were building automation into their platforms;

(d)     that UiPath was losing customers due to the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services;

(e)     that UiPath was suffering from a loss of channel sales due to strained relationships with the Company's partners as a result of increased competition between UiPath and these partners; and

(f)     that, as a result of (a)-(e) above, defendants' statements during the Class Period regarding the Company's business, operations, and key financial metrics such as revenues and ARR were materially false and misleading.

39.     In addition, throughout the Class Period, UiPath's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [UiPath] speculative or risky" and an explanation of "how [the] risk affecte[d] [UiPath]."  Defendants' failure to disclose UiPath's discounting program and that UiPath was suffering from worsening demand trends and heightened competitive threats violated Item 303

because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in UiPath speculative or risky.

40.     On September 7, 2021, UiPath issued a release disclosing the Company's financial results for the quarter ended July 31, 2021 (the "2Q22 Release"). The 2Q22 Release revealed an unexpected slowdown in UiPath's revenues and reported ARR metrics. Specifically, the 2Q22 Release disclosed that UiPath's net new ARR annual growth rate had declined dramatically from approximately 55% in the prior quarter to just 33% in the current quarter and further that growth in UiPath's leading license revenue category had fallen from 57% year-over-year in the prior quarter to just 20% in the current quarter. On the corresponding conference call, defendant Gupta also revealed that UiPath had engaged in substantial discounting of its products prior to the IPO and that the Company was in the process of altering the structure of its contracts to include a "ramping" feature whereby customer contract commitments would start small and increase over time and thereby reduce the need for the Company to offer widespread discounting as it had before. Defendant Gupta stated in pertinent part as follows:

> Looking at our pipeline, which is strong across geographies, *we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts*.

41.     In response to an analyst question, defendant Gupta provided additional information regarding UiPath's shift away from multi-year, discounted deals, stating in pertinent part as follows:

> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention rate is 98%, we *don't feel kind of compelled to trade any type of discount*

*for long for getting the cash in the door right today*. We're able to make better and better economic decisions from the position of strength.

42.     On this news, the price of UiPath common stock fell from $62.46 per share on September 7, 2021 to $54.40 per share on September 9, 2021, a decline of more than $8 per share over a two-day period, or more than 12%, on above-average trading volume. However, the price of UiPath common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

43.     The 2Q22 Release stated that UiPath had achieved ARR of $726.5 million during the quarter, representing a 60% year-over-year increase. The 2Q22 Release also stated that UiPath had earned revenues of $195.5 million during the quarter, representing a 40% year-over-year increase. The 2Q22 Release quoted defendant Gupta who attributed UiPath's incremental ARR growth to the Company's "'competitive differentiation,'" stating in pertinent part as follows:

> "The team executed well this quarter as *we continue to drive meaningful growth at scale*. Our land and expand go-to-model delivered record net new ARR, *a testament to our competitive differentiation* and the power of our platform to drive meaningful return on investment for our customers. Looking ahead, our priority is to continue to drive growth while exercising operational rigor, *which will allow us to maintain our clear leadership position in this large and growing market*."

44.     Also on September 7, 2021 defendants Dines and Gupta hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter of fiscal 2022. During his prepared remarks, defendant Dines highlighted the growth in UiPath's customer base as evidence of the market's "demand for automation," stating in pertinent part as follows:

> As of the end of the second quarter, our customer base was more than 9,100. *And the number of our customers who are leveraging our platform to accelerate automation is growing quickly*. We have 1,247 customers that accounted for at least $100,000 in ARR, up 59% from 785 in the second quarter of last year. This includes 118 customers at $1 million-plus in ARR, up 100% from 59. *These*

*numbers demonstrate not only the significant demand for automation, but demand for automation at scale*.

45.    Defendant Gupta also credited UiPath's "market-leading automation platform" as the driver of the Company's "meaningful growth at scale."

46.    In response to an analyst question, defendant Dines denied that demand for UiPath's platform was waning as pandemic era impacts receded, stating: "As we are getting, hopefully, in the last phase of COVID, we see solid demand in – for our technology, for our platform.  We are seeing quite a solid pipeline for the second part of the year."  Defendant Gupta concurred, stating:

> I look at the long-term demand signals that we see.  Daniel talked about the strength of our pipeline.  *We love our competitive position*.  The awareness in the market around our platform is higher than ever, as you can see from a lot of the industry reports that have also come out.  *So we actually feel very positive about the long-term demand coming out of COVID*.

47.    In response to an analyst question regarding the volatility in UiPath's reported net new ARR metrics, defendant Gupta assured investors that UiPath's pipeline had "grown" and remained "very strong," stating in pertinent part as follows:

> Look, I look at our incremental ARR numbers, the net new ARR that we've been posting, we're very pleased with it.  It reflects the investment.  It reflects both the strong dollar base – the impact of the strong dollar-based net retention rate as well as the steady execution of new logos.  We continue to invest in our sales force.
>
> So as we continue to bring up our sales team and ramp up additional reps, which we've been doing, *I feel very good about the overall trajectory to fulfill the pipeline that we have in front of us, which has grown and is very strong*.

48.    During the call, defendants Dines portrayed UiPath's technology as the "winning angle" and denied that the Company was facing competitive pressures, stating in pertinent part as follows:

> So we all know this is a big market growing quickly, and automation is the central piece of the digital transformation.  So obviously, all major players in the cloud and the business applications are in our space.

- 18 -

\*       \*       \*

So Salesforce is seeing a consolidation between low-code/no-code integration and automation.  And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time.  With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year.  So we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago.   And now we're really combining UI automation and API automation in a very good integrated package.

*We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one -- that is the winning angle*.  All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.

*This is our bread and butter*.  We have built it for a long time.  And starting from this angle, we – *it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space*.

49.     Defendant Gupta also highlighted the Company's new "ramping" contract structure, claiming that it would lead to "long-term engagement" and boost profit margins, stating in pertinent part as follows:

*This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath. It is also positive for ARR growth, which is our most important metric*, but it can create short-term revenue variability due to the timing of license delivery and GAAP revenue recognition.

50.     Later, in response to an analyst question, defendant Gupta indicated that UiPath's revenue growth would accelerate in later years under the ramping model as additional robots were delivered to customers, stating in pertinent part as follows:

So what that means is instead of buying simple annual contracts, what we see a larger demand for is getting larger-term commitments from some of our customers.  *But the way they look at that is instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3.  And those – the license deliveries would happen into those years as we go down*.

\*       \*       \*

- 19 -

And if there's any confusion on ramp, remember what I mean is you can buy robots of 100 per year for a 3-year deal or you can buy robots of 100, 200, 300 in a deal. ***And then the licenses for that additional 100 per year gets delivered in subsequent years. [W]hich is why there is – why that creates variability in terms of revenue recognition***.

51.     On September 8, 2021, UiPath filed with the SEC a quarterly report on Form 10-Q for the quarter ended July 30, 2021, which was signed by defendants Dines and Gupta. The Form 10-Q contained the financial information provided in the 2Q22 Release.

52.     On October 14, 2021, defendants Dines and Gupta presented for UiPath at the Morgan Stanley Spark Conference. During the conference, defendant Gupta was asked how the Company derived its $60 billion total addressable market. In response, defendant Gupta confirmed the purported size of the Company's addressable market and claimed it had been verified in multiple ways, stating in pertinent part as follows:

> ***So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus***. And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. ***When you look at it both qualitative and quantitatively, you can see the massive market that it really is***.

53.     Later in the call, an analyst asked what defendants' response was to concerns that Microsoft may pose a competitive threat. In response, defendant Dines claimed that "Microsoft doesn't even compete" with UiPath's core unattended robot offerings and posed little overall competitive threat to the Company's business, stating in pertinent part as follows:

> So – and I have high respect for Microsoft, especially under Satya. It's a great company. ***And we don't compete really with Power Platform***. Power

Platform, it's a big animal. *We compete within – not even with Power Automate, really*. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.

So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. *This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business.*

Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

*But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality.*

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

*So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear.*

54.    Defendant Dines was also asked about competition from enterprise software providers who were adding automation features to their native program suites, and he again dismissed the competitive pressures as insubstantial, stating in pertinent part as follows:

- 21 -

*Servicetrace.   At least until this point, we really don't compete with ServiceNow or Salesforce.  We simply don't compete with them at this point*.  And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies.  And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.

*So we – in case of ServiceNow, it's also [an] even more stark[] difference between our go-to-markets.  They are primarily an IT shop.  We sell primarily to business lines, to CFO, to operations.  So I see clearly that it's not conflicting. We are actually customers to each other, we and ServiceNow.  So we more partner than compete.  We don't compete right now at this point in time*.

55.    The statements referenced in ¶¶43-54 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them:

(a)    that UiPath's "ramping" contract model and defendants' directions to investors to focus on the bespoke ARR metric created a materially misleading impression of client demand for the Company's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods;

(b)    that part of the motivation for UiPath's "ramping" contract model was the Company's inability to sign up customers for longer-term engagements without substantial discounting;

(c)    that UiPath's actual total addressable market was not as large as portrayed by defendants, because many companies included in the market survey did not need the type of high-cost, high-functionality automation products offered by the Company;

(d)    that UiPath was losing customers to Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were building automation into their platforms;

(e)     that UiPath was losing customers due to the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services;

(f)     that UiPath was suffering from a loss of channel sales due to strained relationships with the Company's partners as a result of increased competition between UiPath and these partners; and

(g)     that, as a result of (a)-(f) above, defendants' statements during the Class Period regarding the Company's business, operations, and key financial metrics such as revenues and ARR were materially false and misleading.

56.     Defendants' failure to disclose the truth about UiPath's ramping contract model and that UiPath was suffering from worsening demand trends and heightened competitive threats violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in UiPath speculative or risky.

57.     On December 8, 2021, UiPath issued a release announcing its financial results for the quarter ended October 31, 2021 (the "3Q22 Release"). The 3Q22 Release revealed that UiPath's growth had stalled further, disclosing that its ARR annual growth rate during the quarter had declined for the third quarter in a row to 58% and that its net new ARR remained subdued at 42% growth year-over-year, down substantially from the 55% growth reported in the 1Q22 Release. On the corresponding conference call, defendant Gupta provided additional information

regarding the Company's progress on transitioning to non-discounted one-year deals and its related

impacts on the quarter, stating in pertinent part as follows:

> And then in terms of the question around duration, billings duration will
> continue to contract for us, and we've talked about this multiple times in terms of
> just our focus now with the cash in the bank that we are going to prioritize more 1-
> year deals and reduce our dependency on multiyear prepaid deals from a cash flow
> standpoint.  That trend continued in the quarter.

58.     On this news, the price of UiPath common stock fell from $47.71 per share on

December 8, 2021 to $44.05 per share on December 10, 2021, a decline of more than $3 per share

over a two-day period, or over 7%, on above-average trading volume.  However, the price of

UiPath common stock continued to be artificially inflated as defendants continued to make

material misstatements and omissions and to conceal the full truth regarding the Company's

business, operations, and financial results.

59.     The 3Q22 Release stated that UiPath had achieved ARR of $818.4 million during

the quarter, representing a 58% year-over-year increase.  The 3Q22 Release also stated that UiPath

had earned revenues of $220.8 million during the quarter, representing a 50% year-over-year

increase.  The 3Q22 Release quoted defendant Gupta, who stated: "'I am pleased with our third

quarter fiscal 2022 results as ARR grew 58 percent and trailing twelve-month revenue grew 57

percent year-over-year, once again demonstrating our market leadership.'"

60.     Also on December 8, 2021, defendants Dines and Gupta hosted a conference call

with analysts and investors to discuss the Company's financial and operational results for the third

quarter of fiscal year 2022.  During his prepared remarks, defendant Dines emphasized the

"considerable demand" he was purportedly seeing for UiPath's platform, stating in pertinent part

as follows:

> In summary, we had a strong Q3, and we continue to drive growth at scale.  ***The
> market is very healthy, and we see considerable demand for our automation
> platform***.  I feel very good about what we have been able to accomplish across the

business since our IPO, and we remain focused on innovation and our customers, which we believe is key to our ongoing success.

61.     Later in the call, defendant Dines similarly stated: "Yes.  It's – we are very pleased with what we are seeing in front of us.  We are seeing a strong Q4.  It's – the demand is there.  We are seeing really very engaged partners.  So overall, we are very pleased with the direction where our business is going."

62.     Defendant Gupta likewise highlighted the purported strength of UiPath's pipeline, stating in pertinent part as follows:

> *The opportunity in front of us is enormous.  We have a strong pipeline*, and we feel very good heading into the end of our first fiscal year as a public company.  We are building a truly multigenerational company that will change how people experience work.  This is what excites us and motivates the team every day.  It also keeps our focus on the long-term value creation for our employees, customers, partners and stockholders.

63.     In response to an analyst question, defendant Dines claimed that UiPath continued to be the "clear leader" among automation providers and was not seeing any intensifying competition, stating in pertinent part as follows:

> In the last quarter, *we have not seen any material moves in terms of the competitive landscape*.  And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position.  *And I would quote them saying that when it comes to real enterprise automation, real scaled enterprise automation, customers are choosing UiPath*.
>
> And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases.  And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases.
>
> So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation.  *We are the clear leader.  And we continue to win deals in very large scores because of our technology and our platform*.

64.     When asked specifically about the competitive threat that Microsoft posed, defendant Dines assured investors that Microsoft had no "*meaningful impact*" on UiPath's "*ability to win customers*," stating in pertinent part as follows:

> In terms of real enterprise traction, *UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration*.
>
> *Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate.  So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers*.
>
> What is going to happen in the next couple of years?  First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer and personnel productivity.  This is a small part of our overall TAM.  *So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now*.

65.     On December 10, 2021, UiPath filed with the SEC a quarterly report on Form 10-Q for the quarter ended October 31, 2021, which was signed by defendants Dines and Gupta.  The Form 10-Q contained the financial information provided in the 3Q22 Release.

66.     The statements referenced in ¶¶59-65 above were materially false and/or misleading when made and failed to comply with applicable SEC rules and regulations because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them, as detailed in ¶¶55-56, *supra*.

67.     Then, on March 30, 2022, UiPath issued a release announcing its financial results for the quarter and year ended January 31, 2022 (the "4Q22 Release").  The 4Q22 Release disclosed that UiPath had earned revenues of just $289.7 million during the quarter, representing year-over-year growth of 39%.  In addition, the 4Q22 Release contained deeply disappointing

ARR and revenue guidance revealing that the declining growth trends adversely impacting UiPath were expected to continue.  Specifically, UiPath projected first quarter 2023 ARR in the range of $960 million to $965 million and fiscal 2023 ARR in the range of $1.2 billion to $1.21 billion. UiPath also projected 2023 revenue in the range of $223 million to $225 million and fiscal 2023 revenue in the range of $1.075 billion to $1.085 billion.  All of these figures were substantially below consensus analysts' expectations.

68.     On the same day, UiPath filed with the SEC a separate release on Form 8-K announcing the abrupt departure of Thomas Hansen, UiPath's Chief Revenue Officer, who was responsible for developing relationships with the Company's current and prospective customers, expanding UiPath's partnership network, and fostering the Company's developer community.  The release also disclosed that UiPath was hiring Chris Weber, a former Microsoft executive, to serve as the Company's Chief Business Officer where he would be responsible for leading UiPath's global go-to-market strategy and for overseeing the Company's worldwide sales, services, and other go-to-market operations.  On the corresponding conference call, defendant Gupta attributed the anticipated slowdown in ARR growth to macroeconomic issues, the emerging war in Ukraine, disruptions caused by the transition in sales leadership, and uncertainty surrounding large deals. However, the magnitude of the guidance reduction belied these representations, which could not reasonably account for the full extent of the slowdown in the Company's anticipated ARR and revenue growth metrics.

69.     On this news, the price of UiPath common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, a decline of $7.45 per share, or more than 25%, on above-average trading volume.

70.     In subsequent written reports, several analysts covering the Company described the ARR and revenue outlook as "disappointing."   For example, a report issued by BMO Capital Markets stated that it was "surprised by the magnitude of the guidance change" and noted that even normalizing for the Ukraine war and macroeconomic issues, the newly issued guidance "suggests ARR growth is expected to decelerate to ~35% y/y."  Analysts at Summit Insights Group similarly observed, based on their own independent channel checks and conversations with industry participants, that UiPath was losing market share to competitors offering lower cost alternatives and established enterprise software providers who could bundle automation software into their native products and, further, that UiPath's relationships with its partners had become strained causing these partners to shift their focus to Microsoft products.  Summit also concluded that many customers and potential customers of UiPath were forgoing the Company's products because of their substantially higher price points as compared to rival offerings, specifically noting that Microsoft's Power Automate provided 80% of the functionality of UiPath's products at less than half the price.  Confirming defendants' scheme to boost UiPath sales in the short term to allow them to dump tens of millions of dollars' worth of UiPath stock, in October of 2022 – approximately one year after UiPath had revealed that it was suspending its discount program – analysts at Evercore reported that customers up for renewal were monitoring their spending at UiPath because the Company had "'remov[ed] many of the discounts that these customers had received initially.'"

71.     By the first quarter of fiscal 2023, UiPath's net new ARR would decline by more than 50% sequentially, to just $51.8 million.  UiPath's revenue growth rate slowed ***every quarter*** from the third fiscal quarter of 2022 to the fourth fiscal quarter of 2023, bottoming out at just 7% year-over-year growth in the fourth fiscal quarter of 2023, belying defendants' representations that

the Company's new contracts issued during the Class Period would "ramp" in later years thereby leading to accelerating revenue increases.  Similarly, UiPath's AAR growth rate declined *every quarter* from the fourth fiscal quarter of 2022 to the first fiscal quarter of 2024, dropping to just just 28% year-over-year growth by the first fiscal quarter of 2024.  Notably, after UiPath hired a Co-CEO, Robert Enslin, he admitted during a conference call that Microsoft's competitive offerings were having a substantial impact on the Company's ability to effectively market its product offerings to clients, stating during a September 7, 2022 investor conference that Microsoft "*certainly does have an impact on how we sell and how we position ourselves in certain companies*.  And that's also the reason why we have to position the platform and get the branding right for the platform."

72.    Ultimately, the price of UiPath stock declined *75% below* the Class Period high, causing plaintiff and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

73.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding UiPath, and their control over and/or receipt and/or modification of UiPath's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

74.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

75.     The Individual Defendants, because of their positions with UiPath, controlled the contents of UiPath's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of UiPath's corporate statements and is, therefore, responsible and liable for the representations contained therein.

76.     Defendants have also admitted that UiPath relied on discounting beginning before the IPO, a fact which was later confirmed by analysts following the Company.  For example, during a September 2021 conference call, defendant Gupta explained that UiPath was "deemphasiz[ing] prepaid deals" and shifting towards "deal structures with annual ramping," which would allow for "lower overall discount levels."  In addition, during a December 2021 conference call, defendant Gupta noted that UiPath was "very deliberate in the intention" of transitioning to annual deals without discounting given that the Company now had "cash in the bank."  The Company's new co-CEO, Robert Enslin, has likewise admitted that the competitive

pressures resulting from Microsoft's products are in fact much more significant than disclosed to investors during the Class Period. Similarly, defendants' purported justification of the switch to a "ramping" contract model has been belied by the Company's subsequent results and channel checks by analysts that follow the Company, which have revealed several consecutive quarters of slowing ARR and revenue growth and the loss of significant customer contracts to UiPath's competitors.

77.     The problems also impacted the most important issues facing the Company that were the focus of UiPath management, including the Individual Defendants. The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding UiPath's competitive position within the automation industry, partner relationships, and client sales.

78.     The turnover in senior leadership at UiPath further bolsters an already compelling inference of scienter, including the departure of UiPath's Chief People Officer, Chief Product Development Officer, Chief Business Officer, multiple directors, and defendant Dines' pending resignation from his Co-CEO position. The Company has also engaged in multiple strategic realignments and workforce reductions in efforts to turn around its business, further confirming that previously unrevealed behind-the-scenes turmoil was impacting the Company during the Class Period.

79.     Defendants and Company insiders also had the motive and opportunity to commit fraud. While the price of UiPath common stock was artificially inflated, Company insiders, including defendant Dines, UiPath's largest shareholders and private equity backers, and members of the Board, collectively sold more than *$810 million* in the IPO and the Individual Defendants went on to collectively sell over *$15 million* worth of additional UiPath shares during the Class Period at fraud-inflated prices.

- 31 -

80.     Defendants' scienter is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 of the Individual Defendants filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about UiPath was made known to them and that the Company's disclosure-related controls were operating effectively.

## NO SAFE HARBOR

81.     UiPath's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.   15 U.S.C. §78u-5(b)(2)(A).

82.     Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of UiPath who knew that the FLS was false.   None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

83.     At all relevant times, the market for UiPath common stock was an efficient market for the following reasons, among others:

(a)     UiPath stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-K for the fiscal year ended January 31, 2022, UiPath had over 459 million shares outstanding as of March 30, 2022;

(c)     as a regulated issuer, UiPath filed periodic public reports with the SEC;

(d)     UiPath regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about UiPath was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

84.     As a result of the foregoing, the market for UiPath common stock promptly digested current information regarding UiPath from publicly available sources and reflected such information in the price of UiPath common stock.  Under these circumstances, all purchasers of UiPath common stock during the Class Period suffered similar injury through their purchases of UiPath common stock at artificially inflated prices, and a presumption of reliance applies.

85.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding UiPath's business,

operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

86.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of UiPath common stock and operated as a fraud or deceit on Class Period purchasers of UiPath common stock by misrepresenting the value of the Company's business and prospects in the Company's operations. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein. As a result of their purchases of UiPath common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of UiPath during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

88.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UiPath common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can

only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by UiPath or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

89.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

90.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

91.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by defendants as alleged herein;

(b)    whether statements made by defendants misrepresented material facts about the business and operations of UiPath; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

92.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

93.     Plaintiff incorporates ¶¶1-92 by reference.

94.     During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes, and artifices to defraud;

        (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of UiPath common stock during the Class Period.

96.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UiPath common stock.  Plaintiff and the Class would not have purchased UiPath common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

97.     Plaintiff incorporates ¶¶1-96 by reference.

98.     Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.   By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.   The Company controlled the Individual Defendants and all of its employees.   By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 6, 2023                    ROBBINS GELLER RUDMAN
                                             & DOWD, LLP
                                             SAMUEL H. RUDMAN

                                             _s/ Samuel H. Rudman_
                                             SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com

                                             ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                             BRIAN E. COCHRAN
                                             FRANCISCO J. MEJIA
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101-8498
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)
                                             bcochran@rgrdlaw.com
                                             fmejia@rgrdlaw.com

                                             ROBBINS LLP
                                             GREGORY E. DEL GAIZO
                                             5060 Shoreham Place, Suite 300
                                             San Diego, CA  92122
                                             Telephone:  619/525-3990
                                             619/525-3991 (fax)
                                             ggaizo@robbinsllp.com

                                             Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Samhita Gera ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _____ day of ^8/31/2023_____,
2023.

DocuSigned by:

CF385B635442498...

Samhita Gera

UIPATH

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 11/10/2021 | 36 | $56.59 |

Prices listed are rounded up to two decimal places.