**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UIPATH, INC. SECURITIES LITIGATION | Case No. 1:23-cv-07908-DLC |
| | CLASS ACTION |
| | JURY TRIAL DEMAND |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

Lead Plaintiff Paul Severt ("Severt" or "Plaintiff"), by and through his attorneys, and on behalf of all others similarly situated, alleges the following as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by UiPath, Inc. ("UiPath" or the "Company"), the Company's Chief Executive Officer ("CEO") Daniel S. Dines ("Dines"), and the Company's Chief Financial Officer ("CFO") Ashim Gupta ("Gupta"), analyst and media reports, conference call transcripts, Company press releases, and other publicly available information.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein.

## I.    SUMMARY OF THE ACTION

1.    This federal securities class action is brought on behalf of all persons and entities that purchased or otherwise acquired UiPath's Class A common stock ("UiPath's common stock") between April 21, 2021 and September 27, 2022, inclusive (the "Class Period"), including all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the registration statement and prospectus ("Offering Documents") issued in connection with UiPath's April 21, 2021 initial public offering ("IPO" or the "Offering") (the "Class"). Plaintiff and the Class bring claims under §§11 and 15 of the Securities Act of 1933, 15 U.S.C. §77a, *et seq.* (the "Securities Act").  They also bring separate claims under §§10(b) and 20(a) of the Securities Exchange Act  of 1934, 15 U.S.C. §78a, *et seq*. (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  The Defendants are UiPath, CEO Dines, CFO Gupta, certain UiPath Directors, certain Funds that invested in UiPath prior to the IPO, and the investment banks that served as Underwriters for the IPO.

2.      UiPath was founded in 2005.  It was among the first companies to offer software which automated various tasks that programs, applications, computers, and related systems would otherwise rely on people to manually carry out – *i.e.*, robotic process automation software ("RPA" or "Robots").

3.      By the time of its April 2021 IPO, UiPath had already largely exhausted its key demographic of customers.  Those were the large organizations for whom substantial purchases of RPA software was feasible as a matter of both economics and technical capacity, and who had fueled UiPath's dramatic pre-IPO revenue growth.  But, lacking a path to significantly expand its business with large customers and to thereby maintain its high growth, UiPath had to focus much more on small and mid-market businesses ("SMBs").  However, SMBs generally lacked the resources and scale to buy significant quantities, if any, of UiPath's Robots.

4.      Making the challenge of landing and expanding its business with large customers and SMBS even more daunting, UiPath's Robots had lost the competitive advantage that had fueled their pre-IPO growth.  UiPath focused on premium, complex Robots and for some time after its founding, its Robots were generally capable of performing better or doing more tasks than those offered by other technology companies.  This contributed to UiPath's high pre-IPO growth rate.  However, in the year before UiPath's IPO, and continuing thereafter, Microsoft and other key competitors had closed the technological gap with UiPath, and were offering RPA software that effective, easier to use, and cheaper than UiPath's.  As a result, starting from before the IPO, Microsoft and other competitors were winning both large customers and SMBs that UiPath was seeking to land, expand, or simply retain.

5.      Between the obstacles with its customer base and potential customers as well as its competitors winning business with cost-effective products, to attempt to maintain its growth rates

UiPath was forced to engage in substantial discounting prior to the IPO.  While UiPath was able to prop up growth with discounting, this undercut the Company's gross profits, gross margins, and net income, and was not financially sustainable.  Nor was discounting a solution to the significant competitive and performance issues that were negatively impacting UiPath.

6.      In violation of the Securities Act, the Offering Documents issued in connection with the IPO described UiPath as a high-growth company, that was far ahead of competitors, and was landing and expanding business from an enormous pool of potential customers.  That was untrue and misleading, as it omitted the obstacles described above and the actual deteriorating state of UiPath's competitive position and growth.  Plaintiff and Class Members who purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents thereby suffered significant losses.

7.      Separately, in violation of the Exchange Act, Defendants made a series of statements extending from the IPO that were materially false and misleading.  Those statements claimed that Microsoft and other competitors were not winning business UiPath sought, that UiPath's "land and expand" model was resulting in significant revenue growth, and that UiPath saw widespread customer demand for its solutions.  However, as the truth described above gradually emerged through several partial corrective disclosures and materializations of the undisclosed risks, UiPath's common stock fell significantly, causing Plaintiff and the Class to lose billions of dollars.

## II.    JURISDICTION AND VENUE

8.      The Exchange Act claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  The Securities Act claims asserted herein arise under §§11 and 15 of the Securities Act (15 U.S.C. §§77k and §77o).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa), and §22 of the Securities Act (15 U.S.C. §77v).

10.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa(a)), and §22 of the Securities Act (15 U.S.C. §77v(a)).  At all relevant times, UiPath was headquartered and conducted business in this District at 90 Park Ave, 20th Floor, New York, New York 10016.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, at all relevant times, UiPath's common stock was offered, sold, and traded on the New York Stock Exchange (the "NYSE"), which is located in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the NYSE, a national securities exchange.

## III.    SECURITIES ACT CLAIMS

### A.    The Securities Act Parties

#### 1.    Securities Act Plaintiff

12.     Lead Plaintiff Paul Severt, as set forth in his previously filed certification (ECF No. 41-2), purchased UiPath's common stock in UiPath's IPO pursuant and traceable to the Offering Documents and was damaged thereby.

#### 2.    Securities Act Defendants

a.    UiPath Defendants

13.    Defendant UiPath is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  UiPath's stock trades on the NYSE under the ticker "PATH."  UiPath is a provider of robotic process automation software. On April 19 and 21, 2021, UiPath respectively filed the final amendment to its Registration Statement and Prospectus for its IPO, pursuant to which it sold 13 million shares of UiPath's common stock.

14.    Defendant Dines co-founded UiPath in 2005 and served at all relevant times as Chairman of UiPath's Board of Directors (the "Board").  Dines also served as the sole CEO of UiPath until April 27, 2022, when the Company announced that he would assume the role of co-CEO alongside Robert Enslin ("Enslin"), effective May 16, 2022.  On July 10, 2023, UiPath announced that Dines would resign from his position as co-CEO effective January 31, 2024 and thereafter assume the newly-created role of Chief Innovation Officer, with Enslin assuming the role as UiPath's sole CEO.  Dines reviewed, contributed to, and signed UiPath's Offering Documents.

15.    Defendant Gupta served at all relevant times as UiPath's CFO.  Previously, upon joining the Company in February 2018 until his appointment as CFO in November 2019, Gupta served as UiPath's Chief Customer Success Officer.  Gupta continues to serve in his role as CFO as of the date of this filing.  Gupta reviewed, contributed to, and signed the Offering Documents.

16.    Defendant Mihai Faur ("Faur") served as UiPath's Global Controller and Chief Accounting Officer at the time of the IPO.  Faur is currently UiPath's Chief Information Officer. Faur reviewed, contributed to, and signed the Offering Documents.

17.    Defendants Dines, Gupta, and Faur are referred to herein together as the "Executive Defendants."

18.     Defendant Philippe Botteri ("Botteri") has served as a member of UiPath's Board since February 2020 and previously served as a Board "observer" beginning in April 2017.  Botteri has also served in various senior roles and as a Partner at Accel (defined *infra* at ¶29) since June 2011 and has held directorships and management positions for several Accel entities.  Botteri reviewed, contributed to, and signed the Offering Documents.

19.     Defendant Carl Eschenbach ("Eschenbach") served as a member of UiPath's Board from March 2021 through March 2023 and previously served as a Board "observer" beginning in November 2018.  Eschenbach has also served as a General Partner at Sequoia (defined *infra* at ¶31) since April 2016.  He reviewed, contributed to, and signed the Offering Documents.

20.     Defendant Michael Gordon ("Gordon") has served as a member of UiPath's Board since September 2020.  Gordon reviewed, contributed to, and signed the Offering Documents.

21.     Defendant Thomas Mendoza ("Mendoza") served as a member of UiPath's Board from October 2017 through June 2021.  Mendoza sold approximately $6.7 million worth of UiPath's common stock in the IPO.  Mendoza reviewed, contributed to, and signed the Offering Documents.

22.     Defendant Daniel D. Springer ("Springer") has served as a member of UiPath's Board since March 2021.  Springer reviewed, contributed to, and signed the Offering Documents.

23.     Defendant Laela Sturdy ("Sturdy") has served as a member of UiPath's Board since March 2021 and previously served as a Board "observer" beginning in November 2018.  Sturdy has also served as a General Partner at CapitalG (defined *infra* at ¶30) since October 2013.  Sturdy reviewed, contributed to, and signed the Offering Documents.

24.     Defendant Jennifer Tejada ("Tejada") served as a member of UiPath's Board from September 2020 through April 2023.  Tejada reviewed, contributed to, and signed the Offering Documents.

25.     Defendant Richard P. Wong ("Wong") has served as a member of UiPath's Board since March 2018.  Wong has also served as a Managing Partner at Accel (defined *infra* at ¶29) since November 2006.  Upon completion of the IPO, Wong was appointed by the Board to serve as the Board's lead independent director, responsible for presiding over periodic meetings, and coordinating certain activities, of the Board's independent directors.  Wong reviewed, contributed to, and signed the Offering Documents.

26.     The Defendants named in ¶¶18-25 above are collectively referred to herein as the "Board Defendants" and with the Executive Defendants, are collectively referred to as the "Individual Defendants."

27.     Due to the Individual Defendants' high-level positions at the Company, they possessed the power and authority to control the contents of UiPath's Offering Documents.  The Individual Defendants were provided with copies of the Company's Offering Documents prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

28.     The Individual Defendants and UiPath are collectively referred to herein as the "UiPath Defendants."

    b.     Fund Defendants

29.     Accel Partners LP ("Accel") is a Palo Alto, California-based venture capital firm that invested in each of UiPath's pre-IPO Series A, B, C, and D fundraising rounds held in April 2017, March 2018, September 2018, and April 2019, respectively.  At the time of UiPath's IPO,

Accel owned 26% of UiPath's Class A common stock, 56.26% of each of UiPath's Series B-1 and B-2 Convertible Preferred Stock, and 22.2% and 21.15% of UiPath's Series C-1 and C-2 Convertible Preferred Stock, respectively. At Accel's direction, UiPath appointed Wong and Botteri to UiPath's Board in March 2018 and February 2020, respectively. Accel and entities associated with Accel sold approximately $297.6 million worth of UiPath's common stock in the IPO.

30.    CapitalG LP (f/k/a Google Capital) ("CapitalG") is a Mountain View, California-based venture capital firm that invested in UiPath's pre-IPO Series B, C, and D fundraising rounds held in March 2018, September 2018, and April 2019, respectively. At the time of UiPath's IPO, CapitalG owned 7.5% of UiPath's Class A common stock, 22.28% of each of UiPath's Series B-1 and B-2 Convertible Preferred Stock, and 44.4% and 42.29% of UiPath's Series C-1 and C-2 Convertible Preferred Stock, respectively. CapitalG and entities associated with CapitalG sold approximately $85.5 million worth of UiPath's common stock in the IPO. At CapitalG's direction, UiPath appointed Sturdy to UiPath's Board in March 2021.

31.    Sequoia Capital Operations, LLC ("Sequoia") is a Menlo Park, California-based venture capital firm that invested in UiPath's pre-IPO Series C and D fundraising rounds held in September 2018 and April 2019, respectively. At the time of UiPath's IPO, Sequoia owned 33.3% and 31.72% of UiPath's Series C-1 and C-2 Convertible Preferred Stock, respectively. At Sequoia's direction, UiPath appointed Eschenbach to UiPath's Board in March 2021.

32.    The Defendants named in ¶¶29-31 above are collectively referred to herein as the "Fund Defendants."

c.    Underwriter Defendants

33.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Morgan Stanley agreed to purchase 5,375,425 shares of UiPath's common stock.  Morgan Stanley also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

34.    Defendant J.P. Morgan Securities LLC ("JPM") is a financial services company that acted as an underwriter for the IPO.  In the IPO, JPM agreed to purchase 5,375,425 shares of UiPath's common stock.  JPM also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

35.    Defendant BofA Securities, Inc. ("BofA") is a financial services company that acted as an underwriter for the IPO.  In the IPO, BofA agreed to purchase 2,516,496 shares of UiPath's common stock.  BofA also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

36.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Credit Suisse agreed to purchase 2,516,496 shares of UiPath's common stock.  Credit Suisse also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

37.    Defendant Barclays Capital Inc. ("Barclays") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Barclays agreed to purchase 1,321,957 shares of UiPath's common stock.  Barclays also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

38.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Wells Fargo agreed to purchase

1,321,957 shares of UiPath's common stock.  Wells Fargo also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

39.     Defendant SMBC Nikko Securities America, Inc. ("SMBC Nikko") is a financial services company that acted as an underwriter for the IPO.  In the IPO, SMBC Nikko agreed to purchase 724,686 shares of UiPath's common stock.  SMBC Nikko also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

40.     Defendant BMO Capital Markets Corp. ("BMO") is a financial services company that acted as an underwriter for the IPO.  In the IPO, BMO agreed to purchase 724,686 shares of UiPath's common stock.  BMO also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

41.     Defendant Mizuho Securities USA LLC ("Mizuho") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Mizuho agreed to purchase 724,686 shares of UiPath's common stock.  Mizuho also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

42.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is a financial services company that acted as an underwriter for the IPO.  In the IPO, KeyBanc agreed to purchase 605,234 shares of UiPath's common stock.  KeyBanc also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

43.     Defendant TD Securities (USA) LLC ("TD") is a financial services company that acted as an underwriter for the IPO.  In the IPO, TD agreed to purchase 485,779 shares of UiPath's common stock.  TD also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

44.     Defendant Truist Securities, Inc. ("Truist") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Truist agreed to purchase 485,779 shares of UiPath's common stock.  Truist also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

45.     Defendant Evercore Group L.L.C. ("Evercore") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Evercore agreed to purchase 246,871 shares of UiPath's common stock.  Evercore also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

46.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Macquarie agreed to purchase 246,871 shares of UiPath's common stock.  Macquarie also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

47.     Defendant Nomura Securities International, Inc. ("Nomura") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Nomura agreed to purchase 246,871 shares of UiPath's common stock.  Nomura also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

48.     Defendant RBC Capital Markets, LLC ("RBC") is a financial services company that acted as an underwriter for the IPO.  In the IPO, RBC agreed to purchase 246,871 shares of UiPath's common stock.  RBC also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

49.     Defendant Cowen and Company, LLC ("Cowen") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Cowen agreed to purchase 246,871 shares of

UiPath's common stock.  Cowen also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

50.     Defendant Canaccord Genuity LLC ("Canaccord") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Canaccord agreed to purchase 179,181 shares of UiPath's common stock.  Canaccord also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

51.     Defendant D.A. Davidson & Co. ("D.A. Davidson") is a financial services company that acted as an underwriter for the IPO.  In the IPO, D.A. Davidson agreed to purchase 119,454 shares of UiPath's common stock.  D.A. Davidson also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

52.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Oppenheimer agreed to purchase 119,454 shares of UiPath's common stock.  Oppenheimer also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

53.     Defendant Needham & Company, LLC ("Needham") is a financial services company that acted as an underwriter for the IPO.  In the IPO, Needham agreed to purchase 59,727 shares of UiPath's common stock.  Needham also sold additional UiPath common stock in the IPO pursuant to an "over-allotment" option permitted by UiPath.

54.     The Defendants named in ¶¶33-53 above are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants served as underwriters for the IPO and collectively sold 27,474,393 million shares of UiPath's common stock to investors.  The Underwriter Defendants collectively received approximately $77 million in fees and commissions for soliciting and selling UiPath's common stock in the IPO, including the "over-allotment" option

agreed upon by the Defendants in the Offering Documents that allowed the Underwriter Defendants to collectively purchase an additional 3,583,616 shares of UiPath's common stock at the public offering price, less the underwriting discount of $2.80. Each underwriter is liable for the untrue and misleading statements in the Offering Documents pursuant to the Securities Act for the following reasons:

(a)     The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting IPOs of securities. They served as the underwriters of the IPO and collectively shared tens of millions in fees. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to market and sell UiPath's common stock in the IPO. In the competition that determined the composition of the underwriting syndicate, the Underwriter Defendants promoted their ability to market UiPath's common stock. Each Underwriter Defendant designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market UiPath's common stock, and those personnel worked on and approved the content of UiPath's Offering Documents and road show presentations. The Underwriter Defendants arranged a road show prior to the IPO during which they, along with certain of the Individual Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects. The Underwriter Defendants also promoted the IPO to their banks' own clients and sold shares to online brokerage account holders.

(b)     The Underwriter Defendants also demanded and obtained an agreement from UiPath that the Company would indemnify and hold the Underwriter Defendants

harmless from any liability under the federal securities laws.  They also made certain that UiPath had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted UiPath and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of UiPath, an undertaking known as a "due diligence" investigation.  That was not accurate.

(d)     During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning UiPath's operations and financial prospects.

(e)     In addition to availing themselves of widespread access to internal corporate documents, agents of the Underwriter Defendants met with UiPath's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO.  During these sessions, understandings were reached as to: (i) the strategy for the IPO; (ii) the terms of the IPO, including the price range at which UiPath common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about UiPath would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and UiPath's management and top executives, the Underwriter Defendants knew, or should have known, of UiPath's existing undisclosed problems, as detailed herein.

(f)     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the offer and sales of the UiPath's common stock, pursuant and/or traceable to the IPO, and solicited and sold UiPath's common stock in the IPO to Plaintiff and the other members of the Class (defined herein).

55.     The Underwriter Defendants were negligent in not knowing of and/or not including the Company's undisclosed existing problems and plans and the materially untrue statements and omissions contained in the Offering Documents, as detailed herein.  Their negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

**B.      Background Leading Up to the IPO**

56.     Founded in 2005 by Defendant Dines, UiPath was among the first companies to offer software which automates various tasks that programs, applications, computers, and related systems would otherwise rely on people to carry out.  Such software is referred to as robotic process automation.  As an example, RPA can be programed to pull mundane information from regularly-filed documents and compile that information, rather than forcing an individual to do it as a manual task.

57.     Robots range from complex to simple, in terms of how much upfront programing and training is required by a customer for them to accomplish a particular task, how difficult it is to integrate them within a customer's other software or systems, and how much support they need to operate on an ongoing basis.  The simple end of the spectrum encompasses "LowCode" or "NoCode" Robots, which enable businesses to enjoy the benefits of RPA in a faster and cheaper manner.  In general, when using a NoCode or LowCode solution a user can automate a task with little or no programming knowledge.  On the other end of the spectrum are complex Robots that

are designed for experienced developers and testers interested in utilizing advanced features to build complex enterprise-wide processes and automations. Robots can also be categorized as attended or unattended, with attended Robots requiring more user interaction and support. UiPath's business strategy focused on driving customers to the more complex and more expensive Robots.

58.     UiPath's Robots were at one point generally capable of performing better or doing more tasks than the Robots designed by many other technology companies. This was in part because, as an early pure-play RPA developer, UiPath had a head start. It was also a deliberate business strategy, with UiPath focusing on more complex, expensive Robots and trying to position them as commercially differentiated, premium products with capabilities other technology companies could not match.

59.     Although that strategy initially contributed to UiPath's growth, by 2020 – about a year before the Company's IPO – it was backfiring for several reasons.

60.     *First*, by that time, key competitors had closed the technological gap with UiPath and were winning business and customers UiPath sought.

61.     Of particular importance, in 2020, Microsoft completed its transformation from a company that offered limited RPA products to a formidable RPA vendor. That transformation had taken several years, and began with Microsoft actually working as UiPath's partner, where the two companies would offer customers a combination of UiPath's Robots and Microsoft's other services. But in 2015 and 2016 Microsoft began releasing its own RPA software line, under the name Power Apps, which was later named Power Automate. Then, in 2018, Microsoft acquired GitHub, an RPA developer, and used GitHub's software to improve its Power Automate Robots.

Microsoft doubled-down on that strategy in May 2020, acquiring another RPA developer, Softomotive Holding Ltd ("Softomotive").

62.    Following its Softomotive acquisition, Microsoft's upgraded Power Automate Robots posed significant competition to UiPath by the second half of 2020.  Unlike UiPath, Microsoft emphasized simpler LowCode or NoCode Robots and turned that into a competitive advantage.  Compared to UiPath's Robots, Power Automate was easier for customers to use, easier for customers to integrate into their systems – many of which were already based on other Microsoft products – and could perform the core tasks that most customers wanted to address through RPA.

63.    Moreover, as a large, multifaceted technology company, Microsoft could take advantage of various efficiencies, including economies of scale and scope, to offer Power Automate at much cheaper prices than the amount UiPath was attempting to charge for its more complex robots.  As a result, with Power Automate's combination of substantial utility, ease of use, and attractive price, Microsoft more than made up for whatever technological advantage UiPath's Robots may have had.

64.    By 2020, a range of other competitors were also creating downward pressure on pricing for RPA software along with, and in response to, Microsoft – in effect, commoditizing the once niche RPA software market.  This included mega application software suppliers like Salesforce and ServiceNow who were improving their RPA products through acquisitions and their substantial resources and opportunities for efficiencies, as well as early pure-play RPA software developers, such as Automation Anywhere and Blue Prism, who like UiPath offered more technologically intensive, complex Robots.

65.    ***Second***, by 2020, UiPath had already signed up many of the large enterprises for whom its complex, expensive Robots were realistic purchases, which undercut UiPath's ability to maintain the large growth rates it had achieved in previous years – even before the materially increased competition in 2020 discussed above.  For the most part, only large enterprises had both the resources to implement and support a substantial number of UiPath's Robots, as well as the scale at which the expense of supporting and licensing those Robots was still cost-effective.  Many large enterprise customers who were also satisfied limited their purchases to a department or two, rather than expanding licenses of UiPath's Robots throughout their organizations, which UiPath needed to continue fueling its growth.

66.    UiPath attempted to maintain its high-growth rate by expanding its customer base to SMBs, but by 2020 those efforts were already not working.  To the extent SMBs had a budget for RPA software, they had a limited number of users and departments who were candidates for Robots, often just those in finance or accounting roles.  Further, cheaper and easier to use LowCode / NoCode Robots were better suited to SMBs than UiPath's Robots.  As such, when UiPath was able to sign up SMBs, it generally could only get them to license a small number of its Robots, which did not generate enough revenue to maintain its high growth rates.

67.    The two foregoing factors – increased competition and saturation of its most valuable customers – combined in 2020 to form a potent obstacle to UiPath's high growth rate.  Unlike earlier years, when large enterprises wanted to license UiPath's RPA software, by 2020 they had simpler and cheaper options than UiPath, with Microsoft's Power Automate particularly attractive.  Licensing cheaper, simpler RPA software from the likes of Microsoft was an even easier choice that SMBs were making as well.  This calculus was not only limiting UiPath's ability to land new customers, but was also limiting its ability to maintain and expand business with

existing customers. Moreover, because UiPath was now competing against several of the key partners with whom it was also nominally working with in additional sales channels, such as Microsoft, that new competitive dynamic was constricting its ability to grow through those channels too.

68.     In the quarters leading up to the April 2021 IPO, UiPath responded to these obstacles by providing significant discounts to its list prices – bringing them to similar levels as the prices of Microsoft and other competitors – in order to land, expand, and keep customers. This discounting enabled UiPath to maintain its relatively high revenue growth rate through the IPO. But the discounting was not a financially sustainable response, and amounted to UiPath giving Robots away at prices that left it with little to no net returns. Nor was the discounting a substantive response to the obstacles UiPath was facing, as the Company still had to find ways to compete with the simpler, cheaper, and easier to support RPA software that customers from large enterprise businesses to SMBs were choosing through other vendors. Further, UiPath had to build out a sales strategy to work with SMBs, and revamp its sales force to fend-off large competitors like Microsoft for all potential customers.

C.     **UiPath's IPO**

69.     On March 26, 2021, Defendants filed a Registration Statement on Form S-1 with the SEC, which would be used for the UiPath IPO following multiple amendments in response to SEC comments.

70.     On April 19, 2021, Defendants filed the final amendment to the Registration Statement, which registered 27,474,393 shares of UiPath's common stock for public sale, which was comprised of 9,416,384 shares to be offered by the Company, 14,474,393 shares to be offered by certain selling stockholders (including Defendants Accel, CapitalG, Dines, and Mendoza), and

an over-allotment option whereby the Underwriter Defendants could acquire from the Company and sell an additional 3,583,616 shares.  The SEC declared the Registration Statement effective the following day, April 20, 2021.  That same day, Defendants priced the IPO at $56.00 per share and on April 21, 2021, Defendants filed the final Prospectus for the IPO, which forms part of the Registration Statement.  On April 23, 2021, Defendants completed the IPO, issuing all 27,474,393 shares – which included the over-allotment – to the investing public and generated almost $1.54 billion in gross proceeds.

71.    As detailed below (at §III.E.), the Offering Documents UiPath issued in connection with the IPO contained a series of untrue and misleading statements that misstated and/or omitted (1) the difficulty it was having maintaining its high revenue growth rate, (2) its heavy reliance on discounting to do so, (3) the price pressure from Microsoft and other competitors, and (4) its limited opportunities beyond longstanding enterprise customers, particularly with SMBs.  The Offering Documents instead described UiPath as a high-growth company, far ahead of its competitors, with significant success with its "land-and-expand business model," its robust sales pipeline, and its enormous TAM, signaling to investors that the Company was on the cusp of – if not already – operating profitably.

### D.    Materiality of the Undisclosed Information

72.    Defendants continued to omit the undisclosed problems set forth above that UiPath was suffering from for some time after the IPO, but eventually and slowly made a series of partial statements which demonstrated the longstanding nature and materiality of those problems along with the material risks they represented to UiPath.

73.    In September 2021, Defendant Gupta stated for the first time that, dating back to before the IPO, UiPath had been relying on "discounts" with customers to get "cash in the door,"

which was not one of their "better economic decisions."  Indeed, the discounting was contributing to UiPath's deteriorating gross profit, gross margin, and net income.  The IPO occurred on April 21, 2021, nine days before UiPath's 1Q 2022 ended.  Although the results of that quarter were effectively set by the time of the IPO, the Defendants did not disclose UiPath's performance for 1Q 2022 in the Offering Documents.  When Defendants later reported UiPath's 1Q 2022 results, they included notable decreases for gross profit, gross margin, and net income, both on a year-over-year basis and sequentially.  Those metrics were consistently worse after the IPO than before.  Moreover, whereas UiPath's gross profits had been increasing on a year-over-year basis of about 100% or more in the first half of FY 2021, it was markedly lower in the second half of FY 2021, as the IPO approached and discounting mounted.

74.    As noted above, one reason for UiPath's discounting was increased competition from large technology companies offering much improved LowCode / NoCode Robots at cheap prices, and other longstanding RPA vendors offering more complex Robots at cheap prices as well.  By 2022, Defendants stated for the first time that UiPath was facing significant competition from Microsoft's cheaper LowCode / NoCode Power Automate, and indicated that this was affecting UiPath's pricing and how it marketed its products.  Specifically, Defendants stated that they had been seeing Microsoft in most deals UiPath was competing for, and later in September 2022 at an Evercore ISI conference Defendants stated that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies."  Defendants had consistently denied these points previously, even though Microsoft's revenue from Power Automate had been increasing significantly over the previous years, among other indications that Microsoft was a formidable competitor.

75.     At the same September 2022 Evercore ISI conference that Defendants made statements regarding competition from Microsoft, they also stated that UiPath was working to improve its low-code offerings, with the creation of low-code application development capabilities—a concession to customers' widespread interest in competitors' cheaper, effective and easier to use low-code products.  The difficulty UiPath's customers were having in using and supporting its complex Robots was reflected in the Company's Maintenance & Support and its Service & Other revenue lines.  Those lines includes revenue from technical support, and revenue from certain fees related to customer training and implementation, respectively.  UiPath's third and main revenue line was License revenue, which primarily represents proceeds from the sale of software licenses.  UiPath's Maintenance & Support revenue along with its Service & Other revenue consistently grew at a higher year-over-year rate than its Licenses revenue – both in terms of the revenue they were taking in and the cost of that revenue.  That is, both UiPath's customers and UiPath itself were having to spend significant sums of money just to enable the customers to understand how to use and support UiPath's complex Robots.  This was a significant competitive obstacle that further contributed to UiPath's need to discount, as industry analysts reported that the average cost of implementing UiPath's Robots averaged $60,000 to $100,000, while implementing Microsoft's Power Automate averaged just 40-50% of that cost.  In another concession to address the difficulty customers were having using its complex Robots, later in 2022 UiPath also announced that it was introducing a "solution accelerator" to "provide our customers with the technical know-how to help them complete the implementations significantly faster."

76.     Another reason for UiPath's discounting, as noted above, was that it had already saturated its most lucrative large enterprise customers and was generally having difficulty expanding its business with existing customers.  At the September 2022 Evercore conference,

UiPath's co-CEO Enslin acknowledged the Company's difficulty expanding business with existing customers by explaining that UiPath's customer contacts were generally with people lower down in the organizational structure who "can't take it [UiPath's Robots] broader"—such as people within a finance or IT department. Accordingly, UiPath was attempting to "reposition" its customer contacts toward the C-suite, as those personnel had the authority to make broad purchases of UiPath's solutions, and such broad purchases were necessary to maintain UiPath's growth. Several months later, Enslin similarly stated that UiPath "acquires customers really well," but "acquired them in small departments," and didn't "scale [them] well."

77.     UiPath was also having difficulty generating significant revenue outside of large enterprises, especially with SMBs. With respect to UiPath's difficulty winning and retaining business from those customers, Enslin stated in December 2022 that "the majority of [UiPath's] churn is in the smaller customers . . . and you should expect to see churn in the smaller customer market."

78.     Based on the statements above and those in the next paragraph, UiPath's saturated base of large customers and difficulty expanding business with its existing customers was reflected in certain UiPath customer data gradually provided after the IPO. In terms of UiPath's customers with an ARR of at least $100,000, the rate of customers crossing that threshold was declining on both year-over-year and sequential bases, with most quarters UiPath adding no more than 100 or so net customers into that category. Likewise, in terms of UiPath customers with an ARR of at least $1 million, the rate of customers crossing that threshold was declining on both year-over-year and sequential bases as well, with most quarters UiPath adding no more than 15 or so net customers into that category. Thus, few customers were significantly expanding their licensing of UiPath's robots at all, undercutting UiPath's growth. After the IPO, an analyst reporting on industry

contacts echoed that data and stated its belief that the majority of UiPath's customers licensed less than ten of its Robots—therefore, UiPath profits from such licenses were small to nonexistent, limiting the actual value derived from many of its customers.

79.    Substantial changes to UiPath's sales strategy reinforced the foregoing points. UiPath's Sales & Marketing expenses increased dramatically in 1Q 2022 – the quarter that ended just nine days after the IPO – more than doubling on both year-over-year and sequential bases and remained elevated thereafter, as UiPath struggled with sales to maintain its growth.  On March 30, 2022, UiPath announced that Chris Weber ("Weber") was joining as the Company's first Chief Business Officer.  That same day, UiPath announced that the Company's Chief Revenue Officer Thomas Hansen would be departing.  Weber notably came from Microsoft, where he specialized in sales to SMBs—signaling that UiPath needed to improve its performance against Microsoft and in the SMB cohort.  However, at the September 2022 Evercore conference, Weber announced that UiPath was shifting its sales team to focus more on larger enterprise customers, as opposed to SMBs, because the larger enterprise customers were the only ones with any meaningful "propensity" to spend significant money on UiPath's products.  By March 2023, Weber resigned after less than year, with these sales strategy changes insufficient to overcome the structural obstacles UiPath had been facing.

80.    Accordingly, the only meaningful response that UiPath had to increased competition and limited customer appetite for its Robots, dating back to before the IPO, was its undisclosed discounting.  As of the IPO, the Offering Documents showed that the Company's overall revenue—and in particular its License revenue and its Maintenance & Support revenue, which were most closely tied to customer Robot usage—was maintaining high year-over-year growth rates.  Likewise, UiPath maintained high year-over-year growth rates for ARR through the

IPO, particularly striking for a company that was already relatively old and large.  But in 1Q 2022, the first quarter after the IPO, UiPath's revenue growth rate had a sizable drop compared to the previous quarter.  UiPath's ARR growth rate, propped up by theoretical future revenue fueled by discounted sales, which Defendants told investors to focus on, remained relatively stable throughout FY 2022.  From 1Q 2023 (which began on February 1, 2022) through the balance of FY 2023, however, UiPath's overall financial performance and growth deteriorated, as it was overwhelmed by the significant obstacles set forth above, notwithstanding its discounting.  UiPath's ARR, in other words, had been largely empty revenue, that did not accurately reflect UiPath's competitive position or customer demand.

### E.    Materially Untrue and Misleading Statements and Omissions in UiPath's April 21, 2021 Offering Documents

81.    UiPath's Offering Documents included multiple untrue statements and omissions concerning then-existing problems, conditions and trends that misled investors regarding the Company's revenue growth, discounting, competitive position, customer demand, land-and-expand strategy, sales, and TAM.  Additionally, UiPath's Offering Documents issued misleading risk warnings regarding multiple supposedly hypothetical risks that had ***already*** come to pass.

82.    The Offering Documents include the following two graphics about UiPath's ARR in the introduction:

*Graphic No. 1*



*Graphic No. 2*



83.     In touting ARR, the Offering Documents explained that "ARR is ***the key metric*** we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers." Emphasis added.  As noted below, Defendants would repeat this statement throughout the Class Period.

84.     The Offering Documents similarly touted "the success of our land-and-expand business model" and claimed that UiPath's ARR demonstrates the Company's "ability to expand within our customer base," as well as UiPath's "rapid growth":

We believe that the ***success of our land-and-expand business*** model is centered on our ability to deliver significant value in a very short time. We grow with our customers as they identify and expand the number of business processes to automate, which increases the number of robots deployed and the number of users interacting with our robots. ***Our ability to expand*** within our customer base is demonstrated by our dollar-based net retention rate, which represents the rate of net expansion of annualized renewal run-rate, or ARR, from existing customers over the last 12 months . . . ***We have experienced rapid growth.*** Our ARR was $351.4 million and $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively, representing a growth rate of 65%. Approximately 30% of this growth rate was due to new customers and 70% of this growth rate was due to existing customers.

Emphasis added.

85.    In a similar vein, the Offering Documents claimed that:

***Historically***, once our platform is deployed, our customers have ***significantly expanded their use of our platform*** by engaging with our customer success team ***as well as increasing use and spend across our product categories and pivoting into enterprise agreements for the entire platform***.

Emphasis added.

86.    The Offering Documents also repeatedly emphasized UiPath's focus on both SMBs

and enterprise customers:

We have an efficient go-to-market model, which consists primarily of an enterprise field sales force supplemented by a high velocity inside sales team focused on small and mid-sized customers as well as a global strategic sales team focused on the largest global customers.

87.    In a section titled "Our Focus on Driving Operational Efficiency and Hyper-

Growth," the Offering Documents painted a bullish picture of the Company's current and future

growth prospects:

In fiscal year 2021, we continued our focus on demonstrating the operational leverage in our business model, while prioritizing investments that will allow us to continue to achieve best-in-class growth and business scale and to capitalize on our significant market opportunity. We have made incredible progress in building a world-class business. Today, we are a company committed to solving for both growth and efficiency and ***have accelerated our path to profitability while continuing to deliver hyper-growth***.

Emphasis added.

88.    In discussing the Company's TAM, the Offering Documents repeatedly claimed UiPath's "current global market opportunity" is "more than $60 billion, which we expect will grow as automation adoption increases and customers continue to further explore the use cases that our platform addresses."

89.    The Offering Documents also contained a number of "risk factors" that purported to warn investors about hypothetical risks that could materialize *in the future*, including:

- "Our recent rapid growth *may not* be indicative of our future growth."

- "Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners. Declines in renewals or the purchase of additional licenses by our customers *could* harm our future operating results."

- "*If* we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected."

- "The markets in which we participate are competitive and, *if* we do not compete effectively, our business, financial condition, and results of operations *could* be harmed."

Emphasis added.

90.    Unfortunately for investors, the above Class Period statements were untrue and misleading because at the time of the IPO UiPath was experiencing substantial competition from Microsoft and other low-cost competitors.  This was undermining UiPath's revenue and ARR growth, and forcing it to offer substantial discounts to land, expand, and simply retain customers or potential customers, which undercut UiPath's gross margins, profits, and financial viability.  As noted above, due to UiPath's already saturated base of enterprise customers, future growth was heavily dependent on attempting to acquire new SMBs and to maintain and expand UiPath's relationship with existing enterprise customers.  However, contrary to the rosy picture of growth

painted by the Offering Documents, competition from (i) Microsoft, which had become a significant competitor for UiPath, offering less expensive RPA solutions, and (ii) other large technology companies or early RPA developers, which offered less expensive and/or easier to use RPA solutions, was securing business that UiPath needed to maintain its high growth rate and was forcing UiPAth to offer significant, financially unsustainable discounts to attempt to compete on price.  This problem was particularly acute for SMBs, who had fewer resources and less scope to support RPA software.  By the end of 2020, to land new customers and expand existing customers, UiPath was forced to offer deep discounts that cut into UiPath's gross profits, gross margins, and net income, while increasing its cost of revenue.  At the time of the IPO, which occurred just nine days prior to the end of 1Q 2022, UiPath was experiencing a significant, and undisclosed, reduction in gross margin and license revenue.  Also, UiPath's discounting rendered the Company's ARR misleading because it was based on unsustainable and/or unprofitable discounts.

### F.    The Offering Documents Failed to Adequately Disclose Material Known Trends and Uncertainties in Violation of SEC Regulations

91.    UiPath's Offering Documents failed to disclose information required to be disclosed therein by Item 303 (17 C.F.R. §229.303).  Item 303 requires the disclosure of "any known trends or uncertainties that have had or that [the] registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations" of the registrant.

92.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

93.     Therefore, Item 303 required disclosure of UiPath's discounting practices prior to the IPO; the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with its most valuable customers; and the impact these undisclosed trends were having on UiPath's 1Q 2022 ARR, revenue, cost of revenue, and gross margin.

94.     Further, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, also imposes an independent duty on Defendants to ensure that the "Risk Factors" section of the Offering Documents discusses "the most significant factors that make [the offering] . . . speculative or risky" and that each risk factor "adequately describes the risk." However, the Offering Documents did not properly disclose the risks identified in ¶93 above.

### G.     Causes of Action

### COUNT I
### Violation of §11 of the Securities Act
### (Against UiPath, the Underwriter, and the Individual Defendants)

95.     Plaintiff realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of UiPath and the Underwriter and Individual Defendants to defraud Plaintiff or the Class.

96.    This Count is based on UiPath and the Underwriter and Individual Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the IPO.

97.    This Count is asserted against UiPath, the Individual Defendants, and the Underwriter Defendants for violation of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's April 21, 2021 initial public offering.

98.    As alleged above, the Offering Documents contained untrue statements and omissions of material fact concerning, among other things, UiPath's discounting practices prior to the IPO; the extent to which UiPath competed with Microsoft and multiple other companies; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with its most valuable customers; and the impact these undisclosed trends were having on in UiPath's 1Q 2022 ARR, revenue, cost of revenue, and gross margin.

99.    As an issuer of the registered securities, UiPath is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

100.    None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering

31

Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

101.    Class Members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities. As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damages in connection with its purchase of UiPath's common stock sold through the IPO.

102.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

103.    By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to members of the Class who purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents.

## COUNT II
### Violation of §15 of the Securities Act
### (Against the Individual and Fund Defendants)

104.    Plaintiff realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or the Class.

105.    This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are specifically excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the IPO.

106. This Count is asserted against the Individual and Fund Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's April 21, 2021 initial public offering.

107. UiPath is strictly liable under §11 for untrue statements and omissions of material fact in the Offering Documents.

108. During their tenures as officers or directors of UiPath, the Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their positions of control and authority as officers or directors of UiPath, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

109. As more fully described above, the Individual Defendants caused UiPath to conduct the IPO and signed the Offering Documents pursuant to which the IPO was conducted. Moreover, in their capacities as senior corporate officers of the Company, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and in the IPO. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of UiPath within the meaning of §15 of the Securities Act.

110. At the time of the IPO, the Fund Defendants, by virtue of their Board appointees, voting power, and specific acts were controlling persons of the Company or, at the least, by virtue of *respondeat superior* and agency principles, controlling persons Defendants Wong, Botteri, Sturdy, and Eschenbach, within the meaning of §15 of the Securities Act, and had the power and

authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

111.    The Fund Defendants caused UiPath to conduct the IPO and the Fund Defendants' Board appointees signed the Offering Documents pursuant to which the IPO was conducted.  As a result of the foregoing, the Fund Defendants, together and individually, were controlling persons of UiPath within the meaning of §15 of the Securities Act.

112.    By virtue of the conduct alleged in this Complaint, the Individual and Fund Defendants are liable for the aforesaid wrongful conduct and are liable to members of the Class who purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents.

## IV.    EXCHANGE ACT CLAIMS

### A.    The Exchange Act Parties

#### 1.    *Exchange Act Plaintiff*

113.    Lead Plaintiff Paul Severt, as set forth in his previously filed certification (ECF No. 41-2), purchased UiPath's common stock during the Class Period and suffered damages as a result of the federal securities law violations and actionable statements and material omissions alleged herein.

#### 2.    *Exchange Act Defendants*

114.    Defendant UiPath is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  UiPath's stock trades on the NYSE under the ticker "PATH."  UiPath is a provider of robotic process automation software. On April 19 and 21, 2021, UiPath respectively filed the final amendment to the Registration Statement and Prospectus for its IPO, pursuant to which it sold 13 million shares of UiPath's

common stock.  During the Class Period, UiPath, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated the securities laws and contained materially false and misleading statements.

115.    Defendant Dines co-founded UiPath in 2005 and served at all relevant times as Chairman of UiPath's Board of Directors.  Dines also served as the sole CEO of UiPath until April 27, 2022, when the Company announced that he would assume the role of co-CEO alongside Enslin, effective May 16, 2022.  On July 10, 2023, UiPath announced that Dines would resign from his position as co-CEO effective January 31, 2024 and thereafter assume the newly-created role of Chief Innovation Officer, with Enslin assuming the role as UiPath's sole CEO.  Dines reviewed, contributed to, and signed UiPath's actionable Offering Documents and throughout the Class Period, signed UiPath's FY 2022 Form 10-K and made statements in the Company's press releases, earnings conference calls, and at other public events, and which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Dines made the false and misleading statements with scienter.

116.    Defendant Gupta served at all relevant times as UiPath's CFO.  Previously, upon joining the Company in February 2018 until his appointment as CFO in November 2019, Gupta served as UiPath's Chief Customer Success Officer.  Gupta continues to serve in his role as CFO as of the date of this filing.  Gupta reviewed, contributed to, and signed the Offering Documents and throughout the Class Period, signed UiPath's FY 2022 Form 10-K and each Form 10-Q and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Gupta made the false and misleading statements with scienter.

117.     Due to the Defendants Dines and Gupta's high-level positions at the Company, they possessed the power and authority to control the contents of UiPath's Offering Documents and filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors, *i.e.*, the market.  Defendants Dines and Gupta were provided with copies of the Company's SEC filings, reports, and press releases alleged herein to be materially false, misleading, and incomplete prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, Defendants Dines and Gupta knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue were materially false, misleading, and incomplete when made.

**B.     Background**

118.     Plaintiff realleges the allegations contained in ¶¶56-80 above.

119.     The substantial competitive, pricing, and structural obstacles UiPath faced prior to the IPO continued and grew even worse after the IPO.  For example, Microsoft's ability to compete and offer a total package that outperformed UiPath's Robots accelerated further.  Other large technology companies that provided critical applications to customers improved their RPA software offerings and bundled them with those applications, further improving their ability to compete against UiPath as well.  Free opensource RPA also increasingly became available, offering customers yet another cheap RPA alternative to UiPath, and other early RPA developers were offering cheaper, effective RPA products as well.  All of this negatively impacted UiPath's performance.

C.    **False and Misleading Statements and Omissions Giving Rise to Liability Under the Exchange Act**

120.    Throughout the Class Period, in numerous SEC filings and public statements, Defendants issued materially false and misleading statements and omissions that misrepresented and/or concealed from investors UiPath's deep discounting, the failure of its "land-and-expand" approach, and the true nature Microsoft's and multiple other companies' competitive threat, and the resultant impact on UiPath's key earnings metrics, including revenue, ARR, and gross margin. Additionally, Defendants repeatedly touted a $60 billion TAM, an unachievable goal in light of the resistance to further RPA expansion from large customers and meaningful RPA purchases from SMBs.

121.    Defendants' actionably false and misleading statements and omissions are separately enumerated below.

1.    *April 21, 2021 Offering Documents*

122.    Plaintiff realleges the false and misleading statements and omissions contained in the Offering Documents and noted in ¶¶81-90, above.

2.    *June 8-9, 2021 Earnings Press Release, Call, Form 10-Q*

123.    After the market closed on June 8, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 1Q 2022, which ended April 30, 2021, stating that during the quarter UiPath had achieved ARR of $652.6 million, a 64% year-over-year increase, and revenue of $186.2 million, a 65% year-over-year increase. While the press release and earnings call noted a drop in UiPath's gross margin, Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including Defendant Dines' claim on the call that UiPath experienced an "***exceptionally strong*** start to fiscal year 2022 . . . a testament to our leadership position in enterprise software automation." Emphasis added.

124.    On that day's earnings call, Dines reiterated UiPath's "***ARR growth***," adding that "***[w]e continue to grow multiples of the market and take market share***."  Emphasis added. Similarly, Defendant Gupta, who opted to "remind [investors] that we run and manage our business on ARR, ***which is most representative of the underlying performance of our business***," claimed that UiPath had:

> ***yet again delivered meaningful growth at scale***.  Given ***our total addressable market of over $60 billion***, the continued expansion of our automation platform and ***our validated lead in the market***, we believe there remains ample room for us to continue to drive durable long-term growth.  As a market leader, we know the inflection point in the adoption of automation is now as customers are choosing their long-term strategic partner.  And as our results underscore, ***we are consistently winning these competitive evaluations*** . . .

Emphasis added.  As a result, Gupta explained, "the opportunity in front of us is enormous and growing.  ***Our strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel***."  Emphasis added.

125.    During the question-and-answer portion of the call, Gupta explained the supposed momentum of the Company's ARR: new customers.

> I just want to start by emphasizing the strength of our quarter.  $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR.  ***When you look at that growth, it was really founded on the fact that we're continuing to add customers at a really fast pace.***  So our customer count is now greater than 8,500 customers.  That's up more than 600 sequentially and 2,400 year-over-year.  Quite frankly, this has exceeded our expectations, and we're looking forward as ***our pipeline continues to be strong.***

Emphasis added.

126.    In response to an analyst question about "the competitive threat that Microsoft brings," Dines dismissed it entirely:

> ***I would start by saying that we are very differentiated [from Microsoft], first of all, in our philosophy towards automation.***  We have a unique platform that aims to emulate people and their work.  Microsoft has built a low-code/nocode platform whose main goal is to provide new applications and analytics to the people.  ***They***

> *are like comparing apples to oranges . . . And by the way, we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments.*

Emphasis added.  Later on the call, in the midst of emphasizing UiPath's alleged TAM, Gupta similarly downplayed UiPath's competition:

> [*W]e continue to feel in the discussions here the TAM $60 billion dollars is real*, every single industry, every single department, every single process, every single employee.  We see that enrich in really the pipeline of what we look at.  ***So you can see also customers migrating away from our competitors and to us.***  And that is not just necessarily just about the strength of our individual components, but that is the strength of our entire platform.

Emphasis added.

127.    The following day, UiPath filed its 1Q 2022 Form 10-Q with the SEC, which was signed by Gupta.  The Form 10-Q reiterated the financial information stated in the 1Q 2022 press release and earnings call.

> 3.    *September 7-8, 2021 Earnings Press Release, Call, Form 10-Q*

128.    After the market closed on September 7, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 2Q 2022, which ended July 31, 2021, and held an earnings call.  While the press release and earnings call noted a slowdown in revenue and ARR, as well as the existence of discounting of UiPath's products prior to the IPO (*see, infra* §IV.D.), Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including Defendant Dines' claim on the call that "***The momentum in our business continued in our second fiscal quarter*** as ARR increased 60% year-over-year to $726.5 million, driven by record net new ARR of $73.9 million."  Emphasis added.  Similarly, Defendant Gupta stated that "I am pleased with our second quarter results, which yet again delivered ***meaningful growth at scale***, driven by our market-leading automation platform that drives fast time-to-value and tangible benefits." Emphasis added.  UiPath's supposed "growth,"

Gupta explained, was "***driven by increased adoption of our core product portfolio, Automation Cloud, as well as new product offerings***." Emphasis added. In fact, Gupta claimed, UiPath's "***customers [continue to] expand [their] platform adoption, add users and deploy more software robots***," resulting in a net retention rate of 144%. Emphasis added. As a result, the Defendants raised UiPath's FY 2022 guidance from a prior revenue range of $850 million – $855 million to $876M million – $881 million.

129.    Again, Gupta emphasized the importance of UiPath's ARR and its "land-and-expand" business model: "We run the business and evaluate our performance based on ARR. ***This quarter's strong results were driven once again by a world-class land-and-expand go-to-market model*** . . . As I have emphasized repeatedly, ARR is ***the key metric*** for measuring UiPath, and it lays a strong foundation for the company as we scale." Emphasis added.

130.    When asked during the question-and-answer portion about competition, Dines dismissed the prospect entirely:

> So we all know this is a big market growing quickly, and automation is the central piece of the digital transformation. So obviously, all major players in the cloud and the business applications are in our space.
>
> *    *    *
>
> So Salesforce is seeing a consolidation between low-code/no-code integration and automation. And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time. With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year. So we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago. And now we're really combining UI automation and API automation in a very good integrated package.
>
> ***We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one – that is the winning angle. All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.***

> ***This is our bread and butter.*** We have built it for a long time. And starting from this angle, we – ***it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space***.

Emphasis added.

131.    The following day, UiPath filed its 2Q 2022 Form 10-Q with the SEC, which was signed by Gupta. The Form 10-Q reiterated the financial information stated in the 2Q 2022 press release and earnings call.

4.    *October 14, 2021 Morgan Stanley Spark Conference*

132.    After the market closed on October 14, 2021, Defendants presented at the Morgan Stanley Spark Conference. In response to a question about how the Company determined its oft-claimed $60 billion TAM, Defendant Gupta claimed it had been verified in multiple ways, stating in pertinent part as follows:

> ***So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus. And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.***
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. ***When you look at it both qualitative and quantitatively, you can see the massive market that it really is***.

Emphasis added.

133.    Again, when asked about Microsoft's competitive threat, Dines dismissed the software giant as a competitor, claiming that "***Microsoft doesn't even compete***" with UiPath's core unattended robot offerings specifically and posed little threat to UiPath overall:

So – and I have high respect for Microsoft, especially under Satya. It's a great company. *And we don't compete really with Power Platform.* Power Platform, it's a big animal. *We compete within – not even with Power Automate, really.* Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.

So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. *This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business.*

Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

*But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality.*

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

*So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear.*

Emphasis added.

134.    Similarly, Dines also dismissed the potential competitive threat from enterprise providers adding automation features to their native program suites:

> ***Servicetrace.  At least until this point, we really don't compete with ServiceNow or Salesforce.  We simply don't compete with them at this point.  And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies.  And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.***
>
> ***So we – in case of ServiceNow, it's also even more starking difference between our go-to-markets.  They are primarily an IT shop.  We sell primarily to business lines, to CFO, to operations.  So I see clearly that it's not conflicting.  We are actually customers to each other, we and ServiceNow.  So we more partner than compete.  We don't compete right now at this point in time.***

Emphasis added.

### 5.    *December 8 & 10, 2021 Earnings Press Release, Call, Form 10-Q*

135.    After the market closed on December 8, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 3Q 2022, which ended October 31, 2021, and held an earnings call.  The Defendants continued to emphasize UiPath's purportedly strong ARR ($818.4 million, an increase of 58 percent year-over-year) and on the call Defendants Dines and Gupta proclaimed the Company's supposed "momentum" and "continued growth." For example, on the earnings call, Dines claimed:

> We continued to have ***very good momentum*** in our third quarter as ARR increased 58% year-over-year to $818 million driven by net new ARR of $92 million.  Our ***continued growth at scale*** is fueled by our market-leading end-to-end automation platform.
>
> *        *        *
>
> In summary, we had a ***strong*** Q3, and ***we continue to drive growth at scale***.  The market is very healthy, and ***we see considerable demand for our automation platform***.  I feel very good about what we have been able to accomplish across the business since our IPO, and we remain focused on innovation and our customers, which we believe is key to ***our ongoing success***.

Emphasis added.

136.    Growth in the quarter ended (3Q 2022) and the quarter in progress (4Q 2022), Dines

explained on the call, was driven by "demand" from "really very engaged partners":

> [W]e are very pleased with what we are seeing in front of us. *We are seeing a strong Q4. It's – the demand is there. We are seeing really very engaged partners.* So overall, we are very pleased with the direction where our business is going.

Emphasis added.

137.    Similarly, Gupta emphasized the purported strength of UiPath's pipeline:

> *In summary, we are pleased with our third quarter results as the team's ongoing execution continues to drive meaningful growth at scale. The opportunity in front of us is enormous. We have a strong pipeline*, and we feel very good heading into the end of our first fiscal year as a public company. We are building a truly multigenerational company that will change how people experience work. This is what excites us and motivates the team every day. It also keeps our focus on the long-term value creation for our employees, customers, partners and stockholders.

Emphasis added.

138.    Again, Gupta directed analyst and investor attention to UiPath's ARR and its land-

and-expand business model:

> *We have a highly recurring subscription business driven by a true land-and-expand model with customers deploying more robots, adopting more platform products and expanding use cases as they realize the considerable value of automation*.

>                    *       *       *

> We run the business and evaluate our performance based on ARR . . . Because it is invoice based, we believe that it is the most accurate and reliable measure of our true business activity. *It most closely aligns to long-term cash flow and best aligns to renewals.* And given our strong dollar-based gross retention rate, which was 98% in the third quarter, *ARR is most reflective of customer commitment regardless of deployment model . . . We manage the business on ARR as it more accurately reflects customer commitment period-over-period, which lays the right foundation for the company.*

Emphasis added.

139.    When asked about competition during the question-and-answer portion of the call,

Dines once again dismissed the prospect:

> In the last quarter, ***we have not seen any material moves in terms of the competitive landscape***.  And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position.  And I would quote them saying that when it comes to real enterprise automation, real scaled enterprise automation, ***customers are choosing UiPath***.
>
> ***And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases.  And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases***.
>
> So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation.  We are the clear leader.  And ***we continue to win deals in very large scores because of our technology and our platform***.

Emphasis added.

140.    And when asked specifically about Microsoft, Dines was similarly dismissive:

> Speaking about the current situation.  As I said before, IDC has underscored very well where we are.  ***In terms of real enterprise traction, UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration.***
>
> ***Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate.  So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers.***
>
> What is going to happen in the next couple of years?  First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer and personnel productivity.  This is a small part of our overall TAM.  So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now.

Emphasis added.

141.    On December 10, 2021, UiPath filed its 3Q 2022 Form 10-Q with the SEC, which was signed by Gupta.  The Form 10-Q reiterated the financial information stated in the 3Q 2022 press release and earnings call.

*6.    March 30 & April 4, 2022 Earnings Press Release, Call, Form 10-K*

142.    After the market closed on March 30, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 4Q and FY 2022, which ended October 31, 2021, and held an earnings call.  While the press release and earnings call noted more information about UiPath's earnings and discounting (*see, infra* §IV.D.), Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including their emphasizing UiPath's supposedly strong ARR – with Defendant Gupta again stressing "I want to reinforce that we run and manage the business to ARR, which is where we believe investors should be focused" – and Defendant Dines declaring UiPath's "continued growth at scale."  As Dines explained in relevant part:

> Fourth quarter net new ARR grew 72% year-over-year, reaching a record $107 million.  This drove total ARR to $925 million, an increase of 59% year-over-year. ***Our continued growth at scale reflects broad-based adoption of our end-to-end automation platform and our focused execution.***  Automation is critical to digital transformation and to unlock new levels of innovation, agility and productivity.
>
> ***Our land-and-expand model continues to drive best-in-class dollar-based net retention of 145%.***

Emphasis added.  That day, the Defendants also issued FY 2022 ARR and revenue guidance, exceeding a billion dollars in each metric, at ranges of $1.2 billion – $1.21 billion and $1.075 billion – $1.085 billion, respectively.

143.    Later on the call, in responding to an analyst question about UiPath's guidance, Dines emphasized "[d]emand" for UiPath's solutions, as well as the Company's supposed leadership among "the pack," *i.e.*, UiPath's competitors:

> ***The business opportunity is here.  Demand is here.  We are bullish for the business for the rest of the year.  We've been capable of distancing ourselves from the pack.  We are the undisputed leaders in the automation.  And overall, we are all seeing really good – great business prospects.***

Emphasis added.

144.    In adding to Dines' point about demand competition, Gupta stated:

> ***The remaining balance that we see there is, we look at our pipeline, and we have a very strong pipeline, as Daniel mentioned.  There's a number of large deals, which we're excited about.  We've won those deals, in the sense of they're not being baked off by competition.***

Emphasis added.

145.    When asked again about competition, Dines repeated that:

> ***We are not seeing really any increase in the competition.  On the contrary, we are seeing less competitive pressure in the deals.***  We are – so we can comment, if you are interested on various major players that we are seeing in the business.

> ***And in terms of the – our traditional specialized competitors, we are really seeing less and less of them.  We are replacing Blue Prism on automation anywhere in many customers.  And speaking about the new entrants like Microsoft and ServiceNow, we are – we really – we are not seeing them that much.***  I can comment on both, specifically, if you are interested.

Emphasis added.

146.    Gupta then made the same competition point in dismissing Microsoft as a competitor:

> And then just on the numbers basis, I think it's really important.  We see – ***when you look at our win rates, we continue to look and analyze win rates between where Microsoft and where some of these large players are playing and where they're not.  We don't see them a lot.***

But even when we do, our win rate has no difference, compared to where they are not playing.  So we're really – the trend of continuing to feel us is the dominant player in the industry.  Right now, that is continuing from the data that I see and that we see as a team.

Emphasis added.

147.    On April 4, 2022, UiPath filed its FY 2022 Form 10-K with the SEC, which was signed by both Dines and Gupta.  The Form 10-K reiterated the financial information stated in the 4Q & FY 2022 press release and earnings call.  Additionally, the Form 10-K contained a number of "risk factors" that purported to warn investors about hypothetical risks that could materialize ***in the future***, including:

- "Our recent rapid growth ***may not*** be indicative of our future growth."

- "Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners. Declines in renewals or the purchase of additional licenses by our customers ***could*** harm our future operating results."

- "***If*** we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected."

- "The markets in which we participate are competitive and, ***if*** we do not compete effectively, our business, financial condition, and results of operations ***could*** be harmed."

Emphasis added.

### 7.    *June 1 & 3, 2022 Earnings Press Release, Call, Form 10-Q*

148.    After the market closed on June 1, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 1Q 2023, which ended April 30, 2022, and held an earnings call in which the Defendants continued to tout the Company's ARR ($977 million) and NRR ($52 million), as well as UiPath's supposedly continuing growth.  Defendant Dines, for example, remarked on the call that:

This year, we expect to cross the $1 billion mark in both ARR and revenue . . . Our market opportunity continues to be significant as the amount of many on working

organizations and need for agility is only increasing.  We continue to win in the market, given the measurable return on investment we create for our customers and the breadth and depth of our platform.

149.    In fact, Defendant Gupta explained, "[a]s a result of our strong first quarter," the Defendants raised full year ARR and revenue guidance, from previously issued ranges of $1.2 billion – $1.21 billion (ARR) and $1.075 billion – $1.085 billion (revenue) to $1.22 billion – $1.225 billion (ARR) and $1.085 billion – $1.090 billion (revenue).

150.    When questioned about the Company's increased guidance and allegedly better outlook, Gupta stated in relevant part:

> We talked about the large deals.  ***We just – we monitor our pipeline very closely and, of course, the top deals that are there.  And we're pleased with the momentum and the movement.***  And I think that relates to the fact that our customers themselves are starting to get a handle in terms of navigating the environment, which takes some time to digest.
>
> ***In terms of what else has changed, I would say, everything else strategically with the business remains on course.***  So our cloud business remains strong.  We're very optimistic about the customer response and the metrics around our cloud business.  And we – one of the other areas is I think we see – we continue to see opportunities for efficiencies in our company.  And that's why we've also increased our operating margin targets for the year.  As we look – as we see opportunities both in emerging enterprises as we talked about some of the sales realignment that Daniel referenced in the earlier comments.

Emphasis added.

151.    Later in the call, when questioned about the strength of UiPath's pipeline, Gupta stated in relevant part:

> We actually were talking about the large deals and uncertainty about the size of the deals and the duration of those deals.  And we – as we've commented this quarter, those deals are taking shape.  They're progressing through the pipeline.  We've adjusted our guidance to kind of reflect a moderate amount of optimism in terms of the conversion of those deals, especially in the second half.
>
> In terms of Europe and in the public sector, I – we didn't – to my knowledge, we didn't make any specific comments like those were examples that then we were giving about anecdotes.  We continue to hear anecdotes around there is pressure in

Europe that I think is just understandable given the climate and the war there.  ***But we're pleased with the movement in our pipeline.  And we're also pleased with the way our sales team is executing in this environment.***

Emphasis added.

152.    And in response to a similar question about the "types of customers in [UiPath's] pipeline," Gupta emphasized its "broad-based" nature and UiPath's advantages over its competitors:

> ***It's broad-based***, right?  We have both local governments.  We have small enterprises.  We have large enterprises, Fortune 500.  ***Our pipeline continues to show strength and interest of expansion and adoption across our platform and across all the segments.***
>
> ***Continuing, including flanking and replacing our competitors, those are deals that we also see more and more of, especially as we have our latest releases in our product, and customers are seeing the breadth of our platform.***  So I wouldn't – I would say no pattern that is different than history.  We feel very good about it across our verticals, with the major verticals and focus that I mentioned.

Emphasis added.

153.    On June 3, 2022, UiPath filed its 1Q 2023 Form 10-Q with the SEC, which was signed by Gupta.  The Form 10-Q reiterated the financial information stated in the 1Q 2023 press release and earnings call.

### 8.    June 2, 2022 Cowen Technology, Media, and Telecom Conference

154.    On June 2, 2022, Defendants presented at the Cowen Technology, Media, and Telecom Conference.  According to Defendant Dines, "the outlook for automation, I think, has increased a bit.  ***We are seeing a positive momentum.***"  Emphasis added.  Defendant Gupta built on this theme, explaining:

> The fundamentals of our company feels strong.  I mean we've talked about a large – we're in the early stages of a large and growing market.  ***We've talked about our total – our TAM of being $60 billion plus, and that automation is ubiquitous.  I think that's not an area of debate anymore.  You can look at our 10,000-plus customers, customers greater than $1 million and the speed at which we've scaled***

> *that crossing 155, meaning, north of that number, and even customers greater than 100,000 is showing the potential.  And that is just in the last 3 to 5 years of accelerated hyper growth.*

Emphasis added.

155.    When questioned about UiPath's oft-touted ARR and vaunted "land-and-expand"

business model, Gupta stated in relevant part:

> *So we landed at 138% still when you look across the peer group of software companies, whether at a smaller scale or at our scale crossing $1 billion here. This quarter, we feel great about where we stand there.*  That includes the absorption of FX in Russia.  So we're really closer to 140% million, depending which way you swing the round right there.
>
> *Expansion is a major – is going to be the growth engine for our company.  And when you look at it, it's just part of the land and expand motion of somebody coming in and really understanding our platform, plugging it in, getting a few use cases up and running, seeing the paybacks of 6 months, seeing ROIs.*  Like a major automotive company that, in their first automation, saved 2,000 hours.  That translates to dollars that they can reallocate across the company.
>
> *And then it becomes – the flywheel starts moving, more pipeline of automations come and more opportunities allow it, and then they go deeper and wider across our platform.  So the land and expand motion, we see that as continuing to evolve strength.*  And then as the platform evolves, if you – again, 2 years ago, we didn't have companies adopting process mining and process discovery.  Major food and beverage company started with RPA, expanded into process discovery.  Test automation is now making its way more into that.
>
> So these are all upsell opportunities.  More chances for our sales team to sell a platform that has immense value to our customers and really drive that dollar-based net retention rate.

Emphasis added.

156.    When questioned about UiPath's competition – including from Microsoft and

ServiceNow – Dines again largely dismissed them as competitors, stating in relevant part:

> *Now going to Microsoft and ServiceNow.  They are very different type of companies in their relation to the RPA market and the automation market. Microsoft has built, technically speaking, a platform for citizen developers.  This is what Power Automate is.  It's a simple-to-use platform but it lacks the power to scale up when you really need more complex use cases.*

> ***So Microsoft has two type of technologies.*** One is for pro dev, where they have all the Azure suites, Visual Studio; and then its Citizen Developer, which is Power Platform. But actually, they don't address well what is in between, which is more like this technical business users that have a bit of coding concepts and they can – and in our world, they deliver [module]. They need a bit more sophisticated tools than Power Platform offers, but not as sophisticated as Visual Studio. So it's this layer. And this is how we scale this company based on this population.

Emphasis added.

> 9.    *June 7, 2022 BofA Global Technology Conference*

157.    On June 7, 2022, Defendants presented at the BofA Global Technology Conference. Again, Defendant Dines praised the Company's 1Q 2023 performance and position for supposed continued success in 2Q 2023.

> ***Well, it was a very good Q1 for us. We've bitten all the metrics in our guide. And we've been able to raise the guide despite the FX impact. We've basically absorbed the FX impact in our guide for Q2.***
>
> ***Overall, we are seeing signs of macro improvement.***

Emphasis added.

158.    And again, Dines emphasized that the Defendants' view of UiPath's supposedly enormous TAM remained unchanged and that UiPath remained "the clear leader in this space."

> ***Look, our view from a year ago, at the time of our IPO has not changed. It's a very big addressable market. We are looking at $60 billion TAM. We're the clear leader in this space.*** And we have progressed a lot from. RPA was just an entry gate for us in the big enterprise world. But we are offering an end-to-end process automation platform at this point and this platform is getting a lot of traction. It helped us to really increase our market share in the automation category overall.

Emphasis added.

> 10.    *September 7, 2022 Evercore ISI Technology, Media & Telcom Conference*

159.    On September 7, 2022, Defendants presented at the Evercore ISI Technology, Media & Telcom Conference. Despite the prior day's press release and earnings call noting more

information about UiPath's earnings (*see, infra* §IV.D.), Defendants obscured and minimized this

information with additional false and misleading statements and omissions, including Defendant

Gupta's response to a question about UiPath's TAM, in which he responded in relevant part:

> Look, ***I think at $1 billion of scale, profitability is, especially with our gross margins, well within reach***.  And I think one of the – I think what's healthy about the current environment is profitability allows us to play offense, right?  Because you get – you have more scrutiny on ROI.  You're saying, I'm going to focus in areas that have higher returns.  And as that focus comes into an organization, and I already feel it as we've kind of brought new leadership in different areas.  As you get more focus, actually, you can accelerate change faster.  Like I just think about like what Rob has been talking about between pricing, repositioning segmentation.  ***Those are all changes that actually we are talking about as accelerants of growth, but they drive massive levels of efficiency.***

Emphasis added.

160.    Unfortunately for investors, the above Class Period statements were false and

misleading because at the time these statements were made UiPath was experiencing substantial

competition from Microsoft and other low-cost competitors, which was undermining UiPath's

revenue and ARR growth, and forcing it to offer substantial discounts to land, expand, and simply

retain customers or potential customers, and was thereby undercutting UiPath's gross margins,

profits, and financial viability.  As noted above, due to UiPath's saturated enterprise customer

segment, additional growth was heavily dependent on acquiring new SMBs and maintaining and

expanding UiPath's relationship with existing enterprise customers.  However, contrary to the rosy

picture of growth painted by the Defendants, increased competition from (i) Microsoft, which had

become a significant competitor for UiPath, offering effective, easy to use and less expensive RPA

solutions, and (ii) multiple of UiPath's other competitors which offered less expensive and/or

easier to use RPA solutions, was undercutting UiPath's land and expand strategy and growth.  This

problem was particularly acute for SMBs, who had fewer resources and less scope to support RPA

software.  Prior to the end of 2020, to prop up its growth and to attract new customers, UiPath was

forced to offer deep discounts that undercut its net income, gross profits, and gross margins. These discounts were neither financially viable nor a substantive response to the significant obstacles UiPath faced. Further, UiPath's discounting rendered the Company's ARR misleading because it was based on unsustainable and/or financially self-defeating discounts.

> **D.    The Truth Begins to Emerge**

161.    The truth slowly emerged through several partial corrective events, which Defendants continued to obscure and minimize with a stream of material misrepresentations and omissions.

162.    On June 8, 2021, after the market closed, UiPath reported its 1Q 2022 financial results, representing the quarter ended April 30, 2021. UiPath's GAAP gross margin fell to approximately 74% that quarter, an 18.41% decline from what the Company reported in the Offering Documents for the prior quarter. This partial correction, a materialization of the undisclosed risks, was obscured by multiple positive misrepresentations and misleading statements that Defendants made at the same time as set forth above, as well as by their reporting that UiPath's revenue beat expectations and its reported ARR increased 64% year-over-year.

163.    On this news, UiPath's common stock price fell from a close of $76.00 on June 8, 2021 to $68.71 on June 9, 2021, a decline of approximately 9.59%, to close at $68.71 per share on June 9, 2021. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing with competitors, customers, and its performance.

164.    On September 7, 2021, after the markets closed, UiPath released its 2Q 2022 financial results, for the quarter ended July 31, 2021, and hosted a corresponding earnings call with securities analysts. For that quarter, UiPath's net new ARR growth rate declined to 33% from

approximately 55% in the prior quarter, and the growth rate for UiPath's License revenue in 2Q 2022 dropped to 20% from 57% in the prior quarter. Defendants also announced that UiPath had been engaged in regular discounting dating back to before the IPO, which Defendants described as supposedly positive for UiPath, and that UiPath would now switch to "ramping" contracts, which Defendants described as supposedly even more positive. A "ramping" contract is one that starts smaller and in theory increases in subsequent years. As explained by Gupta during the call:

> Looking at our pipeline, which is strong across geographies, *we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts*.
>
> \*    \*    \*
>
> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention rate is 98%, *we don't feel kind of compelled to trade any type of discount for long for getting the cash in the door right today*. We're able to make better and better economic decisions from the position of strength.

Emphasis added. These partial corrections, materializations of the undisclosed risks, and disclosures, were obscured by multiple positive misrepresentations and misleading statements that Defendants made at the same time as set forth above.

165.    On this news, the price of UiPath's common stock fell from a close of $62.46 on September 7, 2021, to $56.45 on September 8, 2021, a decline of approximately 9.62%, before falling again to close at $54.40 on September 9, 2021, on above-average trading volume. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing with competitors, customers, and its performance, their claim that discounting had been positive, and their further claim that "ramping" contracts were even more positive, when the practical impact of those contracts was that customers were committing to purchase fewer UiPath Robots and the ramp in subsequent years was theoretical.

166.    For 3Q 2022, UiPath announced performance that was largely similar to the previous quarter, beat expectations, and continued to make material misrepresentations and omissions as set forth above.

167.    On March 30, 2022, after the markets closed, UiPath issued a press release announcing its financial results for the quarter ended January 31, 2022 4Q 2022 and the fiscal year that ended on the same date FY 2022.  While UiPath's financial results for 4Q 2022 were largely similar to the previous quarter, UiPath also issued the following guidance: ARR for 1Q 2023 of $960 million to $965 million; ARR for FY 2023 from $1.2 billion to $1.21 billion; 1Q 2023 revenue in the range of $223 million to $225 million; and FY 2023 revenue in the rage of $1.075 billion to $1.085 billion.  This guidance was well beneath analysts' consensus.  On the same day, UiPath filed with the SEC a separate release on Form 8-K announcing the abrupt departure of Thomas Hansen, UiPath's Chief Revenue Officer, who was responsible for developing relationships with the Company's current and prospective customers, expanding UiPath's partnership network, and fostering the Company's developer community.  The release also announced that UiPath was hiring Chris Weber, former Corporate V.P. of Microsoft's Corporate and Small & Medium Sized Business commercial team, to serve as the Company's first-ever Chief Business Officer where he would be responsible for leading UiPath's global go-to-market strategy and execution, and for guiding the Company's worldwide sales, services, and other go-to-market operations, including its partner organization.  That same day, the Defendants also hosted an earnings call in which they discussed UiPath's discounting.  These partial corrections, materializations of the undisclosed risks, and disclosures, were obscured by multiple positive misrepresentations and misleading statements that Defendants made at the same time as set forth above.

168.    On this news, the price of UiPath's common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, a decline of $7.45 per share, or more than 25%, on heavy trading volume.  But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing with competitors, customers, and its performance, including Defendants' claims that the disappointing guidance was due to macroeconomic issues, uncertainty regarding the timing of several large deals, and the change in sales leadership.

169.    On September 6, 2022, after the market closed, UiPath reported its 2Q 2023 financial results.  For that quarter, UiPath's revenue was 24% year-over-year and its ARR growth was 44% year-over-year, which were both a step down from the previous quarter.  UiPath also revised downward its FY 2023 guidance.

170.    The next day, on September 7, 2022, at the Evercore Conference, Enslin stated that when dealing with a customer or prospective customer, UiPath regularly found itself addressing people "low down in an organization . . . [who] can't take [UiPath] broader," and so UiPath was attempting to "reposition[]" itself to reach the organization's decision-makers, *i.e.*, the "top suite [in] companies," including the CIO, CFO and CEO, who can place bigger orders.  In addition, Enslin noted that Microsoft was a competitor of UiPath's, although he continued to obscure the extent of the competition, stating in relevant part:

> The challenge for us [with Microsoft is] that they are in a broader contractual arrangement where customers first perceive it to be part of the solution[,] which certainly does have an impact on how we sell and how we position ourselves in certain companies.  And that's also the reason why we have to position the platform and get the branding right for the platform.

171.    The partial corrections in the two preceding paragraphs were materializations of the undisclosed risks and disclosures, which were obscured by positive misrepresentations and

misleading statements that Defendants made at the same time as set forth above. On this news, the price of UiPath's shares fell 11.23%, to close at $13.84 per share on September 7, 2022. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the problems the Company was facing with competitors, customers, and its performance.

172.    Finally, on the last day of the Class Period, September 27, 2022, just before markets closed, UiPath hosted an Analyst/Investor Day, during which Weber revealed the significant, longstanding problems with UiPath's sales, and changes UiPath would attempt to make to finally fix those problems. He stated:

> So in the enterprise, we have on average globally, 1 account exec to 50 accounts. That's average. I will tell you in some areas, it's even higher. And then in our – what we call emerging enterprise, which is the corporate mid-market and SMB, our average ratio globally is about 1:150. I will tell you in our ability to capitalize on growth and the opportunities in these segments, we have to change these ratios. And so one of the biggest things that we're going to do is focus a higher density of resources on the customers who represent the highest propensity [to spend].

> By the way, I think this model on the left has worked up until now in terms of it's been a great strategy to sort of have a land grab to get acquisition, new logos, et cetera, where I think we run into headwinds have an opportunity is how do we expand in those accounts once we land them. It's going to take a different coverage ratio and a different coverage ratio on those accounts that have the largest propensity to grow.

173.    As this new information reached the market, the Company's stock sank even further, closing at $12.94 per share, or down 3.72%, on September 28, 2022 from the prior day's closing price.

174.    After the Class Period, revelation of UiPath's substantial problems continued. On December 2, 2022 Defendants announced that UiPath was "piloting [its] first solution accelerator to provide [customers] a starting point for their automation journey," which Enslin claimed would "provide customers with the technical know-how to help them complete the implementations

significantly faster," effectively conceding customer implementations to date were too complex and taking too long.

175.    On March 16, 2023, UiPath disclosed that Weber, who had been brought in to lead UiPath's global go-to-market strategy and execution, as well as to guide worldwide sales, services, and other go-to-market operations, leveraging his experience from Microsoft, particularly in the SMB segment, had stepped down as the Company's Chief Business Officer after only a year on the job.

176.    Analysts also articulated the systematic obstacles that had undermined UiPath since before the IPO.  For example, on November 3, 2022, Oppenheimer downgraded UiPath from "Outperform" to "Perform," citing persistent competitive and internal pressures on improving UiPath's business, as well as the slow adoption of UiPath's solution as an enterprise-wide platform.  In its report entitled, "UiPath: Lingering Issues Make an Improving Business Story Look Distant; Downgrade to Perform Rating," Oppenheimer concluded that notwithstanding UiPath's new go-to-market strategy, the path forward to an improving business story remained unclear because, at least in part, UiPath still "does not handle the last mile of data" but rather "that data is typically held within the platform of the mega application software vendors such as Microsoft, ServiceNow, Salesforce, Workday, Oracle, and SAP . . . [all of which] over the past two years . . . have acquired a RPA solution, built out this functionality within the platform, and currently offer RPA capabilities to the market."  Moreover, because "most of these mega platform suppliers do not charge for the RPA functionality and instead offer it as part of selling the other platform solutions and technologies[,]" Oppenheimer explained that UiPath continues to: (a) face "pricing pressure;" (b) experience "weakened win rates;" and (c) observe "faster commoditization trends of [its] RPA technology."

177.    Ultimately, as a result of Defendants misleading statements and omissions Plaintiff and the Class suffered billions of dollars in losses and economic damages under the federal securities laws.

**E.    Additional Scienter Allegations**

178.    In addition to the facts pleaded above, the following additional facts support a strong inference of Defendants' scienter.

*1.    The Offering Documents Provided Motive and Opportunity for Defendants Accel, CapitalG, Dines, and Mendoza to Sell their UiPath Common Stock at Inflated Prices*

179.    By reason of Defendants' material misstatements and omissions in UiPath's Offering Documents, UiPath's common stock was artificially inflated at the time of the IPO, a fact Defendants Accel, CapitalG, Dines, and Mendoza took full advantage of in order to collectively sell ***$467 million***-worth of UiPath common stock to unsuspecting investors.

180.    The following table shows the heavy IPO insider sales:

| Date | Defendant | Shares Sold | Price per Share Sold | Gross Proceeds |
|---|---|---|---|---|
| April 23, 2021 | Accel | 5,314,386 | $56.00 | $297,605,616 |
| April 23, 2021 | CapitalG | 1,527,673 | $56.00 | $85,549,688 |
| April 23, 2021 | Dines | 1,383,168 | $56.00 | $77,457,408 |
| April 23, 2021 | Mendoza | 120,726 | $56.00 | $6,760,656 |
| ***Total Shares Sold*** | | | ***Total Gross Proceeds*** | |
| 8,345,953 | | | $467,373,368 | |

181.    These Defendants' insider sales are probative of their scienter and are part of their scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  While these Defendants were issuing (or causing the issuance of) materially false and misleading statements about the Company's business and concealing (or causing the concealment of) negative information and trends, each of the Defendants listed in this section, including UiPath's CEO and CFO, had access to confidential information and were aware of the truth about

the Company and its business, including UiPath's discounting practices dating back to before the IPO; the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with its large customers; and the impact these undisclosed obstacles were having on UiPath's ARR, revenue, gross profits, net income, and gross margin. The Defendants' sales were unusual in their amount and in their timing.

> 2.    *The Class Period Statements Provided Motive and Opportunity for Defendants Dines and Gupta to Sell their UiPath Common Stock at Inflated Prices*

182.    By reason of Defendants' material misstatements and omissions, UiPath's common stock was artificially inflated throughout the Class Period, a fact Defendants Dines and Gupta took full advantage of in order to collectively sell over ***$19 million***-worth of UiPath common stock to unsuspecting investors after engineering an unusually short post-IPO lock-up period.

183.    The following table shows the Class Period sales:

| Date | Defendant | Sale Method | Shares Sold | Price per Share Sold | Gross Proceeds |
|---|---|---|---|---|---|
| June 17, 2021 | Gupta | Open Market | 19,000 | $70.68 | $1,342,994 |
| June 28, 2021 | Gupta | Open Market | 10,625 | $70.38 | $747,833 |
| Aug. 24, 2021 | Gupta | 10b5-1 | 26,404 | $62.00 | $1,637,048 |
| Sept. 09, 2021 | Gupta | 10b5-1 | 20,000 | $56.10 | $1,122,000 |
| Nov. 04, 2021 | Gupta | 10b5-1 | 40,000 | $56.48 | $2,259,280 |
| Nov. 12, 2021 | Dines | 10b5-1 | 20,964 | $56.39 | $1,182,095 |
| Nov. 16, 2021 | Dines | 10b5-1 | 24,778 | $56.03 | $1,388,219 |
| Dec. 10, 2021 | Gupta | Open Market | 111,250 | $43.74 | $4,865,619 |
| Jan. 03 2022 | Gupta | Open Market | 24,546 | $43.26 | $1,061,973 |
| Aug. 15 2022 | Gupta | 10b5-1 | 140,000 | $20.70 | $2,897,580 |
| Sept. 11, 2022 | Gupta | 10b5-1 | 60,000 | $14.59 | $875,498 |
| ***Total Shares Sold*** 497,567 | | | ***Total Gross Proceeds*** $19,380,139 | | |

184.    Moreover, despite allegedly making certain of the above-listed trades pursuant to Rule 10b5-1 trading plans, ***neither the plans nor their contents are public***.[1]  Given such a dearth of information, Courts in this Circuit accord no deference to undisclosed Rule 10b5-1 trading plans when holistically considering a plaintiff's motive and opportunity scienter allegations.  In fact, here, the more persuasive inference is that the plans were adopted during the Class Period, and therefore Defendants timed their scheduled trades to capitalize on the inflation in UiPath's stock price in order to reap the highest possible share price gain.  Such a possibility appears extremely likely here, as multiple of the above-listed trades occur ***just days before or in the immediate aftermath of Defendants' partial corrective disclosures***.  *Supra*, §IV.D.

185.    In any event, Defendants Dines and Gupta's insider sales are probative of their scienter and are part of their scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  While Dines and Gupta were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, they had access to confidential information and were aware of the truth about the Company and its business, including UiPath's discounting practices; the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with large customers; and the impact these undisclosed obstacles were having on UiPath's ARR, revenue, cost of revenue, and gross margin.

---

[1]    The existence of the Rule 10b5-1 trading plans are only referenced in certain of the Form 4s Defendant Gupta filed with the SEC to report his sales.

Notably, Dines and Gupta were addressing these topics in false and misleading statements, while omitting the truth.  Dines and Gupta's sales were unusual in their amount and in their timing.

> 3.  *The Company's Equity Incentive Plan Provided Motive and Opportunity for Defendants Dines and Gupta to Issue Material Misstatements and Omissions*

186.    On April 9, 2021, UiPath's Board adopted a "2021 Equity Incentive Plan," which became effective on the date of the IPO, and provided for the grant of a series of awards, including tens of millions of dollars-worth of incentive stock options, to certain UiPath employees, including Defendants Dines and Gupta, "following the achievement of certain pre-established performance goals during a designated performance period."  The Board was given discretion to choose among "any one of, or combination of" a series of "Performance Goals" as a basis for granting awards, including: "***stock price***;" "margin (including gross margin);" "sales or revenue targets;" "increases in revenue or product revenue;" "market share;" "customer satisfaction;" "investor relations, analysts and communication;" "number of users, including unique users;" "individual performance goals;" "and other measures of performance selected by the Board or Committee."

187.    Dines and Gupta's conduct, in light of the significant potential awards available to them, is probative of their scienter.  While Dines and Gupta were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, they had access to confidential information and were aware of the truth about the Company and its business, including UiPath's discounting practices; the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's

struggles to maintain and/or expand its relationships with its large customers; and the impact these undisclosed trends were having on UiPath's ARR, revenue, cost of revenue, and gross margin.

### F.    Loss Causation/Economic Loss

188.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein).  During the Class Period, Plaintiff and Class Members purchased or otherwise acquired UiPath's Class A common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein. The price of the Company's Class A common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and/or materialized, and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

189.    Before the end of the Class Period, on September 27, 2022, investors had been unaware of the following material facts about UiPath that had been known to Defendants:

(a)    UiPath's discounting practices;

(b)    the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with its large customers; and

(c)    the impact these undisclosed obstacles were having on UiPath's ARR, revenue, gross profit, net income, and gross margin.

190.    Defendants' misrepresentations and omissions and fraudulent statements, as alleged in herein, misrepresented and concealed the true adverse material facts from the market during the Class Period, misleading investors about the true state of UiPath's business and the obstacles it was facing.

191.    As alleged in §IV.D., *supra*, these material facts were gradually revealed to investors via a series of partial corrective disclosures and the materialization of the undisclosed risks.

192.    The market reacted swiftly and negatively to each of these disclosures, resulting in significant losses for investors.

## G.    Applicability of the Fraud-on-the-Market and *Affiliated Ute* Presumptions of Reliance

193.    The market for UiPath's common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to UiPath.  Plaintiff and Class Members have been damaged thereby.

194.    During the Class Period, the artificial inflation of the value of UiPath's common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class Members.  As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed and/or materialized, it drove down the value of the Company's common stock, causing Plaintiff and other Class Members that had purchased or otherwise acquired UiPath's common stock at artificially inflated prices to be damaged as a result.

195.    At all relevant times, the market for UiPath's common stock was efficient for the following reasons, among others:

(a)    UiPath's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, UiPath filed periodic public reports with the SEC and/or the NYSE;

(c)    UiPath regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    UiPath was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

196.    Based on the foregoing, during the Class Period, the market for UiPath's common stock promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of UiPath's common stock.  Under these circumstances, the market for UiPath's common stock was efficient during the Class Period and, therefore, investors' purchases and acquisitions of UiPath's common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

197.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions, which concealed, throughout the Class Period:

(a)    UiPath's discounting practices;

(b)    the extent to which UiPath competed with Microsoft and multiple other companies, including partners; the failure of UiPath's "land-and-expand" business model, particularly (i) UiPath's struggle to acquire new customers, especially SMBs, (ii) UiPath's saturation among large enterprise customers, and (iii) UiPath's struggles to maintain and/or expand its relationships with its large customers; and

(c)    the impact these undisclosed trends were having on UiPath's ARR, revenue, gross profit, net income, and gross margin.

198.    Because this action involves Defendants' failure to disclose and omission of material adverse information regarding the Company's business, operations, and prospects – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**H.      Causes of Action**

### COUNT III
### Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against Defendants UiPath, Dines, and Gupta)

199.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against Defendants UiPath, Dines, and Gupta for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between April 21, 2021 and September 27, 2022, inclusive.

200.    In the Offering Documents and throughout the Class Period, Defendants UiPath, Dines, and Gupta: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiff and Class Members, as alleged herein; (ii) artificially inflated and/or maintained the market price of UiPath's common stock; and (iii) caused Plaintiff and Class Members to purchase or otherwise acquire UiPath's common stock at artificially inflated prices.

201.    Each of the listed Defendants here, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of UiPath's common stock during the Class Period.  Defendants' material misrepresentations and omissions are alleged in §IV.C., *supra*.

202.    As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants UiPath, Dines, and Gupta had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

203.    As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Defendants Dines and Gupta had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

204.    Defendants UiPath, Dines, and Gupta, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

205.    The facts alleged herein give rise to a strong inference that Defendants UiPath, Dines, and Gupta each acted with scienter.  Defendants UiPath, Dines, and Gupta each knew, or recklessly disregarded, that the Class Period statements set forth in §IV.C., *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

206.    By virtue of Defendants Dines and Gupta's positions of management and control within UiPath, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. Defendants Dines and Gupta would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at conferences and management and Board of Directors meetings, including

committees thereof; and reports and other information provided to them in connection with their roles and duties as UiPath officers and directors.

207.    Defendants Dines and Gupta were aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

208.    As a result of Defendants UiPath, Dines, and Gupta's dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of UiPath's common stock was artificially inflated throughout the Class Period.  Unaware that the market price of UiPath's common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by Defendants UiPath, Dines, and Gupta, at the times such statements were made, or relying upon the integrity of the markets in which UiPath's common stock traded; and in the absence of material adverse information that was known, or recklessly disregarded, by Defendants UiPath, Dines, and Gupta, but not disclosed to the public, Plaintiff and Class Members purchased or otherwise acquired UiPath's common stock at artificially inflated prices.

209.    Had Plaintiff and the other Class Members known the truth regarding the problems that UiPath was experiencing, which was not disclosed by Defendants UiPath, Dines, and Gupta, Plaintiff and other Class Members would not have purchased or otherwise acquired UiPath's common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

210.    As a direct and proximate result of Defendants UiPath, Dines, and Gupta's wrongful conduct, Plaintiff and the other Class Members suffered damages in connection with their respective purchases and sales of UiPath's common stock during the Class Period, when the

artificial inflation in the price of such securities dissipated, as the truth regarding Defendants UiPath, Dines, and Gupta's conduct was revealed and/or the undisclosed risks materialized, causing the price of UiPath's common stock to decline, resulting in economic losses to Plaintiff and the Class.

211.    By reason of the foregoing, Defendants UiPath, Dines, and Gupta violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in UiPath's common stock during the Class Period.

## COUNT IV
### Violation of §20(a) of the Exchange Act
### (Against Defendants Dines and Gupta)

212.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against Defendants Dines and Gupta for violations of §20(a) of the Exchange Act, 15 U.S.C. 78t(a), on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between April 21, 2021 and September 27, 2022, inclusive.

213.    UiPath is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

214.    During their tenures as officers or directors of UiPath, Defendants Dines and Gupta were controlling persons of the Company within the meaning of §20 of the Exchange Act.  By reason of their positions of control and authority as officers or directors of UiPath, Defendants Dines and Gupta had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

215.    As more fully described above, in their capacities as senior corporate officers of the Company, Defendants Dines and Gupta caused UiPath to conduct the IPO, signed the Offering

Documents pursuant to which the IPO was conducted, signed each Form 10-Q and/or Form 10-K, and had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.  Defendants Dines and Gupta prepared, or were responsible for preparing, the Company's Offering Documents, press releases, and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls.  Defendants Dines and Gupta controlled UiPath and each of its employees.  As a result of the foregoing, Defendants Dines and Gupta, together and individually, were controlling persons of UiPath within the meaning of §20 of the Exchange Act.

216.    Defendants Dines and Gupta were able to, and did, control the content of the Offering Documents and the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Defendants Dines and Gupta were provided with copies of the documents, as alleged herein, containing material misrepresentations and omissions prior to their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected.  Accordingly, Defendants Dines and Gupta are responsible for the accuracy of the Company's public reports and releases.

217.    By virtue of their positions as controlling persons of UiPath, and by reason of the conduct described in this Count, Defendants Dines and Gupta are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.  As a direct and proximate result of Defendants Dines and Gupta's wrongful conduct, Plaintiff and other Class Members suffered damages in connection with their purchases or acquisitions of the UiPath's common stock during the Class Period.

## V.    CLASS ACTION ALLEGATIONS

218.    Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between April 21, 2021 and September 27, 2022, inclusive, including all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's IPO.  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

219.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UiPath's common stock was actively traded on the NYSE.  While the exact number of Class Members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, millions of UiPath common stock were actively traded on the NYSE (an open and efficient market) under the symbol "PATH."  Record owners and other members of the Class may be identified from records maintained by UiPath or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.    Plaintiff's claims are typical of the claims of Class Members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.

221.    Further, Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

222.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act Defendants violated the Exchange Act;

(b)    whether the Securities Act Defendants violated the Securities Act;

(c)    whether statements made by Defendants to the investing public and the Company's shareholders during the Class Period omitted or misstated material facts about the business, operations, and prospects of UiPath;

(d)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted or misstated material facts about the business, operations, and prospects of UiPath; and

(e)    whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    whether the price of UiPath's common stock was artificially inflated; and

(g)    to what extent Class Members have sustained damages and the proper measure of damages.

223.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for Class Members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    NO SAFE HARBOR

224.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be untrue or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be untrue or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially untrue or misleading at the time each such statement was made.

225.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those untrue or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially untrue or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of UiPath who knew that the statement was untrue, misleading, or omitted relevant information when made.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.    declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      awarding compensatory damages in favor of Plaintiff and all other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.      awarding such other and further relief as the Court may deem just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 26, 2024                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Max R. Schwartz*
Max R. Schwartz
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
mschwartz@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Lead Plaintiff Paul Severt*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Paul Severt*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 26, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

        *s/ Max R. Schwartz*
        Max R. Schwartz