UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                      :    23cv7908 (DLC)
In re UiPath, Inc. Securities         :
Litigation                            :    OPINION AND
                                      :       ORDER
--------------------------------------- X
APPEARANCES:

For Lead Plaintiff Paul Severt:
Max R. Schwartz
Thomas L. Laughlin
Jeffrey P. Jacobson
Scott & Scott Attorneys at Law LLP
230 Park Avenue, 17th Floor
New York, NY 10169

For defendants UiPath, Inc., Daniel Dines, and Ashim Gupta:
Edmund Polubinski
Patrick Blakemore
Marie Killmond
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

DENISE COTE, District Judge:

     The plaintiff in this putative class action asserts that

UiPath, Inc. ("UiPath" or the "Company") misrepresented the

difficulties it was encountering in marketing its products and

its competitive environment when it published the offering

documents for its IPO on April 21, 2021 (the "Offering

Documents"), and over the course of the following seventeen

months.  He alleges that the truth was revealed over time,

beginning with partial disclosures in June of 2021.

This securities litigation was filed in 2023 against UiPath and

two of its executives.  The defendants have moved to dismiss

each of the plaintiff's claims.  For the following reasons, the motion is granted in part.

## Background

The following facts are as alleged in the second amended complaint ("SAC") or are taken from documents integral to the SAC.  The allegations are taken as true for purposes of this motion.

UiPath, founded in 2005, was among the first companies to provide robotic process automation software ("RPA" or "Robots") to customers to assist in the management of their businesses.  RPA automates tasks that people commonly carry out manually.  As an early entrant to the market, UiPath initially experienced rapid growth.  On April 23, 2021, UiPath completed an IPO.

The Class Period runs from April 21, 2021 to September 27, 2022, at which time the plaintiff alleges that UiPath finally disclosed material problems of which it had known before the IPO.  Although the SAC is lengthy and the allegations are voluminous, its contentions center around four themes.  It asserts that (1) the defendants used a misleading metric, Annualized Renewal Run-Rate ("ARR"), to suggest that UiPath's financial outlook was stronger than it actually was; (2) the defendants claimed that UiPath's "land-and-expand" business model, through which UiPath attempted to "land" new customers

and then "expand" those customers' use of UiPath products, was successful when it was not; (3) the defendants understated the competitive threats that UiPath faced in the RPA market, especially from Microsoft Corporation ("Microsoft"); and (4) the defendants issued risk disclosures that were misleading because they framed events that had already occurred as merely hypothetical.  The two individual defendants are Daniel Dines, who served as the Chairman of UiPath's Board of Directors (the "Board") and the CEO of UiPath, and Ashim Gupta, UiPath's CFO.

A.    Pre-IPO Environment

The SAC asserts that by 2020 UiPath was having difficulty maintaining its growth.  Specifically, UiPath was having difficulty convincing its existing customers to expand their use of its products and the demand for UiPath's Robots was waning among large enterprises.  When UiPath targeted mid-market customers, these companies preferred cheaper and simpler Robots provided by UiPath's competitors.

The SAC relies on the statements of several Confidential Witnesses ("CWs") who worked at UiPath before and during the Class Period to support its description of the challenges facing UiPath.  CW2 was an Account Executive for the mid-market segment from December 2020 to March 2022, and recalled that sales quotas were often missed and that CW2 did not have much success "upselling" to customers.  CW3, who worked as an Account

Executive for enterprise customers from February 2021 to May 2023, stated that only 60% of sales quotas were met. UiPath was also experiencing "churn," meaning that it was losing its customers or that its customers were reducing the number of Robots they were licensing. CW1, who worked as a Senior Manager and then a Director of Global Marketing Operations and Analytics from September 2018 to January 2022, reviewed reports regarding customer churn as part of his marketing function. CW1 recalled that "a lot" of the mid-market customer contracts were churning, while enterprise accounts were churning at a rate that was "alarming." CW1 stated that customers often had difficulty implementing UiPath's complex software and did not receive enough value from the Robots to renew their contracts at the same volume. CW2 stated that customer churn was "fairly common" and that "a fair amount" of the time customers would not renew the entire contract or would only renew part of the contract.

New entrants to the RPA market were also increasing the competitive pressure on UiPath. In 2020, Microsoft acquired Softomotive, which was another RPA developer. After the acquisition, Microsoft upgraded its own RPA software line, Power Automate. As a result, Microsoft could offer NoCode and LowCode Robots at low prices. Where Microsoft products were already being used by a company, Microsoft's Robots were easier to

integrate and Microsoft could take advantage of existing customer relationships to market its products.

UiPath struggled to compete with Microsoft after the Softomotive acquisition.  CW2 recalled that potential customers brought up Microsoft on "about half" of their sales calls, either because they already used Microsoft's products or because they were thinking about purchasing Microsoft's products.  CW2 noted that UiPath held sales training sessions that were focused on "getting around" competitors, including Microsoft.

Microsoft offered Robots at lower prices than UiPath.  CW3 stated that Microsoft effectively gave Robots away for "free" in bundles with other software, which put UiPath at a competitive disadvantage.  CW4 was a Global Vice President of Value Engineering from July 2020 to July 2022, a role that focused on justifying the cost of UiPath's software to customers.  CW4 recalled a meeting in early 2021 in which Dines asked CW4 to work with the value engineering team to devise a value proposition proving that UiPath's Robots were more effective than Microsoft's in the long-term; the team did not succeed in devising such a proposition because Microsoft's Robots were "obviously cheaper."

Although UiPath attempted to respond to Microsoft's entry into the RPA market, CW1 stated that UiPath "did not typically

win customers when competing against Microsoft."  CW5, who
worked at UiPath as an Enterprise Account Executive from October
2020 to August 2022, stated that customers often questioned why
they would purchase UiPath's complex and expensive Robots when
Microsoft was offering their own at lower prices.  CW4 believed
that UiPath was forced to discount its robots in early 2021
because of the pricing pressure caused by Microsoft.  CWs 2, 3,
and 5 stated that UiPath also offered customers "ramping"
contracts, through which the number of Robots that customers
licensed would increase over the contract term.  The SAC asserts
that these "ramping" contracts were used to inflate metrics that
annualized UiPath's revenue.

B.    The IPO

In the spring of 2021, UiPath "rushed" to complete its IPO
before Microsoft could further solidify its presence in the
market.  On March 26, 2021, UiPath filed a Registration
Statement on Form S-1 with the SEC, which would be used for
UiPath's IPO following several amendments.  The final amendment
was filed on April 21.

The Offering Documents consisted of a registration
statement identifying the shares to be registered and the
proposed offering price of $54.00, and a 278-page prospectus
that provided a summary of UiPath's business and financial
condition.  The prospectus described the RPA industry generally,

6

the products that UiPath offers, UiPath's market opportunity and growth strategies, and the risks to its business that UiPath had identified.

The prospectus repeatedly referenced a metric called ARR, which the prospectus described as the "key metric we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers." It defined ARR as

> annualized invoiced amounts per subscription sku from
> subscription licenses and maintenance obligations
> assuming no increases or reductions in their
> subscriptions. ARR does not include the costs we may
> incur to obtain such subscription licenses or provide
> such maintenance, and does not reflect any actual or
> anticipated reductions in invoiced value due to
> contract non-renewals or service cancellations other
> than for specific bad debt or disputed amounts.

(Emphasis supplied.) The prospectus explained how UiPath calculated ARR:

> Our ARR calculation simply takes our invoiced amounts
> per solution sku under a subscription license or
> maintenance agreement and divides that amount by the
> invoice term and multiplies by 365 days to derive the
> annualized value.

The prospectus explained how ARR differed from Generally Accepted Accounting Practice ("GAAP") revenue:

> For clarity, we use annualized invoiced amounts per
> solution sku as compared to revenue calculated in
> accordance with accounting principles generally
> accepted in the United States, or GAAP, to calculate

7

our ARR.  Our invoiced amounts are not matched to the
performance obligations associated with the underlying
subscription licenses and maintenance obligations as
they are with respect to our GAAP revenue.  This can
result in timing differences between our GAAP revenue
and ARR calculations.

It further warned investors about the limitations of ARR:

Our ARR may decline or fluctuate as a result of a
number of factors, including customers' satisfaction
or dissatisfaction with our platform and professional
services, pricing, competitive offerings, economic
conditions, or overall changes in our customers'
spending levels.  ARR should be viewed independently
of revenue and deferred revenue as ARR is an operating
metric and is not intended to be combined with or
replace these items.

…

ARR is not a forecast of future revenue, which can be
impacted by contract start and end dates, duration,
and renewal rates, and does not include invoiced
amounts reported as perpetual licenses or professional
services revenue in our consolidated statements of
operations.  In addition, investors should not place
undue reliance on ARR as an indicator of our future or
expected results.

(Emphasis supplied.)

The portion of the prospectus that defined ARR directed

investors to the section that discussed UiPath's identified risk

factors, and in particular to a risk factor that read, "[o]ur

key operating metric, ARR, and certain other operational data in

this prospectus are subject to assumptions and limitations and

may not provide an accurate indication of our future or expected

results."  This risk factor reiterated the definition of ARR and

stated that "ARR is based on numerous assumptions and limitations, is calculated using our internal data that have not been independently verified by third parties and may not provide an accurate indication of our future or expected results."  It further warned that investors should consider metrics such as ARR "in light of the assumptions used in calculating such metrics and the limitations as a result thereof" and that "investors should not place undue reliance on these metrics as an indicator of our future or expected results."

The prospectus declared an ARR of $580 million in fiscal year 2021, representing a 65% growth rate year-over-year.  It disclosed that 30% of that growth was due to new customers.  It also disclosed UiPath's GAAP revenue as $607.6 million in fiscal year 2021, and its year-over-year revenue growth, cost of revenue, and operating expenses, as well as the fact that UiPath operated at a net loss of approximately $92.4 million in the fiscal year ended January 2021.

The prospectus further touted "the success of our land-and-expand business model" centered around "offering products that are easy to adopt and have a short time to value," and claimed that UiPath's ARR demonstrated the company's "ability to expand within our customer base" as well as its "rapid growth."  It

reported that UiPath had 6,009 customers as of January 31, 2020, and 7,968 customers as of January 31, 2021.

In addition to the risk warning regarding the ARR metric, the prospectus also disclosed a multitude of other risks that could impact UiPath's business, including:

- "Our recent rapid growth may not be indicative of our future growth."

- "Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners.  Declines in renewals or purchases of additional licenses by our customers could harm our future operating results."

- "We also provide some customers the opportunity to use our automation platform and products for free prior to purchasing a license."

- "Our renewals and dollar-based net retention rate may decline or fluctuate as a result of a number of factors" including "the ability of our customers to quickly integrate our products into their businesses . . . customer satisfaction . . . our prices, the capabilities and prices of competing products."

- "If we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected."

- "If we fail to continue to differentiate our platform and products from those offered by our competitors, then our business, results of operations, and financial condition may be harmed."

- "Some of our competitors offer their on-premises or cloud solutions at a lower price, which has resulted in, and may continue to result in, pricing pressures."

- "A limited number of customers represent a substantial portion of our revenue and ARR.  If we fail to retain these customers, our revenue and ARR could decline significantly."

The prospectus also disclosed, as a risk factor, that the "markets in which we participate are competitive and, if we do not compete effectively, our business, financial condition, and results of operations could be harmed."  The list of competitors included Microsoft.

On April 23, 2021, the defendants completed the IPO. UiPath issued all 27,474,393 shares to the investing public and generated almost $1.54 billion in gross proceeds.

C.    Post-IPO Filings and Statements

After the IPO, UiPath made quarterly and annual filings with the SEC.  These filings disclosed UiPath's financial results, including ARR, revenue, operating expenses, and net losses.  The quarterly and annual filings included the disclosure of the same risk factors that were identified in the Offering Documents.

Concurrently with its quarterly and annual filings, UiPath issued press releases attached to Forms 8-K summarizing its financial results and performance.  UiPath also held conference calls each quarter to discuss its financial performance and business strategy with investors.  During these calls,

defendants Dines and Gupta discussed UiPath's results and
answered questions.

During the Class Period, defendants Dines and Gupta also
made presentations on behalf of UiPath at several conferences.
These included the Morgan Stanley Spark Conference on October
14, 2021; the Cowen Technology, Media, and Telecom Conference on
June 2, 2022; the Bank of America Global Technology Conference
on June 7, 2022; and the Evercore ISI Technology, Media &
Telecom Conference on September 7, 2022.  At each of these
presentations, defendants Dines and Gupta spoke regarding
UiPath's business and answered questions from moderators and the
audience.

Throughout the Class Period, the defendants disclosed
information pointing to difficulties UiPath was experiencing.
UiPath's quarterly filings with the SEC sometimes disclosed
stagnant or declining rates of growth even though revenue and
ARR had grown year-over-year.  On the September 7, 2021
quarterly earnings call, the defendants stated that UiPath had
engaged in regular discounting of its products since before the
IPO; they also stated that UiPath would increase its use of
"ramping" contracts.

On March 30, 2022, UiPath issued "disappointing" ARR and
revenue guidance.  UiPath also announced that it was hiring

Chris Weber, former Corporate V.P. of Microsoft's Corporate and Small & Medium Sized Business commercial team, to serve as the Company's Chief Business Officer.

D.   End of Class Period

On September 6, 2022, UiPath issued quarterly financial results showing a decline in the growth rate of both revenue and ARR. On the earnings call that day, Robert Enslin, who became Co-CEO with defendant Dines on May 16, 2022, stated that UiPath's "top line metrics have slowed, and we need to evolve how we manage our business." He further stated that UiPath was "strategically repositioning the company to increase velocity, efficiency and customer centricity." At the Evercore Conference the next day, Enslin stated that UiPath was attempting to "reposition" itself to reach organizational decision-makers rather than lower-level employees who did not have authorization to broaden the company's implementation of UiPath's Robots.

On September 27, 2022, the last day of the Class Period, UiPath hosted an Analyst/Investor day, during which Enslin stated that "[w]e haven't been efficient in how we sell, and we aren't delivering the platform . . . in ways that clearly articulate the holistic value automation can deliver." Enslin further stated that while UiPath's model "has worked up until now" in terms of getting "acquisition" of new customers, UiPath had to develop in terms of "expand[ing] in those accounts once

we land them." He explained that UiPath planned to increase its ratio of account executives to mid-market customers in order to "focus a higher density of resources on the customers who represent the highest propensity" to increase their use of UiPath products.

The following day, J.P. Morgan commented on UiPath's disappointing revenue and ARR guidance, stating that J.P. Morgan believed that "a material improvement in the company's glidepath" would take "multiple quarters to materialize, particularly as the competitive landscape continues to evolve." The same day, Sumitomo Mitsui Banking Corporation issued a report stating that UiPath's "platform strategy will likely be difficult to execute in a crowded market with macro headwinds." The report further opined that "[w]e think [UiPath's] issues have morphed from outsized investor expectations to a need for a full-blown corporate turnaround as the company repositions itself." On September 29, Canaccord Genuity issued a report stating that "investors got a legitimately sizable amount of new information" and reduced its UiPath common stock target price to $14.00 per share.

E.    Procedural History

This action was filed on September 6, 2023 by Samhita Gera as a putative class action. She was represented by Robbins Geller Rudman & Dowd LLP. As required by the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), the plaintiff published notice of the filing on September 6.  By November 6, seven applications to be appointed lead plaintiff had been filed.  On December 1, Paul Severt was appointed as lead plaintiff.  He is represented by Scott & Scott Attorneys at Law, LLP.  Lead plaintiff filed his first amended complaint on January 26.  In response to a motion to dismiss, lead plaintiff filed the SAC on March 26.[1]

The SAC alleges (1) violations of §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k; (2) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b); and (2) "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[2] The SAC asserts that the defendants made misleading statements and omissions that masked UiPath's difficulties in gaining and retaining customers and the impact of competitors such as Microsoft.  The defendants have renewed their motion to dismiss the entire pleading.

---

[1] Lead Plaintiff had been warned that it was unlikely that he would be granted any further opportunity to amend.

[2] In his opposition to the motion to dismiss, the plaintiff does not defend the claims brought under § 15 of the Securities Act or § 20 of the Exchange Act.  These claims are deemed abandoned and will not be further considered.

**Discussion**

To survive a motion to dismiss under Fed. R. Civ. P.

12(b)(6), a party "must plead enough facts to state a claim that

is plausible on its face." Green v. Dep't of Educ. of N.Y., 16

F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Vengalattore

v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting

Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009)).  "In determining

if a claim is sufficiently plausible to withstand dismissal," a

court "accept[s] all factual allegations as true" and "draws all

reasonable inferences in favor of the plaintiffs." Melendez v.

City of N.Y., 16 F.4th 992, 1010 (2d Cir. 2021) (citation

omitted).  In securities actions, a court

> may also consider any written instrument attached to
> the complaint, statements or documents incorporated
> into the complaint by reference, legally required
> public disclosure documents filed with the SEC, and
> documents possessed by or known to the plaintiff upon
> which it relied in bringing the suit.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016).  After the

Exchange Act claims are addressed, this Opinion will turn to the

Securities Act claims.

I.    § 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the sale of any security . . . any manipulative or deceptive device in contravention of" SEC rules. 15 U.S.C. § 78j(b).  Rule 10b-5, in turn, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.  17 C.F.R. §10b-5.

To state a claim for material misrepresentations or omissions, a plaintiff must plead

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission (5) economic loss; and (6) loss causation.

In re Phillip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417 (2d Cir. 2023) (citing Stoneridge Inv. Partners, LLC v. Sci.

Atlanta, Inc., 552 U.S. 148, 157 (2008)).[3]  Complaints brought by private plaintiffs under § 10(b) and Rule 10b-5 are subject to a heightened pleading standard pursuant to the PSLRA and Rule 9(b), Fed. R. Civ. P.  "[B]ecause such a claim sounds in fraud, the plaintiff must state with particularity the circumstances constituting fraud."  Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd., 19 F.4th 145, 150 (2d Cir. 2021) (citation omitted).  The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 167 (2d Cir. 2021) (citation omitted).

A. Material Misstatements

"A statement is materially misleading when the defendants' representations, taken together and in context, would have misled a reasonable investor."  Altimeo Asset Mgmt., 19 F.4th at 151 (citation omitted).  "To be material, a statement must, in the view of a reasonable investor, have significantly altered the total mix of information available."  Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 100-01 (2d Cir. 2021) (citation omitted).

Rule 10b-5(b) makes it unlawful to "omit material facts in connection with buying or selling securities when that omission

---

[3] The defendants do not argue that the SAC fails to plead reliance, loss, or loss causation.

renders statements made misleading." <u>Macquarie Infrastructure</u> <u>Corp. v. Moab Partners, L.P.</u>, 601 U.S. 257, 259 (2024).  Rule 10b-5(b) does not apply to "pure omissions," which occur "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." <u>Id.</u> at 263.  Even "a duty to disclose" certain information "does not automatically render silence misleading under Rule 10b-5(b)." <u>Id.</u> at 265.  Rather, Rule 10b-5(b) requires "identifying affirmative assertions" before "determining if other facts are needed to make those statements 'not misleading.'" <u>Id.</u> at 264.

B. Application

The SAC does not challenge the accuracy of UiPath's reported financial information.  It asserts, however, that UiPath made four sets of misrepresentations.[4]  The first category is statements concerning the ARR.  The second category is statements concerning UiPath's "land-and-expand" business model. The third category is statements regarding competitors, particularly Microsoft.  Finally, the SAC alleges that the "risk factors" identified in UiPath's SEC filings were misleading. According to the plaintiff, the defendants' statements artificially inflated the price of UiPath's stock during the

---

[4] In opposing the motion to dismiss the SAC, the plaintiff has abandoned many of the allegations in the SAC.  Therefore, this Opinion describes those claims that the plaintiff continues to pursue, as described in its opposition to the motion.

Class Period.  The only statements that survive this motion to
dismiss fall within the third category and relate to competition
with Microsoft.

### 1.  ARR statements

The first category of alleged misstatements concerns
UiPath's disclosures regarding its ARR metric, which annualized
invoiced amounts.  The SAC does not assert that the ARR figures
appearing in the Company's SEC filings were false.  Instead, the
plaintiff argues that the ARR metric itself was "artificially
inflated" for three reasons.  First, the invoiced amounts
included revenue that might never be realized in future years,
for instance if customers chose not to renew licenses.  The SAC
explains that those decisions not to renew occurred on occasion
with "ramping" licenses, which added more Robots in the final
month or months of a license.  Therefore, the invoiced amounts
in a particular year would be similar to the amounts invoiced in
future years only if customers renewed their licenses and did so
with all of the additional Robots.  Secondly, the ARR was
inflated because it included non-recurring revenue such as one-
time fees for implementation and service.  Finally, the
plaintiff argues that the definition of ARR was misleading
because UiPath described it as a "key metric" and a better
indicator of UiPath's financial health than the GAAP metrics.

The SAC does not plausibly plead that the defendants'
statements regarding ARR were either false or misleading.
UiPath made ample disclosures regarding both the nature of the
ARR metric and its limitations.  For instance, the 2021
Registration Statement defined ARR as a measurement only of
amounts invoiced annually and warned that ARR "does not reflect
any actual or anticipated reductions in invoiced value" due to
"service cancellations".  The Registration Statement also warned
that ARR "should be viewed independently of revenue and deferred
revenue as ARR is an operating metric and is not intended to be
combined with or replace these items."  The SAC does not assert
that the GAAP revenue disclosures contained in any of the
company's financial disclosures were either incomplete or
misleading.  Therefore, investors were at liberty to consider,
if they wished, the ARR figures as well as traditional GAAP
metrics.  The Registration Statement further warned that "ARR is
not a forecast of future revenue" and that "investors should not
place undue reliance on ARR as an indicator of our future or
expected results."  These and similar disclosures and cautions
were repeated in each of UiPath's filings with the SEC.

In making its ARR claims, the plaintiff is in essence
faulting UiPath for adopting a unique measure of its operations
in addition to reporting its GAAP-compliant financial results.

The plaintiff has failed to explain, however, why UiPath was not free to develop a bespoke measurement tool and describe that tool to investors so long as it did so accurately. The fact that management used ARR as a "key" metric and believed it was a useful tool to measure customer commitment period-over-period, as Gupta explained to investors on December 8, 2021, does not state a violation of the securities laws. UiPath repeatedly warned that ARR is not a forecast of future revenue and that investors should not place undue reliance on it as an indicator of either future or expected results.

Neither of the specific complaints regarding the accuracy of the defendants' statements regarding ARR succeeds. The SAC has not pleaded that, to avoid misleading investors, UiPath was required to specifically point out that the invoiced amounts reflected in ARR included revenue from ramping contracts or from one-time implementation and service fees for new customers. Nothing in the disclosures made by UiPath suggested otherwise. Again, UiPath's disclosures did not suggest that ARR measured revenue that would or was even likely to recur. To the contrary, UiPath explained that the calculation was based on amounts invoiced during a particular time period and warned against using this metric to predict future revenue. Therefore, the SAC's allegations regarding ARR are dismissed.

2.   Land and Expand

The next category is composed of three statements regarding UiPath's "land-and-expand" model.[5]  One appears in the Offering Documents; two were made by Gupta during earnings calls.  None of these are actionable.  All have been taken out of context.

First, the plaintiff points to this statement in the prospectus: "Historically, once our platform is deployed, our customers have significantly expanded their use of our platform."  The plaintiff argues that the prospectus statement is misleading because the CWs have reported that customers had stopped renewing and expanding their licenses by the time of the IPO.  But none of the statements by the CWs, as reported in the SAC, quantify the extent to which customers had either reduced their business or stopped doing business with UiPath.  The CWs' vague assertions do not plausibly plead that the prospectus statement was misleading.

The SAC's allegation is in fact troubling since the prospectus statement at issue is immediately illustrated by data which the plaintiff does not challenge as inaccurate.  The graph in the prospectus shows six years of growth in ARR data -- from

---

[5] In opposition to the motion to dismiss, the plaintiff only discusses the three statements described here.  In a parenthetical, the plaintiff's memorandum refers to a paragraph of the SAC as containing "other actionable statements."  The Court will not address statements which the plaintiff has not discussed substantively in his opposition to this motion.

2016 to 2021 -- for several cohorts of customers.  The
prospectus adds that the ARR from its top 50 customers increased
"by a median multiple of approximately 81x, as measured from the
ARR generated in each such customers' first month as a
customer."  Therefore, the reference in the prospectus to
customers' expansion of their business with UiPath is backed up
by data disclosed in the prospectus, and the SAC does not assert
that any part of the data is unreliable or wrong.

Next, the plaintiff identifies two statements made by Gupta
on quarterly earnings calls.  In the June 8, 2021 earnings
conference call, Gupta said:

> Many of our customers start with single points of
> automation and then rapidly expand across different
> processes, different departments and different
> employee bases.  And so that creates more demand for
> our platform -- for the UiPath platform and robots,
> and that translates to more ARR dollars for us.

This statement was made in response to a question regarding
how UiPath's expansion rate during the first quarter of
fiscal year 2022 compared to its historical expansion rate.
Gupta continued by giving precise figures for those
customers with ARR values greater than $100,000 and greater
than $1 million.  Again, the SAC does not take issue with
the accuracy of any of the figures upon which Gupta relied
in responding to the question.  The SAC's vague allegations

fail to plausibly plead that the June 8 statement was false or misleading.

Finally, the plaintiff points to a statement made by Gupta during the June 1, 2022 earnings conference call:

> Our pipeline continues to show strength and interest of expansion and adoption across our platform and across all the segments.  Continuing, including flanking and replacing our competitors, those are deals that we also see more and more of. . . . I would say no pattern that is different than history.

Gupta's statement, which is only partially quoted by the SAC, was made in response to a question about whether UiPath was seeing patterns in the types of new or anticipated customers.  Gupta explained that UiPath continued to have a "broad-based" customer pipeline, which he identified as including local governments, small enterprises, large enterprises, and Fortune 500 companies. The SAC does not plausibly allege any basis to find that the June 1 statement about the strength of the pipeline, when read in context, is misleading.

> 3.  Competition Statements:  Microsoft

The third category of alleged misstatements are five statements regarding Microsoft that were made by Dines in conference calls and at conferences.  The statements describe UiPath's Robots as more complex than Microsoft's and discuss UiPath's competition with Microsoft.

To the extent that these statements describe UiPath's Robots as more complex that Microsoft's, the SAC does not plausibly allege that the statements are either false or misleading.  Those statements were made by Dines at the October 14, 2021 Morgan Stanley Spark Conference and will not be further discussed.

One of the five statements which the plaintiff discusses in opposing this motion was made by Dines at the December 8, 2021 Bank of America Global Technology Conference, to wit, that Microsoft "doesn't have a meaningful impact on our ability to win customers."  This statement of opinion is too vague and general to be actionable.  See In re Synchrony, 988 F.3d at 170.

A third statement was made by Dines at the June 7, 2022 Bank of America Global Technology Conference.  In that statement, Dines discusses a report by a third party, Gartner. The SAC does not plausibly allege that this discussion of a third party's report was misleading.

The remaining two statements, which are actionable, were made by Dines at the March 30, 2022 earnings call.  They are that

- "We don't see {Microsoft} a lot.  But even when we do, our win rate has no difference, compared to where they are not playing."

- "[A]nd speaking about new entrants like Microsoft and ServiceNow . . . we are not seeing them that much."[6]

The SAC alleges that UiPath was experiencing difficulties competing with Microsoft by March of 2022.  CW1, who worked as a Senior Manager and then a Director of Global Marketing Operations and Analytics, recalled that UiPath "did not typically win customers when competing against Microsoft" and was "losing out" to Microsoft by 2021.[7]  CW2, who left UiPath in March of 2022, recalled customers bringing up Microsoft's robots in "about half" of their sales calls.  In light of these assertions by an executive and a salesperson, the SAC has plausibly pleaded that Dines's statements that UiPath "did not see" Microsoft "a lot" or "that much" in deals, or that Microsoft did not affect UiPath's "win rate", were misleading.

The defendants argue that the SAC has not plausibly pleaded that these representations were misleading.  According to the defendants, the SAC's allegations regarding competition with Microsoft are vague and plead at best that UiPath lost some

---

[6] The SAC identifies Gupta as the speaker.  The defendants' motion to dismiss attached the transcript of the March 30, 2022 Earnings Call, which identifies Dines as the speaker.  The lead plaintiff's opposition to the motion to dismiss does not dispute the accuracy of the transcript.

[7] Several of the allegations in the SAC about competition with Microsoft are too general to be inconsistent with the statements by Dines cited above.  Other allegations are untethered to any date.

deals to Microsoft, something which Dines did not deny.  They
argue as well that Dines was merely expressing corporate
optimism and that in their SEC filings and at other conferences
the company disclosed that Microsoft was a competitor.  These
arguments fail.  Dines's statements are not expressions of
optimism but of fact, and the assertions of CW1 and CW2 are
sufficiently concrete to plead that his statements were
misleading.

The plaintiff has also adequately pleaded that these
statements were material and that Dines acted with scienter in
making them.  The SAC alleges that after Microsoft acquired
Softomotive in 2020, UiPath changed its marketing strategy to
respond to Microsoft.  CW4 describes a meeting with senior
executives in early 2021 in which Dines instructed the Company's
engineers to assist in responding to Microsoft.  At the time of
the March 30, 2022 earnings call, UiPath announced that it was
hiring a Microsoft executive as its Chief Business Officer.  At
the pleading stage, these allegations are sufficient to support
an inference that Dines had the requisite scienter when making
the actionable statements.

### 4.  Risk Factors

The plaintiff argues in its opposition to this motion that
the risk factors disclosed in the Offering Documents and
subsequent SEC filings were misleading because two of the risks

which had already materialized were described as hypothetical risks.  These allegedly misleading statements concerned competition with Microsoft and the decisions by UiPath's customers not to renew licenses.

It is true that "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk, has in fact, materialized in the past and is virtually certain to materialize again."  Set Capital LLC. V. Credit Suisse Grp. AG, 996 F.3d 64, 85 (2d Cir. 2021) (citation omitted).  Here, however, an examination of the SEC filings demonstrates that the risk disclosures were not purely hypothetical statements.

The section of the prospectus containing risk warnings was 42 pages in length.  The plaintiff asserts in opposition to this motion that the following four statements about risk were misleading:

- "The markets in which we participate are competitive and, if we do not compete effectively, our business, financial condition, and results of operations could be harmed."

- "If we fail to continue to differentiate our platform and products from those offered by our competitors, then our business, results of operations, and financial condition may be harmed."

- "Declines in renewals or the purchase of additional licenses by our customers could harm our future operating results."

- "If we are unable to attract new customers, our
  business, financial condition, and results of
  operations will be adversely affected."

The SAC fails to plausibly plead that these statements,
when read in context, were misleading.  The Company's SEC
filings did not fail to disclose adverse events that had already
occurred.

For example, the discussion that followed the first of
these four statements explained that UiPath "compete[s] with
companies that provide RPA and other automation solutions"
including "Microsoft"; that the RPA market is "increasingly
competitive" and "we expect that the competitive environment
will remain intense going forward"; that many competitors had
advantages such as "greater name recognition," "more established
customer relationships and installed customer bases," and
"greater resources"; and that some "competitors offer their on-
premises or cloud solutions at a lower price, which has resulted
in, and may continue to result in, pricing pressures."  Similar
descriptions of adverse circumstances that the company was
currently experiencing exist for each of the other three
statements.

In light of these robust disclosures, the risk factors
identified in the prospectus were not misleading.  This is
especially true because UiPath made fulsome disclosures about

its financial condition, none of which the SAC asserts are inaccurate.  Therefore, investors were able to track, quarter by quarter, whether revenue was adversely affected by competition and UiPath's failures to expand its business.  The claims based on these statements must be dismissed.

## II.  Securities Act Claims

The plaintiff alleges that the defendants violated § 11 of the Securities Act because the Offering Documents contained material misstatements and omissions.  Section 11 provides in pertinent part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement or a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security

may sue.  15 U.S.C. § 77k(a).  The Securities Act requires that "companies issuing securities make a 'full and fair disclosure of information' in connection with a public offering."  New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo, 80 F.4th 158, 168 (2d Cir. 2023), amended and superseded on rehearing, --- F.4th ---, 2023 WL 11965444 (Oct. 3, 2024) (citing Pinter v. Dahl, 486 U.S. 622, 646 (1988)).  See also DeMaria v. Andersen, 318 F.3d 170, 175 (2d Cir. 2003).

Unlike claims brought under § 10(b), a plaintiff bringing a claim under § 11 "need not allege scienter, reliance, or loss

causation." Set Capital, 996 F.3d at 84 (citation omitted).

Instead, "Section 11 imposes absolute liability on the issuer of

a registration statement if:

> 1) The statement contained an untrue statement of
> material fact,
> 2) The statement omitted to state a material fact
> required to be stated therein, or
> 3) The omitted information was necessary to make the
> statements therein not misleading.

Id. (citation omitted). In another departure from § 10(b), § 11

"also creates liability for failure to speak on a subject at

all" in addition to "proscribing lies and half-truths".

Macquarie, 601 U.S. at 264-5 (2024) (citing Omnicare, Inc. v.

Laborers Dist. Council Const. Industry Pension Fund, 575 U.S.

175, 186 (2015)). A statement or omission is material if "a

reasonable investor would view it as significantly altering the

total mix of information made available." Set Capital, 996 F.3d

at 84 (citation omitted).

To have standing to plead a Securities Act claim, a

plaintiff must plead that she purchased stock in or traceable to

the securities offering at issue. DeMaria, 318 F.3d at 176.

Aftermarket purchasers have standing to pursue a claim under §

11 only so long as they can prove that the securities they

bought were those sold in an offering covered by the false

registration statement. Id. at 178. Accordingly, to plead a

§ 11 claim, a plaintiff must plead that she "purchased shares

traceable to the allegedly defective registration statement."
Slack Technologies, LLC v. Pirani, 598 U.S. 759, 770 (2023).

The plaintiff does not allege that the Offering Documents
contained any additional misleading statements in violation § 11
apart from those already discussed in connection with his
Exchange Act claims. The Exchange Act claims based on alleged
misrepresentations in the Offering Documents have already been
dismissed. They are the claims that the Offering Documents made
false or misleading statements in connection with ARR, the land
and expand program, and in connection with its discussion of
risk factors.

Because the SAC did not plausibly plead that any
misstatements were made in the Offering Documents, all that
remains of the § 11 claim is the plaintiff's assertion that the
defendants omitted material information from the Offering
Documents in violation of a duty to disclose. In opposing the
defendants' motion to dismiss, the plaintiff argues that UiPath
had a duty to disclose in its Offering Documents, pursuant to
Items 105 and 303 of Regulation S-K, a "known trend", to wit,
that UiPath had been facing problems competing with Microsoft
since 2020.

The defendants argue that the plaintiff does not plausibly
plead any material omission from the Offering Documents and that

33

the § 11 claim is in any event untimely.  It is only necessary
to address the latter argument.

A plaintiff must assert a § 11 claim "within one year after
the discovery of the untrue statement or the omission, or after
such discovery should have been made by the exercise of
reasonable diligence."  15 U.S.C. § 77m.  The limitations period
begins when "a reasonable investor conducting [] a timely
investigation would have uncovered the facts constituting a
violation."  City of Pontiac Gen. Emps' Ret. Sys. v. MBIA, Inc.,
637 F.3d 169, 174 (2d Cir. 2011).  Combined with a three-year
statute of repose, the limitations period for Securities Act
claims is designed "to protect defendants' financial security by
reducing the open period for potential liability."  CALPERS v.
ANZ Sec., Inc., 582 U.S. 497, 506 (2017).  The one-year statute
of limitations period, which is more limited than the period
that applies to Exchange Act claims,[8] is also designed "to
encourage plaintiffs to pursue diligent prosecution of known
claims."  Id. at 504 (citation omitted).

The Offering Documents were filed on April 21, 2021.  The
lead plaintiff first brought his claims under the Securities Act
in the first amended complaint, filed on January 26, 2024.  The

---

[8] The Exchange Act has a two-year statute of limitation and a
five-year statute of repose.  China Agritech v. Resh, 584 U.S.
732, 736 (2018).

plaintiff asserts that the § 11 claims are nonetheless timely. The plaintiff contends that it could not have uncovered the facts supporting its § 11 claims until at least September 7, 2022, and thus it had one year from that date to file the claims. It next asserts that the time to file the Securities Act claims was tolled from the date this litigation was filed, which occurred on September 6, 2023, pursuant to American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974).

Before addressing American Pipe, it is important to observe that Samhita Gera, who filed the original complaint in this litigation, did not plead that she purchased her shares pursuant to the Registration Statement. Her PSLRA certification, filed alongside the original complaint, indicates that she purchased UiPath stock in November of 2021, more than six months after the IPO. There is no basis to find, therefore, that she had standing to bring a § 11 claim or that the Court would have had jurisdiction over such a claim should she have attempted to plead it, which she did not.

In American Pipe, the Supreme Court held that the filing of a "timely class action" "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Id. at 550, 554. This tolling benefit is

afforded to active participants in the litigation as well as those who were unaware of the proceedings.  Id. at 552.  The "watchwords of American Pipe are efficiency and economy of litigation."  China Agritech v. Resh, 584 U.S. 732, 748 (2018).  The purpose of American Pipe tolling is to preserve the rights of plaintiffs who "reasonably relied on the class representative, who sued timely, to protect their interests in their individual claims."  584 U.S. at 743 (citing Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 350 (1983)).

The American Pipe Court observed that its holding was not inconsistent with the "functional operation of a statute of limitations."  414 U.S. at 554.  It ensures "essential fairness to defendants" since the class representative

> commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also the number and generic identities of the potential plaintiffs who may participate in the judgement.  Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation.

Id. at 555.  See also In re WorldCom Sec. Litig., 496 F.3d 245, 253 (2d Cir. 2007) (noting in its discussion of American Pipe that statutes of limitations guard against unfair surprises).

American Pipe tolling of a statute of limitations period, however, does not apply to successive class actions.  China Agritech, 584 U.S. at 744.  "A would-be class representative"

who commences suit after expiration of the limitation period
"can hardly qualify as diligent in asserting claims and pursuing
relief." Id. at 743.  It is a fundamental rule of law that
"[p]laintiffs have no substantive right to bring their claims
outside the statute of limitations." Id. at 745.  On the other
hand, American Pipe tolling does apply to putative class members
who seek to file individual actions.  Applying these principles,
an individual may rest "secure in the knowledge that she can
avail herself of American Pipe tolling if [class] certification
is denied to a first putative class," id. at 747, while a
plaintiff who seeks to lead a class "has every reason to file a
class action early." Id.

      More recently, applying American Pipe and Agritech, the
Court of Appeals held that a new class representative may be
able join a class action and benefit from American Pipe tolling
when it does. Fund Liquidation Holdings LLC v. Bank of Am.
Corp., 991 F.3d 370, 393 (2d Cir. 2021).  In Fund Liquidation,
the original named plaintiff in the class action lacked standing
to bring the claims pleaded on behalf of the class, while the
new class representative possessed standing to do so. Id. at
392.  The Second Circuit remanded the action with instructions
for the district court to determine whether the addition of the
new class representative would satisfy the relation-back

requirements of Rule 15(c)(1)(B), id. at 393, and whether any claims could be said to relate back against certain defendants where no timely complaint had been filed against them alleging the relevant misconduct.  Id. at n.17.

Rule 15, however, cannot revive claims that were dismissed from a class action complaint for want of jurisdiction.  Police and Fire Ret. Sys. Of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 110 (2d Cir. 2013).  In IndyMac, the Court of Appeals held that American Pipe tolling could not extend the statute of repose contained within § 13 of the Securities Act.  Id. at 109. It rebuffed as well the effort to use the relation back doctrine under Rule 15(c) to permit members of a putative class "who are not named parties, to intervene in the class action as named parties in order to revive claims that were dismissed from the class complaint for want of jurisdiction."  Id. at 110.  That effort was "foreclosed by the long recognized rule that if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim."  Id. at 111 (citation omitted).  The district court in IndyMac had dismissed the § 13 claim for lack of standing prior to class certification.  Id.

Applying this precedent, the plaintiff's reliance on
American Pipe tolling fails.[9]  That doctrine does not permit the
filing of an amended class action complaint in 2024 containing a
time-barred § 11 claim.  The original complaint, filed in
September of 2023, did not plead a § 11 claim.  No reasonable
plaintiff seeking to lead a class, and no investor who purchased
shares traceable to the IPO, could have reasonably relied on
that 2023 complaint as tolling the § 11 statute of limitations.
This is particularly true when that complaint did not allege
that Gera had standing to bring such a claim.  Therefore, the
lead plaintiff's § 11 claim, brought on behalf of the class, is
dismissed as time-barred.

As soon as the statute of limitations period on a § 11
claim had run, the defendants were entitled to rely on that fact
and assess their litigation risks accordingly.  The impact was
not trivial.  Because there is no § 11 claim, plaintiffs will
have the burden of proving scienter and reliance, among other

---

[9] In a footnote in the opposition brief, the plaintiff also
argues that the Securities Act claims, first pleaded in 2024,
may be timely because they relate back to the original
complaint.  It is unnecessary to address a substantive argument
made in a footnote.  Conn. Bar. Ass'n v. United States, 620 F.3d
81, 100 n.21 (2d Cir. 2010).  In any event, as explained in
IndyMac, a jurisdictional defect cannot be cured by resort to
Rule 15.  721 F.3d at 110; see also In re Magnum Hunter
Resources Corp. Sec. Litig., 26 F.Supp.3d 278, 303 (S.D.N.Y.
2014), aff'd, 616 F. App'x 442 (2d Cir. 2015).

things; the defendants will not face a strict liability claim.
And because of the Supreme Court's recent ruling in Macquarie,
the defendants will not be exposed to a claim that the Offering
Documents contained a pure omission.  601 U.S. at 266.  These
consequences will affect the scope and nature of discovery, the
complexity of any trial that may occur, and the parties'
settlement discussions.

The plaintiff relies on cases which have permitted the
substitution of a named plaintiff to cure a standing defect.  In
none of those cases, however, was a substituted plaintiff
permitted to amend the pleading to file a claim that had not
been previously pleaded and that was time-barred at the time it
was first filed.

The plaintiff also cites MYL Litig. Recovery I LLC v. Mylan
N.V., No. 19-cv-1799 (JPO), 2020 WL 1503673 (S.D.N.Y. Mar. 30,
2020), which relied on American Pipe tolling to permit an
individual plaintiff who had opted out of a class action to
bring a time-barred claim under § 18 of the Exchange Act even
though the original class action had not included that claim.
Id. at *8.  Not every court has reached the same conclusion as
the MYL court.  See Gotham Diversified Neutral Master Fund, LP
v. Chicago Bridge & Iron Co. N.V., 18-cv-9927 (LGS), 2019 WL
3996519, at *3 (S.D.N.Y. Aug. 23, 2019).  In any event, MYL was

an individual plaintiff's action and not a class action.  It is
inapposite.

The lead plaintiff next argues that he should be given
time, beyond the statute of limitations, to plead a Securities
Act claim because he was only chosen as lead plaintiff on
December 1, 2023, and was permitted to file first amended
pleading on January 26, 2024.  This argument carries little
weight.  There was no impediment to a putative class
representative filing a timely § 11 claim.  And because the
PSLRA requires a party filing a securities class action to
provide prompt notice of the action to members of the purported
class, other putative class action plaintiffs were given notice
of Gera's filing and could have filed their own actions on or
near the time Gera filed hers.  Indeed, that is typically the
case: when one putative securities class action is filed,
several more quickly follow.  Nothing prevented Severt,
represented by his current counsel, or any other investor with
standing to bring a Securities Act claim from filing a timely
action.  Therefore, the fact that Severt filed his amended
complaint on a schedule set by this Court after he was chosen as
lead plaintiff does not make the filing of the Securities Act
claim timely.

Given the conclusion that the lead plaintiff may not rely on American Pipe tolling to add a § 11 claim, it is unnecessary to address the plaintiff's argument that an investigation may reveal that Gera had standing to plead a Securities Act claim even though she did not do so. Nor is it necessary to address the defendants' additional argument that the Securities Act claim would have been untimely even if it had been included in the September 6, 2022 complaint.

### Conclusion

The defendants' April 23, 2024 motion to dismiss the complaint is granted in part. All claims against defendant Ashim Gupta are dismissed. All claims based on a violation of §§ 11 and 15 of the Securities Act and § 20 of the Exchange Act are dismissed. The claims against UiPath and Daniel Dines for a violation of § 10(b) and Rule 10b-5 based on alleged misrepresentations on March 30, 2022 regarding Microsoft's competition with UiPath survive.

Dated:    New York, New York
          November 4, 2024

                                    DENISE COTE
                          United States District Judge