**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UIPATH, INC. SECURITIES LITIGATION | Case No. 1:23-cv-07908-DLC<br><br>CLASS ACTION<br><br>JURY TRIAL DEMAND |

**PLAINTIFF'S THIRD AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiff Paul Severt ("Severt" or "Plaintiff"), by and through his attorneys, and on behalf of all others similarly situated, alleges the following as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by UiPath, Inc. ("UiPath" or the "Company"), the Company's Chief Executive Officer ("CEO") Daniel S. Dines ("Dines"), and the Company's Chief Financial Officer ("CFO") Ashim Gupta ("Gupta"), analyst and media reports, conference call transcripts, Company press releases, interviews with former Company employees, other publicly available information, and information produced by Defendants in discovery. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein.

## I.    SUMMARY OF THE ACTION

1.    This federal securities class action is brought on behalf of all persons and entities that purchased or otherwise acquired UiPath's Class A common stock ("UiPath's common stock") between April 21, 2021 and September 27, 2022, inclusive, including all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the registration statement and prospectus ("Offering Documents") issued in connection with UiPath's April 21, 2021 initial public offering ("IPO" or the "Offering"), and were damaged thereby. Plaintiff and the Class bring claims under §§11 and 15 of the Securities Act of 1933, 15 U.S.C. §77a, *et seq.* (the "Securities Act"). They also bring separate claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq.* (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. The Defendants are UiPath, UiPath's former CEO Dines, and UiPath's CFO Gupta.

2.      By the time of its April 2021 IPO, UiPath was suffering from substantial undisclosed problems, and Defendants had sped up the IPO so that the Company could issue shares at a higher valuation before being overwhelmed by those problems, which occurred at the end of the Class Period.  Founded in 2005, UiPath was among the first companies to offer software which automated various tasks that programs, computers, and related systems would otherwise rely on people to manually carry out – *i.e.*, robotic process automation software ("RPA" or "Robots").  Due to its head start, UiPath experienced "hyper growth" in its early years, which UiPath's valuation was predicated upon.

3.      But, in the year before the IPO, as multiple confidential witnesses ("CWs") recounted, UiPath's growth and demand for its products were stagnating.  This was initially a result of UiPath having already significantly tapped those customers that were most suited to and interested in licensing substantial numbers of its Robots – the type of licenses that fueled its former growth and were necessary to sustain it.  UiPath focused on expensive, complex Robots with more advanced capabilities, but only certain large enterprises had the scale across which deploying its Robots would be cost-effective, while also taking into account that its Robots were difficult to implement and use, effectively requiring considerable in-house technical support.

4.      As a result, Defendants attempted to refocus their sales on mid-market customers, because, as the CWs recounted, they needed to prop up revenue prior to the IPO, but this effort also proved unsuccessful.  To the extent mid-market customers licensed UiPath's Robots, they often made small orders, and their more modest resources meant that they sometimes did not even use all of their limited number of Robots.  UiPath was therefore experiencing significant customer churn among mid-market customers – and a notable amount of churn among enterprise customers as well – with UiPath sales executives regularly failing to meet their quotas.

5.      In May 2020, about a year before the IPO, Microsoft entered the RPA market with Robots designed to exploit UiPath's weaknesses, turning UiPath's already problematic circumstances into a crisis.  Microsoft's Robots were inexpensive, required minimal support and could readily accomplish the RPA tasks that customers actually wanted, more than making up for whatever advanced capabilities UiPath's Robots may have had.

6.      Again, the CWs recounted that by the second half of 2020, Microsoft had fundamentally altered the competitive landscape and was regularly winning customers that UiPath needed to sustain its growth, particularly in the mid-market.  UiPath was well aware of these problems, and, at the same time, shifted its strategy to try to respond to Microsoft, while rushing out its IPO.

7.      Unable to mount an effective response, UiPath instead resorted to various gimmicks to prop up its revenue.  They ranged from discounts, to ramping contracts that made it appear customers would increase their licenses when that might never happen or if it did happen would often be short lived, to switching to a new metric called Annualized Renewal Run-rate ("ARR") that made growth and demand appear larger than was the case.

8.      The CWs also confirmed that Defendants Dines and Gupta knew of the foregoing problems undermining UiPath.  Defendants led or attended meetings discussing these problems, had access to reports laying them out, and oversaw the executives making large strategic changes for UiPath in a failed response to those problems.

9.      Starting with the IPO and continuing throughout the Class Period, Defendants issued numerous misstatements concerning UiPath's growth, repeatedly declaring "increasing demand in our pipeline" and customers' "increased adoption of our core product portfolio," when the Company was experiencing significant customer churn and forced to resort to unsustainable

3

and unsuccessful sales gimmicks.  As another example, Defendants denied the substantial negative impact that Microsoft was having on UiPath, claiming that "Microsoft doesn't even compete in this space" and "Microsoft has – doesn't have a meaningful impact on our ability to win customers."  Additionally, Defendants issued numerous statements about UiPath's ARR, which Defendants claimed was the best metric to evaluate UiPath's "highly recurring subscription-based business," even though it gave an amplified and inaccurate impression of demand for the Company's Robots.  When the undisclosed risks that Defendants worked to conceal throughout the Class Period began to materialize in disappointing performance, Defendants attributed that performance to the broader "macroeconomic environment" instead of revealing the truth.

10.     Despite Defendants' efforts, the truth gradually emerged through a series of materializations of the undisclosed risks and partial corrective disclosures.  In turn, UiPath's common stock fell significantly, leading to billions of dollars of losses for Plaintiff and the Class.

## II.    JURISDICTION AND VENUE

11.     The Exchange Act claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  The Securities Act claims asserted herein arise under §§11 and 15 of the Securities Act (15 U.S.C. §§77k and §77o).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa), and §22 of the Securities Act (15 U.S.C. §77v).

13.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa(a)), and §22 of the Securities Act (15 U.S.C. §77v(a)).  At all relevant times, UiPath was headquartered and conducted business in this District at 90 Park Ave, 20th Floor, New York, New York 10016.  Many of the acts charged herein, including the

preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, at all relevant times, UiPath's common stock was offered, sold, and traded on the New York Stock Exchange (the "NYSE"), which is located in this District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the NYSE, a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

15. Lead Plaintiff Paul Severt, as set forth in his previously filed certification (ECF No. 41-2), purchased UiPath's common stock in UiPath's IPO pursuant and traceable to the Offering Documents and during the Class Period and suffered damages as a result of the federal securities law violations and actionable statements and material omissions alleged herein.

### B. Defendants

16. Defendant UiPath is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York. UiPath's stock trades on the NYSE under the ticker "PATH." UiPath is a provider of robotic process automation software. On April 19 and 21, 2021, respectively, UiPath filed the final amendment to its Registration Statement and Prospectus for its IPO, pursuant to which it sold 13 million shares of UiPath's common stock. During the Class Period, UiPath, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated the securities laws and contained materially false and misleading statements.

17.     Defendant Dines co-founded UiPath in 2005 and served at all relevant times as Chairman of UiPath's Board of Directors (the "Board").  Dines also served as the sole CEO of UiPath until April 27, 2022, when the Company announced that he would assume the role of co-CEO alongside Robert Enslin ("Enslin"), effective May 16, 2022.  On July 10, 2023, UiPath announced that Dines would resign from his position as co-CEO effective January 31, 2024 and thereafter assume the newly-created role of Chief Innovation Officer, with Enslin assuming the role as UiPath's sole CEO.  Dines reviewed, contributed to, and signed UiPath's actionable Offering Documents and throughout the Class Period signed UiPath's FY 2022 Form 10-K and made statements in the Company's press releases, earnings conference calls, and at other public events, and which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Dines made the false and misleading statements with scienter.

18.     Defendant Gupta served at all relevant times as UiPath's CFO.  Previously, upon joining the Company in February 2018 until his appointment as CFO in November 2019, Gupta served as UiPath's Chief Customer Success Officer.  Gupta continues to serve in his role as CFO as of the date of this filing.  Gupta reviewed, contributed to, and signed the actionable Offering Documents and throughout the Class Period signed UiPath's FY 2022 Form 10-K and each Form 10-Q and made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements.  At all relevant times, Gupta made the false and misleading statements with scienter.

19.     Defendants Dines and Gupta are referred to herein together as the "Individual Defendants."

20.    Due to the Individual Defendants' high-level positions at the Company, they possessed the power and authority to control the contents of UiPath's Offering Documents and filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's Offering Documents, SEC filings, reports, and press releases alleged herein to be materially false, misleading, and incomplete prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue were materially false, misleading, and incomplete when made.

21.    The Individual Defendants and UiPath are collectively referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    UiPath's Background

22.    Founded in 2005 by Defendant Dines, UiPath was among the first companies to offer software which automates various tasks that computer programs, applications, and related systems would otherwise have people carry out. This software is referred to as robotic process automation ("RPA"). RPA can, for example, pull a standard set of information from regularly generated documents and compile that information in a spreadsheet.

23.    Robots range from simple to complex. While complex robots may be able to automate a broader and more difficult set of processes, they generally require more upfront programing and customer training, are harder to integrate with a customer's other software or

systems, and necessitate more support on an ongoing basis as they are used.  The simple end of the spectrum encompasses "LowCode" or "NoCode" Robots, which enable businesses to enjoy the benefits of RPA in an easy and inexpensive manner.  In general, NoCode or LowCode solutions enable a user to automate a task with little or no programming knowledge—as such, these Robots are also sometimes called "attended."  The other end of the spectrum covers complex Robots designed for experienced developers that utilize advanced features to build complex enterprise-wide processes and automations; these Robots are also called "unattended," because they require more user interaction and support.

24.     By 2020, the year before UiPath's IPO, Defendants' business strategy focused on more complex and expensive Robots.  This was in part the legacy of UiPath's early entry into the RPA market, which left its Robots at one point prior to the IPO generally capable of performing better or doing more tasks than the Robots designed by many later market entrants—though UiPath's Robots were not able to perform as well as the Company claimed they could.  But, as detailed below, in the lead up to the IPO, Defendants focused on complex, expensive Robots primarily to justify the high prices UiPath was struggling to impose on customers and to position UiPath as a premium brand that could supposedly fend off heavy competition from NoCode and LowCode rivals.

**B.      Leading Up to the IPO, UiPath's Growth and Demand for Its Products Were Stalling and Customers Were Churning**

25.     Whereas UiPath's head start in the RPA market had enabled "hyper-growth" in earlier periods, by 2020—about a year before the IPO and the Class Period—the Company's growth was stalling.

26.     This problem began with demand for UiPath's Robots faltering among large enterprises, who were the Company's most important set of customers.  Given UiPath's focus on

complex, expensive Robots, large enterprises were generally the only potential customers with both the resources to onboard and support a substantial number of UiPath's Robots and the scale at which the benefits of doing so were arguably worth the expense. These enterprise customers were the main source of contracts that provided more than marginal revenue for UiPath and fueled the Company's earlier "hyper-growth." But, by 2020, UiPath had already landed many of the large enterprises for whom its Robots were realistic purchases, and was having difficulty landing new ones.

27.    As a result, UiPath then attempted to target a new set of mid-market customers, but demand was stagnating there as well. Mid-market customers are smaller than enterprise customers, with less financial and technological resources, and less scale across which to deploy Robots. Accordingly, by 2020, to the extent mid-market customers had a budget for RPA software at all, they were often choosing cheaper and easier to use LowCode / NoCode options provided by UiPath's competitors, which were better suited to their scale and resources, instead of UiPath's more complex – and expensive – Robots.

28.    UiPath was not only having difficulty landing new enterprise and mid-market customers during that time, but also struggled to retain customers and expand business with the customers it already had. Many longstanding enterprise customers had already expanded their licensing of UiPath Robots about as much as they were going to. Notably, enterprise customers were often satisfied limiting their use of UiPath Robots to a department or two, rather than expanding licenses throughout their organizations, which UiPath needed to continue its growth. Likewise, UiPath generally could not get mid-market customers to expand beyond licenses for a small number of users, which yielded far too little revenue to maintain UiPath's growth. On top of that, other customers were not renewing their licenses with UiPath at all, leading to significant

churn.   All of this reflected that customers were not getting sufficient value from UiPath's expensive Robots, particularly compared to competing products.

29.     A number of confidential witnesses ("CWs") who formerly worked at UiPath during the relevant time period further described this situation, and also described the Individual Defendants' knowledge of those problems.

30.     CW1 worked at UiPath as a Senior Manager and then a Director of Global Marketing Operations & Analytics from September 2018 to January 2022 and reported to UiPath's Chief Marketing Officer.

31.     CW1 recounted that, prior to the IPO, UiPath was experiencing customer churn—that is, it was losing customers entirely, or having customers reduce the number of Robots they were licensing.   CW1 recalled that UiPath had dedicated customer success operations and specialists who reported on churn, and that CW1 saw reports outlining the reasons that customers were churning (discussed herein) as part of CW1's marketing role.   As CW1 explained, "I needed to know why we were churning so marketing could make changes to avoid those losses."

32.     CW1 recalled that churn was especially an issue with mid-market customers, stating that "a lot of those contracts were churning."   Further, CW1 stated that enterprise accounts were churning too, "enough that it was alarming."

33.     Consistent with CW1's recollection, in December 2022, after the Class Period, UiPath's CEO Enslin conceded that "the majority of [UiPath's] churn is in the smaller customers . . . and you should expect to see churn in the smaller customer market."

34.     CW1 stated that UiPath's c-suite – including Dines and Gupta – were aware of the level of churn and the reasons for churn, because all senior executives had access to the same reports as CW1 had access to and more.   CW1 continued that reports were made available in

applications like Tableau along with Gainsight, a customer success tool that monitors propensity to churn. CW1 stated that UiPath executives would have seen higher churn in these reports and CW1 recalled discussions of churn during all-hands Company-wide meetings, which executives, like Dines, attended and frequently led.

35.     Further to that point, CW1 recalled that UiPath built reporting dashboards "specifically for the audience" of the c-level executives. As CW1 explained, UiPath had a centralized set of reports available for people in go-to-market functions, but the dashboard included a c-suite business help dashboard, where the c-suite was "the target audience." CW1 was able to see reports on churn in the reporting dashboard, because CW1 was in a reporting function, and CW1 stated these were the same reports that the c-suite had access to.

36.     CW2 was an Account Executive for UiPath's mid-market segment from December 2020 to March 2022, whose recollections, including with regard to churn, is consistent with CW1's. CW2 sold UiPath Robots directly to mid-market customers and also through the Company's partner networks. The mid-market team was split into three "Regions" domestically (East, Central, West), and also had a global component. CW2 focused on sales in the "East" Region and reported to a sales director for that Region.

37.     During CW2's tenure, CW2 and CW2's peers had sales quotas, but often most – including CW2 – missed them. Personally, CW2 only hit sales quotas in two or three quarters during CW2's tenure at UiPath. CW2 learned that peers were regularly not hitting quotas as well, because every quarter the sales organization would host quarterly business reviews (QBRs), and there were always slides in this presentation about the percentage of quotas that were attained or missed. CW2 further stated that Account Executives had to submit their individual sales contributions to their managers who integrated these sales into the presentation.

38.     CW3 worked at UiPath as an Account Executive for Enterprise customers from February 2021 to May 2023, whose recollections of UiPath's sales were consistent with CW1's and CW2's. CW3 stated that enterprise account executives managed customers whose own revenue was above $3 billion. CW3 managed enterprise accounts covering the entire lifecycle of a sale, from the initial sale, through renewals, upselling, cross-selling, and account management, and involved developing contract terms. CW3 noted that UiPath's Enterprise division, similar to the mid-market division, was split up regionally, and CW3 reported to the Vice President for the "Central" Region.

39.     In the course of performing CW3's job, CW3 learned that sales quotas were missed "all the time." To CW3's knowledge, only about 60% of sales quotas were hit – and so about 40% were missed.

40.     Not only were sales executives missing quotas, but CW2, who worked in mid-market sales, also recalled that customer churn was "fairly common" and that "a fair amount" of the time customers would not renew. Notably, CW2 continued, in some cases customers never even deployed the UiPath Robots they licensed and had been paying for, and once the contract expired, CW2 was unable to get back in touch with the customer to renew. There were also instances where customers did renew, but for less than the amount in the existing contract, such that UiPath would "take a churn on ARR," CW2 explained.

41.     Regarding upselling, CW2 recalled that UiPath did not have much success there either. "Customers were not even getting the full value of what they purchased in the first place," CW2 explained.

42.     CW2 described several systems at UiPath that tracked sales progress or lack thereof. CW2 noted that UiPath used a system called Xactly to track sales performance, which

had a dashboard that showed the percentage of attainment toward quota and how much account executives would be paid out.

43.    Other systems CW2 recalled were Salesforce, which tracked sales and ARR, and Clarity, which was a forecasting tool that tracked progress toward quotas.  CW2 explained that "everyone" had access to Clarity and Salesforce.

### C.    UiPath's Growth and Demand Were Faltering Prior to the IPO Due to (i) Significant Weaknesses with Its Robots, Especially Their Complexity and Expense, and (ii) Microsoft's Release of Robots that Targeted These Weaknesses

44.    UiPath's flagging growth and demand prior to the IPO resulted from several significant obstacles related to Defendants' strategy to focus on complex, supposedly premium Robots.  Of particular importance, UiPath Robots were complex and expensive, in terms of both onboarding onto customer systems in the first instance and continuing in use over time.  For customers and potential customers, this frequently undercut whatever technological capabilities UiPath Robots may have had.  As a result, licensing UiPath Robots in substantial amounts, if at all, was not worth the expense and trouble for most customers outside of certain very large enterprises.  Compounding this problem, UiPath generally dedicated its support team that helped customers implement and use its Robots to large enterprise customers, because they were the customers with the potential to generate more meaningful revenue for the Company, making the expense of supporting them potentially worthwhile.  This left other customers, who already had fewer resources and technological capabilities, to struggle with UiPath's complex Robots, and get insufficient value from them.

45.    Multiple CWs recounted how these obstacles were undercutting demand for UiPath Robots prior to the IPO and Class Period and continued to do so thereafter, and also described the Individual Defendants' knowledge of those problems.

46.    With respect to the complexity and difficulty of using UiPath Robots, CW1, who worked in marketing, explained that while the Company's sales approach promised customers, especially in the mid-market space, that all they needed was a "center of excellence" – a specially designated team – with four people and no internal technology developer to implement those Robots, this was not the case, which caused additional churn.  "There was definitely a lot of: we've sold a bag of goods that seemed significantly easier to implement than it actually was," CW1 recalled.

47.    Relatedly, CW1 noted that the time it took customers between implementing UiPath Robots and receiving value from them was one such reason for churn, and something CW1 was working on during his time there.  Thus, CW1 stated that, while big customers who were "fully staffed" from a customer success standpoint were not churning, even some enterprise customers were churning.

48.    Adding to customers' difficulty using UiPath Robots and software, CW1 explained that UiPath claimed that the Company's RPA possessed certain technological capabilities that the Robots did not actually have.  According to CW1, one example was artificial intelligence, which UiPath's Robots did not have at the time they were sold to customers, despite UiPath's claims. This too "caused some churn."

49.    Although Defendants repeatedly denied that customers had difficulty using UiPath's complex Robots, data that gradually emerged during the Class Period reflected the materialization of those undisclosed difficulties.  UiPath's "Maintenance & Support" revenue, along with its "Service & Other" revenue, which primarily consist of technical support along with customer training and implementation, consistently grew at a higher year-over-year rate than its revenue from Licensing Robots after the IPO.  The cost of revenue for Maintenance & Support

and Service & Other grew at a higher rate too. Thus, both UiPath's customers and UiPath itself were having to spend significant sums of money just to enable the customers to understand how to use and support UiPath's complex Robots, and in disproportionate amounts to the sums customers were spending on licensing the Robots.

50.     Additionally, on the last day of the Class Period, UiPath also announced that it was introducing a "solution accelerator," which the Company would later explain was created to "provide our customers with the technical know-how to help them complete the implementations significantly faster"—a concession to the difficulty customers were having using UiPath's Robots.

51.     With respect to the expense of UiPath Robots, CW1 stated that the lower cost of competition was a reason for UiPath's troubles closing deals. This is discussed further below, including with respect to competition from Microsoft.

52.     CW1 also recounted how, during Covid, UiPath "made a play" to grow their mid-market team and target mid-market customers in particular by telling those customers that RPA would offset the impact of layoffs. But this just "played on that heartstring" to sell those customers "something they wouldn't be able to get value out of in the terms of their contracts," CW1 stated.

53.     CW1 believed that c-level executives, including Defendant Gupta, "absolutely knew" that UiPath Robots were not meeting customer needs, and that there was churn due to over-promising and under-delivering. "They saw the same reports I was looking at," CW1 stated, referring to the reports discussed above.

54.     Consistent with CW1, CW2, who worked in mid-market sales, recalled that UiPath Robots were confusing not just to customers, but even for CW2 as a salesperson. CW2 continued that, because UiPath's Robots were confusing, even those customers who bought them sometimes had not fully deployed the Robots they licensed by the time of a potential contract renewal.

Further, CW2 explained that UiPath's sales representatives were not incentivized to make sure that customers' deployment of Robots was successful, because they heavily depended on their partners to support customers with implementing and using those Robots. Among other things, CW2 recounted that this negatively impacted CW2's ability to upsell.

55.    Compounding this, CW2 noted that potential customers could not fully trial UiPath Robots, with some purchasing the Robots and subsequently realizing that that they did not fully work as expected. CW2 stated that the difficulty in trialing Robots was another roadblock to sales.

56.    CW2 continued that there were "lots of different" Robots that were "constantly changing," and that bundles of Robots were also constantly changing, which was "hard for customers to follow." Along with colleagues, CW2 expressed these frustrations up the reporting chain, but never saw any mitigation efforts.

57.    In addition, CW2 recalled that costs associated with the implementation of UiPath caused "a lot" of CW2's deals to fall through. For example, CW2 described one contract license that was quoted at $30,000 a year, but with a partner implementation cost of $200,000, and, as frequently happened, the customer did not want to pay that price. CW2 believes that UiPath as a whole was aware of this issue since it was "fairly common."

58.    CW2 stated that these problems in the mid-market existed "generally from the time I started" at UiPath in December 2020 – *i.e.*, prior to the IPO.

59.    UiPath's problems with mid-market sales were also widely known at the Company. CW2 recalled all-hands meetings for mid-market account executives that occurred either monthly or quarterly, at which problems, including cost, upselling, churn, and competition, were discussed. These meetings were led by UiPath's Vice President of America, Commercial Sales & LATAM Enterprise.

60.     Consistent with the CWs' recollections, after the Class Period in January 2023, UiPath's co-CEO Enslin acknowledged the Company's difficulty expanding business with its existing customers, stating that UiPath "acquire[s] customers really well," but "acquired them in small departments," and didn't "scale [them] well."

61.     Though Defendants had made many misrepresentations and omissions during the Class Period touting UiPath's supposed strength in expanding its business with existing customers, data that gradually emerged during the Class Period reflected Enslin's belated concession that UiPath did not actually expand well.  In terms of UiPath's customers with an ARR of at least $100,000, the rate of customers crossing that threshold was declining on both year-over-year and sequential bases, with UiPath adding no more than 100 or so net customers into that category in most quarters, representing a small percentage of ARR.  Likewise, in terms of UiPath customers with an ARR of at least $1 million, the rate of customers crossing that threshold was declining on both year-over-year and sequential bases as well, with UiPath adding no more than 15 or so net customers into that category in most quarters, also representing a small percentage of ARR.  Thus, the bulk of the ARR expansion would have had to come from other customers, but that was not actually happening, or was only happening through the aid of gimmicks like ramping contracts and discounting, discussed below.

62.     Into this already deteriorating situation, Microsoft began offering Robots by the second half of 2020 that exploited the weaknesses of UiPath's Robots discussed above, and were regularly winning customers UiPath needed, presenting a substantial problem for Defendants.

63.     Microsoft's transition from a company with limited RPA offerings to a substantial threat to UiPath took place over several years.  In 2015 and 2016, Microsoft started releasing its own RPA software line, under the name Power Apps, which was later renamed Power Automate.

Then, in 2018, Microsoft acquired GitHub, an RPA developer, and used GitHub's software to improve its Power Automate Robots. The key transformation happened in May 2020, when Microsoft doubled down on that strategy by acquiring another RPA developer, Softomotive Holding Ltd ("Softomotive").

64.     Following the Softomotive acquisition, Microsoft's upgraded Power Automate line consisted of simple LowCode or NoCode Robots that performed very effectively and unattended Robots as well. Moreover, as a large, multifaceted technology company, Microsoft could take advantage of various efficiencies, including economies of scale and scope, to offer Power Automate at much cheaper prices than the amount UiPath was attempting to charge for its more complex robots. Also, unlike UiPath, Microsoft's Robots were based on other products Microsoft offered, which often made up the bulk of customers' systems, making Microsoft's Robots easier to integrate. This meant that Microsoft already had longstanding relationships with many potential customers from its other products. At base, Microsoft's Robots efficiently did what most customers actually wanted from RPA software at a low price, whereas UiPath was trying to sell expensive Robots with capabilities that customers did not need and often could not even figure out how to use, which more than made up for whatever high-end capabilities UiPath's Robots may have had.

65.     The CWs described the substantial problems that Microsoft was creating for UiPath, prior to the IPO and Class Period, as well as thereafter, and also described the Individual Defendants' knowledge of those problems.

66.     CW1 recounted that Microsoft was the "elephant in the room," and that upon acquiring Softomotive in 2020 "everything changed." CW1 explained that UiPath Robots are built on Microsoft infrastructure, so once the Microsoft Robots improved following the acquisition,

Microsoft's Robots would do better than UiPath's, not to mention that Microsoft had more manpower. Also, CW1 confirmed that competitors like Microsoft had cheaper priced Robots than those of UiPath.

67.     Thus, CW1 recounted that when Microsoft acquired Softomotive in 2020, it was a "massive deal" internally at UiPath and caused a big push at UiPath to "rush" to an IPO before Microsoft could fully "build out their strategy." "The second Microsoft made the [Softomotive] acquisition, Automation Anywhere [UiPath's hitherto main rival] fell off" and Microsoft became the "Goliath" in the room, CW1 explained.

68.     UiPath did not typically win customers when competing against Microsoft, CW1 recalled, whereas UiPath had typically done so previously with other competitors like Automation Anywhere. By 2021, CW1 stated that UiPath was "losing out to Microsoft." Further CW1 noted that the fact that UiPath was losing deals to Microsoft was reflected in reports UiPath generated, including those the c-suite had access to, as noted above.

69.     CW1 recalled an all-hands meeting led by Defendant Dines in mid-2020 following the Softomotive acquisition to address Microsoft. That acquisition led UiPath to feeling "threatened" and "was a big point of contention and big shift in strategy," CW1 stated. Accordingly, UiPath then made "entire dedicated campaigns and tactics to combat" Microsoft, CW1 continued. UiPath's Chief Marketing officer also then changed the Company's marketing strategy to respond to Microsoft, CW1 noted.

70.     CW4 joined UiPath in January 2020 and became a Global Vice President of Value Engineering in July 2020, serving in that role until leaving UiPath in July 2022. CW4's recollections, including regarding Microsoft, were consistent with CW1's. Value engineering departments attempt to justify the cost of software to customers, as CW4 explained, *i.e.*, "you tell

customers how they could save money over time" by using UiPath's Robots.  CW4 had a team of about 25 value engineers, most of whom directly reported to CW4, with some reporting to directors in the sales department.  Initially, CW4 reported to the Managing Director for the Americas, who reported to Defendant Dines.  Later, CW4 reported to the UiPath's Vice President of Global Pre-Sales, who reported to the Company's Chief Revenue Officer.

71.    When it came to competition with Microsoft, CW4 stated that pricing was "the big deal," and CW4 knew "for certain that [UiPath's] c-suite was aware this was an issue."  CW4 explained that Microsoft was "basically giving away" its Robots for free in a bundle along with other Microsoft products.  CW4 recounted that UiPath began to fear Microsoft was a big player and to seriously question whether customers would pay for our "huge prices," when they could use similar Robots for free from Microsoft, which are also already integrated into their workflow with other Microsoft products and so were very accessible for customers.

72.    In early 2021, CW4 recalled a Zoom meeting with several senior executives, including Defendant Dines, to discuss how to respond to Microsoft's Robots.  In this meeting, Dines asked CW4 to work with the value engineering team to devise a value proposition, based on the total cost of UiPath Robots, which proved to customers that UiPath's Robots were more cost effective than Microsoft's in the long term.  Although the value engineering team attempted to create this proposition, they were never able to successfully complete it, because, as CW4 stated, "Microsoft was obviously cheaper."

73.    Accordingly, also in early 2021, CW4 recounted that UiPath discounted its Robots, which CW4 believed the Company was forced to do because customers were comparing UiPath's prices with Microsoft's.

74.     CW4 recalled that while UiPath's competition was initially smaller companies, like Automation Anywhere, once Microsoft entered the RPA space with Power Automate, UiPath knew that its biggest competitor would soon become Microsoft, due to the lower price of Microsoft's Robots and their ease of use. To that point, CW4 observed UiPath's strategy shifting around this time to try to convince customers that, whereas Microsoft did not support complex RPA, customers needed the more advanced Robots that UiPath offered. Based on CW4's experience, however, CW4 believed that customers mostly needed simpler Robots like Microsoft's.

75.     CW5, was an Enterprise Account Executive at UiPath from October 2020 to August 2022, whose recollections, including with regard to Microsoft, were consistent with CW1's and CW4's. CW5 initially reported to the Vice President of Sales-Leading Digital Transformation and later to the Vice President of Enterprise for the Northeast and Canada.

76.     CW5 stated that upon starting with UiPath in October 2020, it was clear that Microsoft was a threat to UiPath "right out of the gate." CW5 recalled that potential customers with big relationships with Microsoft would mention Microsoft's free offerings and question how they could justify spending on UiPath Robots when they could get Robots from Microsoft for free.

77.     CW5 stated that Defendant Dines "absolutely" brought up Microsoft during CW5's tenure at UiPath. For example, CW5 recalled Defendant Dines, at an all-hands meeting, "screaming over the fact that Microsoft was giving it away" and that UiPath was not "standing up for [themselves]" or showing clients what UiPath could do. Thus, Dines "absolutely knew the threat of Microsoft," CW5 stated.

78.     CW5 continued that Microsoft's competitive advantage was widely known throughout UiPath. As one example, CW5 noted that UiPath had competitive intelligence reports,

which it made available through its internal intranet, and that they included internal challenge (or battle) cards on Microsoft for salespeople. Further, CW5 stated that Microsoft often came up during sales enablement calls, and UiPath was "always trying to figure out value add to sell around the fact that [Microsoft] were pushing it basically for free."

79. Similarly, based on CW3's experience as an account executive at UiPath, CW3 stated that Microsoft is a market leader, and that Microsoft was making a "big play" in the RPA market by effectively "giv[ing] it away" for free. Microsoft could do so, CW3 explained, because its RPA business was "such a small piece of [its] overall pie." This created a competitive disadvantage on prices, CW3 continued, because UiPath's Robots were expensive, with customers mentioning Microsoft's free or cheaper Robots in conversations. CW3 also recalled discussing Microsoft's Robots in sales meetings with the regional enterprise team and ways to get around them.

80. CW2 also recalled Microsoft as a competitive threat to UiPath, with potential customers bringing up Microsoft's Robots on about half of CW2's calls, because the customers either already had them or were thinking about getting them. CW2 also recalled that UiPath knew of this problem, as CW2 described sales enablement, or training, sessions at UiPath focused on getting around competitors, including Microsoft. These sessions, CW2 continued, were supposed to help account executives "deal with," among other things, conversations where customers were thinking about going with Microsoft.

81. Consistent with the CWs' recollections, acts that Defendants took during the Class Period were a materialization of the undisclosed risks posed by Microsoft. On March 30, 2022, UiPath announced that Chris Weber ("Weber") was joining as the Company's first Chief Business Officer, and that the Company's Chief Revenue Officer Thomas Hansen would be departing.

Weber notably came from Microsoft, where he specialized in sales to mid-market businesses – a response to UiPath's need to improve its performance against Microsoft and in the mid-market cohort. However, near the end of the Class Period, in September 2022, Weber conceded that UiPath was shifting its sales team to focus more on larger enterprise customers, as opposed to mid-market businesses, because the larger enterprise customers were the ones with a meaningful "propensity" to spend significant money on UiPath's products, though Defendants continued to obscure the full extent of UiPath's problems with mid-market customers. Also, though Defendants repeated their claim that executives were eager to expand UiPath's Robots across their enterprises because of the great value those Robots were adding, Defendants noted at the same time that UiPath was in fact attempting to "reposition" its customer contacts toward the c-suite, who actually had the authority to make the broad purchases of Robots sufficient to drive UiPath's growth. Following related attempts to improve UiPath's sales strategy, in March 2023, after the end of the Class Period, Weber resigned, with those changes insufficient to overcome the structural obstacles UiPath had been facing.

82.     Also, near the end of the Class Period, on September 7, 2022, at an Evercore ISI conference, Defendants acknowledged that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies," after denying that for over a year, although they continued to obscure the significant and full extent to which Microsoft was winning customers from UiPath. At the same September 7, 2022 conference, Defendants also noted that UiPath was working to improve its LowCode offerings, with the creation of LowCode application development capabilities – an acknowledgment of customers' widespread interest in competitors' cheaper, effective, and easier to use LowCode products, even as Defendants claimed that UiPath's Robots were winning because they were technologically differentiated.

83.     The cheaper, easier to use, and more effective Robots offered by Microsoft beginning in 2020, in effect, commoditized the once niche RPA software market, creating downward pressure on prices and reducing demand for premium Robots like UiPath's. Those trends grew worse as Microsoft's position strengthened the longer its Robots were on the market, and as other large software companies that potential UiPath customers already had strong relationships with, like Salesforce and ServiceNow, followed Microsoft in improving their RPA products through acquisitions while taking advantage of their substantial resources for efficiencies that UiPath could not match.

84.     Microsoft's ability to regularly win customers UiPath sought, and the increasing competition from other large software companies, was also harmful because UiPath still depended on these companies to serve as "partners" through which it sold its Robots. That is, when Microsoft or other partners were selling their various software products, they could offer to sell customers UiPath Robots at the same time.

85.     UiPath made a substantial amount of its sales through such partners. CW2, a mid-market account executive, understood that much of what UiPath sold was through partners.

86.     Further, UiPath had to split, or sacrifice, a substantial amount of the potential profit from those sales with the partners. CW3, an enterprise account executive, recounted that UiPath commonly gave partners a 20% to 30% discount on UiPath Robots, that the partner would then mark back up some amount for customers – which is how the partners made their margins on the sales and professional services. CW5, also an enterprise account executive, added that the large partners could get as much a 50% discount from UiPath, while other partners "would have gotten 20%."

87.     Additionally, based on CW2's experience, CW2 believed that UiPath was competing with its partners as resellers.

88.     Likewise, the incentive for Microsoft and other so-called partners to market UiPath Robots was much lower when they had their own RPA offerings.

**D.      Given the Foregoing Problems Undermining UiPath, Defendants Rushed Out the Company's IPO, While Turning to the ARR Metric to Make Its Demand Appear Stronger than Was the Case, and Scrambling to Find Customers to Inflate Its Performance**

89.     As set forth above, with UiPath's growth and demand already stagnating, Defendants rushed out the Company's IPO after Microsoft fundamentally shifted the competitive landscape in May 2020 and further undermined UiPath's performance.  Defendants led a simultaneous effort to make UiPath's performance and position appear much stronger than was actually the case.  The CWs described these events.

90.     CW1 recalled being confused about how the Company's valuation suddenly jumped from $8 billion to $30 billion in a four-month period leading up to the IPO.  CW1 stated that there was "no real data" to back up UiPath's valuation at the time of the IPO and believed the numbers were inflated.  "There was no way we could deliver on certain things," CW1 continued, "everything felt held together by a band-aid, we're talking about being the next Snowflake [Inc., a $50 billion cloud computing company], but things [we]re falling out from the bottom of the bucket," as discussed above.   In contrast to UiPath's messaging prior to the IPO, which was "so positive," internally CW1 stated that there was "anxiety" among UiPath employees to get to the finish line.

91.     One of the ways that Defendants inflated UiPath's performance leading up to the IPO was through the use of a metric called ARR.  ARR stands for Annualized Renewal Run-rate, and, according to every single Class Period SEC filing, earnings call, and analyst/investor

presentation, is the best metric to evaluate UiPath's "highly recurring subscription-based business" – or, as Defendants routinely claimed, "We run the business and evaluate our performance based on ARR." According to UiPath's Offering Documents:

> ARR is the key metric we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers. We define ARR as annualized invoiced amounts per solution sku from subscription licenses and maintenance obligations assuming no increases or reductions in their subscriptions.

However, undisclosed to investors, Defendants used ARR in several ways to create the impression of an amplified and inaccurate level of demand for UiPath's products.

92.    To begin with, ARR was inherently misleading under the circumstances, because it counted and annualized revenue that given UiPath's high churn rate was reasonably likely not to ever be paid. This was exacerbated by, among other things, UiPath's reliance on ramping contracts that were based on customers eventually licensing an increased amount of Robots at the end of the initial contract term and thereafter, when customers might never undergo the ramp or regularly did not renew a contract based on the ramping terms.

93.    Separately, Defendants also included revenue in ARR that they did not adequately disclose, thereby boosting the amount of ARR reported.

94.    CW1 recalled that ARR was "rolled out a year prior to the formal IPO," as UiPath prepared for it. Prior to that, CW1 continued, UiPath was using total revenue or total contract value without annualizing it to capture its performance and demand. Not annualizing could reflect more clearly UiPath's stagnating growth and demand.

95.    CW1 further explained that, leading up to the IPO, UiPath was actually including certain one-time revenue in its ARR calculation, even though that revenue was not recurring. UiPath was "liberal in what [it] called recurring revenue," CW1 stated. As CW1 recounted,

examples of one-time revenue that UiPath improperly classified as recurring revenue for ARR included implementation fees, service fees, and certain one-time "business expenses" the Company charged in the first year of multi-year contracts but not in subsequent years.

96.     CW1 believed that UiPath used these ARR "miscalculations" to make up for the customer churn it was experiencing.  UiPath was publicly presenting ARR boosted by the undisclosed inclusion of non-recurring revenue, CW1 recounted.  But when CW1 went into UiPath's Salesforce program, CW1 saw in the underlying deals revenue that was properly classified as recurring **and** revenue that was actually non-recurring.  CW1 saw this because CW1worked directly with the data that was used to calculate ARR, and personally had to rebuild ARR calculations in 2020, during the run up to the IPO, and continued doing so through January 2022.

97.     CW1 noted that this data UiPath used to calculate ARR was available to Defendant Gupta too and that the finance team and Salesforce team worked under a Global Vice President, Head of Revenue Technology who reported directly to Gupta.

98.     Moreover, CW1 recalled UiPath circulated a deck explaining ARR and the inclusion of one-time revenue therein.  The deck was circulated by a sales operations director.

99.     Significantly, CW1 flagged the incorrect inclusion of one-time revenue in ARR "to finance and the Salesforce admin" – both departments under Defendant Gupta – and CW1 was told in response, that it had "already been rubber-stamped."

100.    CW1 was therefore sure that Defendant Gupta knew that UiPath's ARR actually included non-recurring revenue.  CW1 added that Defendant Gupta was very hands on in his management of operations: "I've been at smaller companies where the CFO manages half of what

[Gupta] did." Also, CW1 added, UiPath's c-suite was "a little too smart" to simply miscalculate ARR by accident.

101.    Likewise, CW5, who spent time with Defendant Gupta while traveling for business together, described Gupta as the "genius" behind the stock price, who "wanted that stock up."

102.    UiPath's use of ARR inflated the amount of purportedly recurring revenue in other ways as well. CW3 explained that the ARR calculated for a customer contract was often greater than the actual revenue the contract generated, and that compensation for account executives (including CW3) was based on this ARR calculation. For example, CW3 could structure a contract with a set number of Robots for the first eleven months, and then in the final month of the contract, the number of Robots would ramp up, with customers only charged for those additional Robots in that final month. But, CW3 continued, UiPath would calculate the ARR from that contract by annualizing the greater charge to the customer in the final month with the ramped up Robots as if it was revenue generated in all twelve months of the contract, when that would not occur, meaning that the actual revenue UiPath received from the contract was less than the reported ARR.

103.    CW3 recounted that before UiPath's IPO, account executives were allowed to structure contracts with the ramping structure set forth above, were incentivized to use that structure, and in fact did so. CW3 noted that in 2022 or 2023, UiPath stopped allowing account executives to ramp up contracts just in the final month of a deal, and instead allowed them to ramp up the number of Robots in the final quarter (or three months) of a contract.

104.    Similarly, CW2, who worked as a mid-market account executive, recounted being incentivized to bring mid-market customers in with ramping contracts that could "increase over time." CW2 explained that the ARR of a deal went toward CW2's quota rather than the revenue the deal brought in.

105.    The Individual Defendants were personally involved with some customers who had such ramping contracts, because, among other things, UiPath had executive sponsors for large customers.  CW5, an enterprise account executive, recounted that Defendant Gupta was the executive sponsor on at least two large accounts that CW5 managed, both of which involved ramping contracts.

106.    Further undermining the demand signal manufactured by ARR, just because contracts ramped in their final month did not mean that customers would continue to license that ramped up number of Robots thereafter.  As CW3 explained, "some [customers] said they weren't going to renew" the contracts with UiPath for a second year at all, while other customers would restructure the contract for the second year.

107.    In addition to promoting and manipulating ARR, Defendants also tried to prop up UiPath's performance, and in turn the Company's value, prior to the IPO.  This included adopting strategies that reflected their recognition of the problems undermining UiPath detailed above.

108.    As CW1, who worked in marketing and analytics, recounted, "if you want to increase your valuation, you need more logos [customers]."  But because, prior to the IPO, UiPath was having trouble closing renewal deals with existing customers who were churning, UiPath started focusing on new business at that time, CW1 continued.  There was a need to "fill up at the top" with new customers because existing customers "were dropping out at the bottom," CW1 explained.

109.    So, for example, with UiPath's enterprise sales stagnating, CW1 recalled that about a year and change before the IPO UiPath made a play to target mid-market customers.  CW1 stated that this "didn't play as well as [UiPath] would have liked," and does not recall UiPath ever seeing

the boom in mid-market sales it wanted to see. This illustrates UiPath's recognition of its difficulty landing mid-market customers and expanding business with enterprise customers.

110. Indeed, as detailed above, UiPath had substantial difficulties in the mid-market segment, and as a result UiPath had to fall back on lowering its prices. CW2 explained that, as a sales executive, "a decent amount of throwing in" of additional Robots for free was necessary to try to get customers to adopt UiPath products. Additionally, CW2 stated that because there was "a fair amount of competition," UiPath instructed CW2 "to be flexible with contracts." This demonstrates UiPath's recognition of cheaper competition.

111. Consistent with CW2's recollection, Defendants stated during the Class Period that, dating back to before the IPO, UiPath had been relying on "discounts." However, Defendants obscured the extent and purpose of the discounting, claiming that it was just to get "cash in the door" while UiPath was a younger company, and so was no longer necessary.

112. CW4, also stated that UiPath wanted to "have as much revenue as possible ahead of the IPO," and described how the value engineering team was pushed to expand the number of customers it covered during that time. CW4 recounted that by the end of 2020 and start of 2021, UiPath instructed the value engineering team to create value propositions for at least 60% to 70% of prospective customers, far more than it had done previously. As the value engineering team was supposed to explain to customers why it was worth it for them to license UiPath's Robots, this shows UiPath's awareness that it was harder for UiPath to convince customers of its Robots' value and to win customers during by that time.

113. Defendants' undisclosed reasons for promoting ARR and increasing its marketing and support, along with their undisclosed inclusion of free Robots in deals, offering of price and other incentives, enabled Defendants to create the impression that UiPath's growth, demand, and

performance was strong for the IPO and for some time thereafter.  But this was not a financially sustainable response, as it amounted to UiPath giving Robots away at prices that left it with little to no net returns, particularly while increasing UiPath's costs, and the negative impacts of these undisclosed risks gradually materialized during the Class Period.  Nor was any of this a substantive response to the obstacles UiPath was facing, as the Company was still unable to find ways to compete with the simpler, cheaper, and easier to support Robots from Microsoft and others, and remained unable to do so during the Class Period.  Further, UiPath was still unable to build a sales strategy that worked with mid-market customers, and a sales force that could get enterprise customers to expand their licenses of UiPath Robots, and again remained unable to do so during the Class Period.

### E.    UiPath's April 2021 IPO Offering Documents Contained Actionable Misstatements and Omissions

114.    On March 26, 2021, Defendants filed a Registration Statement on Form S-1 with the SEC, which would be used for the UiPath IPO following multiple amendments in response to SEC comments.

115.    On April 19, 2021, Defendants filed the final amendment to the Registration Statement, which registered 27,474,393 shares of UiPath's common stock for public sale, which was comprised of 9,416,384 shares to be offered by the Company, 14,474,393 shares to be offered by certain selling stockholders (including Defendant Dines), and an over-allotment option whereby the IPO underwriters could acquire from the Company and sell an additional 3,583,616 shares. The SEC declared the Registration Statement effective the following day, April 20, 2021.  That same day, Defendants priced the IPO at $56.00 per share and on April 21, 2021, Defendants filed the final Prospectus for the IPO, which forms part of the Registration Statement.

116.    On April 23, 2021, Defendants completed the IPO, issuing all 27,474,393 shares – which included the over-allotment – to the investing public and generated almost $1.54 billion in gross proceeds.

117.    The Offering Documents UiPath issued in connection with the IPO contained a series of actionable misstatements and omissions.  *Infra*, §V.B.

**F.    Defendants Continued to Make Actionable Misstatements and Omissions After the IPO to Cover Up the Material Problems Still Negatively Impacting UiPath**

118.    Defendants continued to make actionable misstatements and omissions after the IPO.  *Infra*, §§V.A-B.  They did so to obscure the substantial problems and risks that UiPath had been and was facing as set forth above, and to obscure the negative impacts of those problems and risks which were gradually materializing after the IPO.  *Infra*, §§V.A-B.

119.    While the Offering Documents showed that for each of the four quarters prior to the IPO (1Q 2021 through 4Q 2021), UiPath's year-over-year ("YoY") growth rate for total revenue, including all three of its subcomponents, was relatively high and stable, that was not the case for 1Q 2022, which closed nine days after the IPO.  In 1Q 2022, UiPath's YoY growth rate for total revenue dropped by over 15 percentage points from the previous quarter, and its growth rate for total revenue dropped on a sequential basis as well, with this slow down covering all three revenue subcomponents.  In addition, UiPath's YoY total cost of revenue was up over 200 percentage points in 1Q 2022 compared to 4Q 2021, the last quarter with data reported in the Offering Documents, and more than doubled during that time on a sequential basis.  Similarly, UiPath's Sales & Marketing expense doubled sequentially in 1Q 2022 compared to 4Q 2021 after decreasing or remaining flat on a sequential basis in three of the previous four quarters, it also doubled on a YoY basis after that rate had gone done the previous four quarters and remained

elevated thereafter. The foregoing factors resulted in UiPath's gross margin dropping by 16 percentage points in 1Q 2022 compared to 4Q 2021. Its net income also turned substantially negative in 1Q 2022, to its largest deficit yet (approximately $240 million), after being positive in two of the previous three quarters including 4Q 2021, and remained depressed during the Class Period, with Defendants claiming that this showed their heavy investment in UiPath's growth in response to strong demand.

120.    Although this performance was an initial materialization of the significant problems and risks UiPath was facing from saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, Robots that were too complex and expensive, losing substantial customers to Microsoft, stagnating growth, and stagnating demand from new and existing customers, as well as increased costs, ramping, discounts, and reliance on ARR to try to combat those problems, they were obscured by Defendants numerous misrepresentations and omissions made prior to, contemporaneously with and subsequent to the release of UiPath's 1Q 2022 results. Those misrepresentations and omissions assured investors that UiPath was performing strongly and denied the existence of the problems it was facing. Further, UiPath's YoY growth rate for ARR essentially remained at the same high level in 1Q 2022 that it had been in 4Q 2022, and its sequential ARR growth rate also remained at essentially the same high-level as the previous quarter. Defendants thus instructed investors to focus on the apparently strong ARR metric, which they claimed was the key metric that investors should focus on, because it purportedly smoothed out fluctuations in other performance data – though ARR provided a misleading demand signal for the reasons set forth above.

121.    The next quarter, 2Q 2022, UiPath's YoY ARR growth rate did drop by about four points compared to the previous quarter, and Defendants also announced guidance for the

remainder of FY 2022 indicating that UiPath's ARR growth rate would remain at about that same level.  Although this was also a materialization of the risks set forth above, Defendants once again obscured it with similar misrepresentations and omissions, which led the market to interpret the guidance as simply being conservative because their overall descriptions of UiPath's position and performance were quite positive.  Moreover, Defendants continued to point investors to ARR, which was still performing better than UiPath's revenue – the growth rate for its license revenue, the main source of the Company's income from selling Robots, dropped by an even larger amount on a YoY basis in 2Q 2022 from the previous quarter and dropped sequentially too.  Likewise, in FY 2023, when Defendants issued below consensus guidance indicating that UiPath's YoY ARR growth rate had dropped more, Defendants downplayed this with misrepresentations and omissions blaming the guidance on macroeconomic issues, including diverging foreign exchange rates and the war in Ukraine.  Among other things, they maintained that UiPath's demand remained robust, the pipeline was strong, the Company was still regularly beating competitors, and that customers were just taking a bit longer to close deals due to "macroeconomic" circumstances.

122.    With the exception of a brief and misleading reference to discounting, it was only at or very near the end of the Class Period in September 2022 that Defendants made partial, though still obscured, disclosures of the problems that UiPath was facing, which were the actual causes of the Company's disappointing performance.

123.    Defendants' repeated resort to misrepresentations and omissions, along with their rushing out the IPO, demonstrate that apart from gimmicks like discounting, ramping, and reorganizing the sales team, which did little more than help them hide the material problems and risks UiPath was facing for a limited time, they had no viable response to overcome those problems during the Class Period.

124.    As such, while making material misrepresentations and omissions in and after the IPO, Defendants Dines and Gupta also sold substantial amounts of UiPath common stock themselves at artificially inflated prices.

125.    In addition, following the issuance of shares to the public via the IPO, corporate insiders are usually barred from selling additional shares of their common stock for a certain defined period of time – known as a "lock-up" period – but Defendants drastically shortened that period here.  The typical lock-up period does not "expire" for at minimum 90 days and in many cases can last as long as 180 days after the IPO.  Here, the lock-up period largely expired on June 11, 2021, after just 51 days, permitting the sale of numerous new shares of UiPath's common stock by company insiders, including the Individual Defendants.

126.    Ultimately, Defendants Dines and Gupta would sell approximately 1.9 million shares in total – almost 1.4 million in the IPO and almost 500,000 during the Class Period – earning approximately $97 million.  Adding to the suspiciousness of these trades, several were large open-market sales and multiple sales occurred in the aftermath of the expiration of UiPath's early lock-up period.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING COMPETITION WITH MICROSOFT IN VIOLATION OF THE EXCHANGE ACT

127.    During the Class Period Defendants issued materially false and misleading statements and omissions that misrepresented and/or concealed from investors the Company's competitive position and harm from Microsoft.

128.    Defendants' false and misleading statements and omissions are separately enumerated below.

### A.    Actionable Statements

1.      *October 14, 2021 Morgan Stanley Spark Conference*

129.    After the market closed on October 14, 2021, Defendants presented at the Morgan

Stanley Spark Conference.  An analyst asked Defendants about Microsoft's competition:

> So debate #2 that I hear most often is the competitive debate.  And honestly, it's
> not about automation anywhere.  It's not about Blue Prism, the guys that are in your
> core market.  It's about Microsoft, number one, that with their Power Platform,
> they're just going to run you over, they're going to crush you on price.  Tableau is
> to Power BI what UiPath is to Power Platform.  How does UiPath stay ahead of
> Microsoft?  How do you maintain pricing and keep that innovation gap versus what
> Microsoft is able to bring into the marketplace?

130.    In response, Defendant Dines was dismissive, claiming:

> So now, if you look at our business, how it is today, we have unattended space, we
> have attended space.  For unattended space, you need a professional tool to – for
> professional developers.  ***This is not – Microsoft doesn't even compete in this
> space.  We've never seen them in a competitive situation for unattended robots.
> So this is half of our business.***

[Emphasis added.]

131.    Unfortunately for investors, the statement in the preceding paragraph ("October

2021 Statement") was materially false and misleading for the reasons set forth immediately below.

132.    ***First***, the statement was materially false on its face.  By the time Dines made the

October 2021 Statement, UiPath was, in fact, regularly seeing Microsoft compete with it in the

unattended space and had lost major deals to Microsoft in that space.  Based on UiPath's Salesforce

data and Sharepoint files maintained by UiPath's Competition Team ("Competition Team"),

Microsoft competed against UiPath for at least 213 deals with unattended Robots that closed from

January 6, 2020, to October 6, 2021.  (Salesforce or "SFDC" is a system UiPath used to track

certain information on deals it was pursuing; and a "closed" deal is one that UiPath won, lost, or

dropped).  These included deals with major customers, such as Walmart Stores, Inc., the United

States Internal Revenue Service, Wells Fargo, LexisNexis Risk Solutions, and Exelon Corporation,

and included large deals for over $100,000. UiPath lost many of those deals, including many of the deals over $100,000. In addition to closed deals, as of October 14, 2021, UiPath was also actively competing against Microsoft for other open deals in the unattended space.

133. The fact that Microsoft was regularly competing in the unattended space was known to UiPath executives, including Defendants Dines and Gupta, and was a topic of discussion at the highest levels of the Company. For example, an August 25, 2021 email to senior UiPath executives stated that "Paypal and Omnicom are two examples I know of off the top of my head that we lost as net new logos" on "unattended" deals. Kelsey Turcotte, the head of Investor Relations, forwarded that email to Defendant Gupta on August 26th. The Paypal deal closed in May 2021, and the Omnicom deal closed in January 2021.

134. Additionally, a PowerPoint sent to Defendants Dines and Gupta by August 30, 2021, which was related to that August 25, 2021 email chain, discussed those two unattended losses to Microsoft. The PowerPoint made clear that Microsoft competed with unattended Robots, reporting that Paypal had stated that "Microsoft's unattended was close enough to parity with UiPath[.] MS price was much lower." It also recounted that the Paypal deal was for $580,000, making it one of UiPath's largest potential deals. With respect to the Omnicom deal, the PowerPoint reported that it was for $530,000, and in that deal "Microsoft leveraged strong executive relationships to box UiPath out of this opportunity and persuaded them to choose Power Automate."

135. Indeed, Microsoft's mere entry into the unattended Omnicom deal earlier in 2021 was a critical moment for senior UiPath executives. On January 10, 2021, after Omnicom asked UiPath as part of its sales pitch to compare its Robots to Microsoft's, UiPath's Chief Revenue Officer ("CRO") Thomas Hansen wrote other senior sales executives that "MSFT over the past

few months is clearly becoming our threat #1, we need to take this super serious please."  An executive responded, "totally understand and they are, no question, our #1 threat."  He also stated "Microsoft's bundling"—of Power Automate into Microsoft's other widely used products such as Office365—"is probably our biggest nearer term risk."  Another executive stated "[t]his is coming from executive relationship between Microsoft (Satya) and Omnicom CEO rather than technology comparison. . . we should expect this will happen again and Microsoft's technology will continue to catch up to us."

136.    Also showing Microsoft's competition in the unattended space, a June 22, 2021 email chain with the heads of Competition Team and senior sales executives discussed a deal UiPath was competing for against Microsoft, where the customer informed them that "Microsoft have confirmed" that it was offering "individual licenses per unattended and attended robots."  The UiPath executives then circulated to the group a "licensing brief from MS on M365 unattended licenses . . . You'll note that is specifically calls out the difference between attended and unattended robots," further confirming that Microsoft was then competing with unattended Robots.  As a related email recounted, Microsoft's offer of unattended Robots at a minimum put this deal "on hold" for UiPath.

137.    ***Second***, in addition to being false on its face, the October 2021 Statement was materially misleading.  UiPath was also seeing Microsoft compete for unattended business: (i) through widespread deployment of tactics such as "edging" and bundling, further described below; and (ii) by offering customers attended Robots that performed most of the tasks that customers wanted and that UiPath was trying to address through its unattended Robots, when Microsoft's Robots were also cheaper and easier to use than UiPath's, as described below.

138.     As of the October 2021 Statement, UiPath knew that Microsoft was widely competing for unattended deals and large enterprise clients through a tactic called "edging."  It worked as follows: Microsoft would obtain a foothold with customers, including through attended Robots, then use that foothold to provide more Robots and unattended Robots, while preventing UiPath from further expanding its unattended and attended business with those customers.  Microsoft was able to carry out this tactic because it bundled Power Automate with other widely used Microsoft products, and made Power Automate essentially free as part of that bundle, which incentivized many Microsoft customers to become Power Automate users, even if they were existing UiPath customers.  As such, even if UiPath had won unattended deals with customers, Microsoft separately could and did win current and future RPA business from those customers, which undermined those deals.  Through edging, Microsoft also blocked UiPath from even having the opportunity to bid for certain desirable deals, including with customers who were candidates for unattended Robots, as they were already using Power Automate or had essentially free access to it.

139.     Microsoft used these and other tactics to broadly compete for customers, such that by July 2021, UiPath saw almost 60% of its customers using Microsoft's free Robots and saw the same amount considering using its Robots for the type of enterprise-wide deployment that UiPath targeted for its unattended Robots, as set forth below.

140.     Top UiPath executives knew that Microsoft was using edging and related competitive tactics as early as April 2020, and the threat Microsoft thereby posed to UiPath was a frequent topic of discussion for them.  For example, as early as April 1, 2020, UiPath's Competition Team was already compiling problems the Company was "usually" encountering when competing against Microsoft.  These problems included competing with Microsoft's edging

technique, and responding to such customer questions as: "[s]ince MS is integrated into the Office suite, which is my company standard, why should I introduce a non-MS technology that does the same as the MS technology," and "should I postpone any large scale decision" on RPA purchases until further development of "MS' roadmap"?  Other common problems UiPath encountered were customers raising that "MS is basically free," and that Microsoft "bundled" its Robots into other products they used.

141.    UiPath was particularly vulnerable to Microsoft's edging technique because, among other things, UiPath sold many of its Robots through Microsoft as a sales partner, and Microsoft had independent relationships with many of UiPath's customers.  An email chain with the Senior Vice President ("SVP") for Americas, Christopher Klayko, and other executives, from April 3 to 7, 2020,  highlighted that, as a sales partner, "MSFT Co-sell deal pipeline is $79M with 322 deals, which is 5% of total UiPath pipeline.  Average deal size is $25K, 5X larger than the rest of the UiPath deals[.]  In addition to the customers that are in the co-sell pipeline, many UiPath customers are on the MSFT S500 account list (most likely to be 'MSFT shop')."  Thus, if UiPath tried to compete for business with customers that "already planned to try Power Automation," it risked alienating one of its most important sales partners.  Nevertheless, SVP Klayko instructed that, "[t]he single largest threat we have to our companies' existence is Microsoft Power Automate" and "in my mind MSFT power automate = enemy #1 --- we are selling against, always." A head of the Competition Team agreed, "Chris, to your point, Microsoft is undoubtedly the single largest threat to UiPath."  Defendant Dines then received this email chain on April 7, 2020, when SVP Klayko forwarded it to him, writing "I do not want to concede any market.  Are we aligned here?"

142.    By Fall of 2020, the edging tactics led Defendant Gupta to conclude that Microsoft was the competitor UiPath "should" "fear the most," noting its "ability to bundle pricing and conceptually offer for free."  A survey of UiPath's executive committee, conducted by its Chief Strategy Officer ("CSO") Vargha Moayed, showed that Chief Marketing Officer Bobby Patrick, SVP for Global Sales Brandon Deer, SVP Channel Chief Eddie O'Brien, Chief People Officer Mandy Sebel, Chief Product Development Officer Ted Kummert, CRO Thomas Hansen, Chief Corporate Development Officer Vijay Khanna, and CSO Moayed, reached the same conclusion— that Microsoft was UiPath's most feared competitor and one of the top threats to its leadership.

143.    A September 15, 2020 report on UiPath's competitive strategy, authored by UiPath's CSO Moayed, confirmed that Microsoft's broad use of edging, bundling, and related tactics posed an existential threat to UiPath, and that Microsoft's attended Robots posed a competitive threat to UiPath's unattended Robots.  The report stated that "[o]n the competition front, we worry most about Microsoft," because of, among other things, its "ability to bundle," "offer for free," and also its "[m]uch richer low-code solutions"—that is, the capacity of its attended Robots.  The report further explained why UiPath was vulnerable to Microsoft, including that UiPath's unattended and other Robots had a high "[c]ost of ownership & maintenance" and limited "ease of use" which made it "[h]ard to get demonstrable value out of our product" for customers and led to "[o]verwhelmed product support and customer success" teams at UiPath. Moayed circulated this report and underlying survey discussed in the preceding paragraph to Gupta, Dines, Hansen, Kummert, Deer, Khanna, Patrick, and others, on September 15, 2020.

144.    One effect of Microsoft's edging tactic was that existing UiPath customers decreased their use of and willingness to pay for UiPath Robots, as Microsoft offered them low-cost Robots bundled with their other Microsoft products.  For example, on October 27, 2020, SVP

Klayko emailed Defendant Dines regarding a recent discussion for a renewal with PwC, a major customer, in which "PwC offered ½ what they pay today ($2.5M vs $5M/yr) for uncapped use of the platform firm-wide."  Notably, other competitors including "MSFT are aggressively pursuing them."  SVP Klayko further explained that "[p]art of the PwC rational for lower price point is they have not gotten the utilization rates they expected when they initially negotiated the deal," and that "[t]his is becoming a growing theme/trend that really concerns me . . . ."  To that point, he warned Dines "[m]y 'flat' renewals next quarter are forecasted to be up to 32% (vs 26% in Q3) and my 'at risk' renewals forecast is 5% (vs 3% in Q3). This analysis is for accts >30k ARR and the #1 cited reason for flat/at risk renewals is low utilization (22% of the time)."  Dines replied, "I share the concern."

145.    Thereafter, UiPath's urgency to stop Microsoft from gaining a foothold with major customers through its edging and other competitive strategies continued to grow.  On February 24, 2021, when Justin Grindal, Product Management Senior Director and one of the co-heads of the Competition Team, was informed that a large customer was planning to try Microsoft Robots for certain tasks because they were much cheaper than UiPath's Robots, he responded, "[t]his is a situation where we need to stamp Power Automate out at the edges.  If there is anything we can do to get them to use UiPath instead of PA for even these simple use cases, we need to explore it."  Grindal was also reminded that this was "[j]ust another example of Power Automate encroaching on our automation pipeline."  Indeed, Grindal continued to be informed when this issue occurred.  For instance, on March 23, 2021, he was told that "MS has just bundled [Power Automate] in for free for Pepsi who we are looking to do a larger ELA type deal with but now our champion is struggling to position us against free. . . .  This is one of many large MS clients where we are seeing

free or almost free even outside of their announced prices and probably not the last so looking to make pre-emptive moves/positioning.  Customers include: Intel, HP, P&G, etc."

146.    On February 26, 2021, CRO Hansen prepared an update for UiPath's Board, which included Defendant Dines, in which he stated "[t]he real competitive concern is Microsoft. We are seeing them creep into some enterprise companies through C-Level alignment as well as some competition in the Velocity space via their 'already bundled into your enterprise Microsoft agreement' motion."  This threat from Microsoft came as UiPath's growth was faltering.  Hansen also explained that UiPath had a "downsell challenge" with Enterprise customers, who were decreasing the number of UiPath Robots they used, instead of expanding. "To address it, we are educating our salesforce (who have never looked at deals from the ARR lens) and focusing our Customer Success and Renewals teams on it."

147.    With UiPath seeing Microsoft deploy the edging strategy among ever more customers, it held an in-person "MS compete session with Daniel" Dines and his executive leadership team ("ELT") on edging and related topics on April 29, 2021.  Senior executives including Chief Product Development Officer Kummert, Competition Team co-head Grindal, SVP Product Management Brandon Nott, and Chief Product Officer Param Kahlon, who were presenting at the meeting, outlined their points for the meeting in an April 22, 2021 email chain. They explained that a key goal of the meeting was to "[p]aint the picture of the threat and attack vectors (edge, licensing leverage, windows bundling) – capture seats, leverage price & relationships, build to good enough, upsell" that Microsoft was using to win customers.  Thus the objective of the meeting was to "[c]learly articulate what MS is doing here: A. Trying to commoditize our 'crown jewel' UiAutomation; B. Driving for ubiquity and organic scale usage/adoption on the back of M365, with monetization later (usage first, monetization later is the

guiding philosophy); C. Slow down UiPath in accounts, while they build capabilities."  In turn, the meeting had to "[h]ighlight that we don't currently have an organic adoption/growth play to address the threat," so "[i]f we don't vigorously defend now, then MS will push unimpeded until it is successful, and then it will be too late for us to do anything about it."  In sum, the meeting was a "[c]all to action: this needs to be a focused effort across our product, sales and operations otherwise we can run out of time: the market can tilt in a nick of time (1 year or less)."  UiPath did not have a session on any other competitors at this meeting.

148.     One of the primary ways that Defendants attempted to guard against the edging and bundling strategy that Microsoft was broadly deploying was by reducing UiPath's pricing strategy and discounting.  On April 12, 2021, CSO Moyaed emailed Defendant Dines to follow up with "thoughts on how to combat Microsoft on the pricing front."  In an attached memorandum, Moyaed reiterated the problem UiPath faced, "[m]ost of our value (up to 90% of revenue potential) will come from large clients (more than 10K FTE); so it is paramount that we protect these clients from Microsoft 'free' offering as well as be able to increase our penetration in these accounts which is too[] low today (less than 5%)."  Thus, he recommended a "pricing 'weapon' to combat Microsoft" and for "protecting large accounts from the 'edge' approach of MS," in particular that UiPath should reduce its price on certain of its attended Robots.

149.     An April 29, 2021 "Microsoft Compete" report from the heads of the Competition Team accentuated that point, stating that a UiPath "Low-Cost Package" was "[c]ritical to combat organic growth from Microsoft" and "Pricing Pressure."  This was needed because Microsoft's broad edging strategy was working, and the report explained that frequent responses from customers were "I'll try [Power Automate] and see how it is. If I can't do something in PA, I'll try with UiPath" or "UiPath is a premium solution, but Power Automate is good for day-to-day

things."  In other words, Microsoft was inducing a "Commoditization of Core" RPA products, such that, in terms of "Customer Health," UiPath was "losing traction we don't realize," and in terms of "Partner Health," "MS is out-partnering across the board."

150.    On May 25, 2021, CSO Moayed emailed Defendants Dines and Gupta, as well as CRO Hansen, and others with an attachment named "answer to MSFT-v2" to further build out UiPath's new pricing strategy.  In an attached memorandum, Moayed discussed UiPath offering a reduced-priced attended product to combat Microsoft's edge tactics.  It stated, "this requires an attended product at half the price of our current offering.  It will have undoubtedly a cannibalization effect (today attended robot/users represent $23M in billing and 9% of total billing) but it can also be argued that without it, the adoption of full automation might not become a reality."  Moayed also indicated that holding onto and expanding with customers was critical to UiPath, because the "average first sale" was "17-21K."  Comments on the memorandum highlighted that Microsoft was also able to compete because Power Automate "is incredibly easy to use, and broadly capable out of the box," such that trying to characterize Power Automate as only for "narrow" uses "is wishful: So what if PA can do 20% of what AR can do, if those 20% cover 80% of Customer's actual usage volume?"

151.    UiPath also resorted to offering large discounts in order to try to stop Microsoft from taking its customers.  As an example, a July 21, 2021 email to CRO Hansen sought approval for a 75% discount "to prevent the use of Power Automate[.]"  This deal was to protect UiPath's "highly regarded reference customer[]" in Japan, and would have been for a large amount, $2.278M for 200 attended licenses, absent the discount.  Hansen approved the discount the same day.

152.    But such discounts were not sustainable.  A June 2, 2021 quarterly update to the Board on UiPath's Q1 FY 2022 results and preview of Q2 preview noted "Microsoft Competitive Urgency" and also "[d]iscounting levels too high and too many renewal extensions."  However, illustrating how UiPath was stuck with poor alternatives, the update recounted that even with those discounts, "[b]ased on Q1 rep attainment, the forward projection for the full year has approximately 50% of all reps making their quota, well below industry desired benchmark," and "[all] geos are currently forecasting to miss billings goals" for Q2.

153.    Another primary way that Defendants attempted to guard against Microsoft's broad edging, bundling, and related tactics was through revamping UiPath's marketing and sales strategies.  For instance, senior UiPath executives prepared a course in May 2021 entitled "Competing Against Microsoft Power Automate," and drafted an introduction from CRO Hansen in which he would state "[l]et's make no mistake - Microsoft Power Automate is our #1 competitor and will continue to be for the next several quarters."  Hansen concluded his remarks by emphasizing that "everyone one of us must take Power Automate very serious and invest the time required to master positioning the value of UiPath vs Power Automate, and overcoming objections.  We must not lose to Microsoft – not a single deal. . . .  If there is risk of losing to Power Automate in any of your deals, make sure to bring in your surrounding team early in the quarter, including me."  He also listed a number of the other actions that UiPath was taking so that the sales team might have a better chance of responding to Microsoft, "[w]e will continue to update you on competitive positioning through our new Competitive Roundtable series, Sales Masterminds, QRT, and our library of competitive content on Highspot."  Hansen's script for the course was circulated to the Competition Team on May 13, 2021.

154.    On May 26, 2021, CRO Hansen prepared his Board Update for Q1 of FY 2022, wherein he reiterated that "Microsoft continues to be our biggest competitive threat," and, referencing the materials discussed in the preceding paragraph, reported that "[w]e have launched quarterly training focused on Microsoft compete. There are strategic discussions underway about our commercial response."

155.    UiPath's struggle to assist the sales team response to Microsoft encroaching on their customers through edging and related tactics had become overwhelming by June 10, 2021, as set forth in a PowerPoint titled "Product Marketing – Competitive – H1 Review – H2 Priorities" from Christopher Janiszewski, Competitive Product Marketing Director and the co-head of the Competition Team.   It reported that the Product Marketing team had "no bandwidth to assess products/strategies. 85% of time is currently dedicated to Microsoft in some capacity," as the "number of deal support requests continues to rise, especially for dealing with Microsoft."  Further, the PowerPoint explained that this heavy focus on Microsoft was continuing going forward, "[f]ollow up activities for Microsoft compete include updated QRT training, competing with MS survey to field, training plan for field, roundtable focused on MS, Project Red Arrow, direct deal support."   It also recounted that UiPath's senior-most executives were involved in coordinating the response to Microsoft, and had "[l]aunched [a] Microsoft Competitive playbook with input and reviews from exec LT"—*i.e.*, the ELT also sometimes referred to as Defendant "Daniel's leadership team."

156.    In the QRT training for Q3 2022, referenced in the preceding paragraph and released in July 2021, the co-heads of the Competition Team were so concerned that Microsoft's edging tactics were "taking users and market share we don't know we're losing" that they notified the sales team it "is more critical than ever to ensure that your accounts are healthy" by "[a]sking

probing questions" to determine if customers are using Power Automate. They instructed that if customers were doing so, "[w]e have brought executive commitment that we want to stamp Microsoft out of the edges however possible. Don't be afraid to bring them into the deal."

157.    UiPath's attempts to slow Microsoft were not effective, and as a result of Microsoft's aggressive move into the RPA market—through competing for deals, edging, bundling, marketing, low-pricing and a solid and improving product—large percentages of UiPath's customers were already using Power Automate, or at risk of doing so by the summer of 2021. UiPath's Competition Team documented this in a July 22, 2021 presentation entitled "Microsoft Competitive Update." The presentation reported that, based on results from a survey conducted by UiPath, "57% of customers use [a] free version of PA," representing the success of Microsoft's bundling and pricing tactics, and "58% of customers evaluate PA for Enterprise Use," representing the success of Microsoft's ability to edge into the type of unattended business that UiPath targeted. On top of that, "[m]ore and more customers are talking or inquiring about PA." The upshot was that 71% of UiPath accounts were at "High Risk" or "Some Risk" of "being penetrated by Power Automate," with "26%" falling into the High Risk category.

158.    As a result, the foregoing July 2021 presentation continued, even where Microsoft was not yet outright winning, "Microsoft is slowing deals and muddying waters," including with large customers. For example, Microsoft had won the RPA business of "Coca-Cola, AT&T, T-Mobile, Ingram Micro," among others. For AT&T, on a large deal that included 23,000 Robots, "UiPath [was] not given the opportunity to quote," in part because "Microsoft leveraged [its] deep partnership with AT&T," but also because Microsoft Power Automate was able to "please a large customer with complex requirements. This is a long road as opposed to smaller incremental capabilities"—showing Microsoft's ability to take the type of business that UiPath was targeting

with its unattended Robots.  Further to that point, Microsoft Power Automate's orchestrator Robot, was "currently in Private Preview: HP, Boeing, Disney, AT&T, T-Mobile."

159.    Summarizing how Microsoft was able to accomplish this, the foregoing July 2021 presentation explained that Microsoft's strategy was "NOT about matching product functionality" rather it was about providing "'Good enough'" Robots, and using them for "Account Penetration and Adoption," which Microsoft's strategy was "ALL about".  Microsoft was also winning business with a "[c]oncerted push via broad sales engine."  This covered customers, as well as the partners that UiPath primarily depended on to conduct its sales.  Microsoft was able to coopt UiPath's sales partners, because "MS has a great Partner network[.]  Partners like the 'ease of doing business' with MS[.]  Partners are promoting PA[.]"  The presentation concluded that the "Key Activities to Compete" with Microsoft required UiPath to increase its "funding," or expenditures, to drive its "pervasiveness within existing Top Accounts," so that they would not be susceptible to tactics like edging, and "with our largest partners who also have large MSFT footprints."

160.    At UiPath's Q2 2022 Finance Quarterly Board Report in September 2021, Defendant Gupta gave a presentation highlighting that UiPath's competitive position, performance, and strategy were all declining.  Gupta stated that there was "[r]ecognition" that "[c]ompetition is increasing with more formidable players[.]  Microsoft is more present than before" and he did not mention any other competitors.  At the same time, Gupta stated that "[w]e are seeing a deceleration in growth. . . New logos have stabilized, but expansion is decelerating vs accelerating[.]"  Moreover, "[w]e have been investing in our company since 2Q' 2020 across all functions but missing top line numbers," but Gupta questioned whether these investments were

consistently paying off. Between the decelerating topline growth and increasing expenses, UiPath's "2nd half profitability [is] rapidly declining[.]"

161.    Dines' October 2021 Statement was materially false and misleading because it omitted the information set forth above, including that UiPath had, in fact, seen Microsoft compete with unattended Robots and had also seen Microsoft compete in the unattended space through tactics like edging, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

> 2.    *December 8, 2021 Earnings Call*

162.    After the market closed on December 8, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 3Q FY 2022, which ended October 31, 2021, and held an earnings call.

163.    During the call, an analyst asked about competition from Microsoft,

"Daniel, I wanted to revisit with you on the competitive landscape. Could you speak specifically to Microsoft and how you see Microsoft as a competitor both now and over the course of the next year or two? And the dynamics that I was thinking about in terms of UiPath as a pure play vendor with cross functionality and many different application areas versus Microsoft, more of a Microsoft-centric versus – but Microsoft has pretty deep reach."

164.    In response, Dines was dismissive, claiming:

> **Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate.**

[Emphasis added.]

165.    Unfortunately for investors, the statement in the preceding paragraph ("December 2021 Statement") was materially false and misleading, for the reasons set forth immediately below.

166.   *First*, the December 2021 Statement was false and misleading, because UiPath's Salesforce ("SFDC") data and the win rates generated therefrom showed a material change in UiPath's win rates with Microsoft as opposed to without Microsoft leading up to and by the time Dines made that statement.   SFDC is a system that UiPath used to track certain deals it was pursuing, and that system sometimes included information on competitors in those deals and the outcomes of deals that UiPath did not win—although SFDC had flaws that undercounted Microsoft as set forth below.   Based on the data in SFDC as of December 7, 2021, as set forth in a presentation on that date, UiPath's win rate for deals involving Microsoft had been higher than its win rate for deals without Microsoft in Q2 FY 2022 (ending July 31, 2021).   But those win rates inverted in Q3 FY 2022—which ended on October 31, 2021, and was the quarter at issue in the December 2021 earnings call—such that UiPath's win rate was, for the first time, worse with Microsoft involved than without Microsoft involved.   Thus, in Q2 FY 2022, UiPath's win rate for deals involving Microsoft (54.1%) was 2.7 points higher than its deals without Microsoft (51.4%).   However, in Q3 FY 2022, UiPath's win rate for deals involving Microsoft (49.9%) was 3.8 points worse than its deals without Microsoft (53.7%).   That reversal was material in and of itself, as was the 6.5 point deterioration in deals involving Microsoft as compared to deals without Microsoft between Q2 and Q3 of FY 2022.   Defendants Dines and Gupta were sent the foregoing information prior to the December 2021 earnings call.   After Q3 FY 2022, UiPath's win rate in deals with Microsoft remained worse than its win rates without Microsoft.

167.   Moreover, UiPath's SFDC data was flawed and undercounted Microsoft's presence and negative impact.   As the foregoing December 7, 2021 presentation conceded, that data was "[d]irectionally accurate but not absolute given CRM [SFDC] data quality."   Taken on its own terms, the data undercounted Microsoft because UiPath's sales team regularly failed to enter key

information into the SFDC data, such as the presence of Microsoft in a deal, and many sales team members were not fully trained in using SFDC.  UiPath was well aware of these shortcomings, and repeatedly noted them, including among the top executives.  For example, on November 23, 2020, and in response to a question regarding how to track competitive risks with Microsoft, Competition Team co-head Grindal stated "[t]his is a great question, one I've been trying to get answered for almost a full year now.  We have a few mechanisms in place to track some of this information, but it requires input from field sales, who have been reluctant to input the data into SFDC."  He concluded, "Thanks for bringing this up, it's obviously a big deal and we want to do everything we can to stay ahead of the Microsoft 'wave.'" UiPath subsequently tried to implement a series of fixes to the SFDC data beginning in the fall of 2021 and again in the Spring of 2022.

168.    Beyond its data entry flaws, the SFDC data did not fully attempt to track Microsoft's deep penetration of UiPath's customers that UiPath was actually seeing.  For example, it did not necessarily include deals where Microsoft won and UiPath wanted to bid, but was not given the opportunity to do so, including due to Microsoft's strong customer relationships. Further, SFDC data did not necessarily include edge deals, like those Microsoft made through bundling Power Automate with its other popular products, where UiPath was not involved. Therefore, among other shortcomings, the SFDC data did not necessarily account for the 57% of customers that UiPath knew were already using Power Automate, or the 58% of customers that it knew were also considering trying Power Automate for broad enterprise uses.

169.    **Second**, the December 2021 Statement was false and misleading because the SFDC win rate data discussed above concealed that UiPath often only "won" deals involving Microsoft after having to alter its practices, often in a self-defeating manner, to do so.  In terms of pricing, senior executives such as Defendant Gupta were so concerned by Microsoft that on August 30,

2021, he ordered the sales team not to let Microsoft win on price, even though Microsoft's prices were substantially lower, without the approval of Defendant Dines, the CRO, and himself. Thus, UiPath offered substantial discounts when competing against Microsoft, examples of which are set forth above, and also include a discount of over 96% that CRO Hansen approved on November 5, 2021, for a large customer because it was "a MSFT compete"—that discount took the price of UiPath's Robots down from €2.4M to about €75,000. Such large discounts continued regularly thereafter. UiPath engaged in those discounts even though, as set forth above, it recognized that they were unsustainable and were undercutting UiPath's revenue and profits, because otherwise it would be losing even more to Microsoft. These discounts were also accompanied by a strategic decision, involving Defendant Dines and other senior executives, to reduce UiPath's prices on certain Robots, discussed above.

170.    Further, UiPath was expending significant resources just to compete with Microsoft and Microsoft was bogging down UiPath's deals, as detailed above. By July 2021 UiPath's Competition Team was spending so much of its time, 85%, supporting sales executives trying to convince customers not to go to Microsoft, that the team did not have time to work on other critical functions and was exposing UiPath to other problems. UiPath also expended so much effort trying to win over customers who were comparing Microsoft's easy-to-use Power Automate to its own complex Robots—such as developing plans and demonstrations for customers to potentially get value from its Robots, and providing support with using and implementing them—that UiPath's sales were regularly delayed and, even when successful, often reduced UiPath's profits.

171.    **Third**, UiPath was also seeing material changes in its winning rates due to Microsoft's ever broadening edging and bundling tactics over 2020 and 2021 (FYs 2021 and 2022), especially with regard to decelerating customer expansion. As detailed above, Microsoft's

edging and bundling tactics meant that even for customers using some UiPath Robots, UiPath struggled to win upsell deals or have those customers expand their use of UiPath Robots, because they were already using Microsoft Robots for additional use cases and were considering using even more Microsoft Robots.  In fact, for the foregoing reason, even when customers renewed their UiPath licenses, they sometimes reduced the number of UiPath Robots they used and licensed.  This harmed UiPath because expansion was critical to its growth and performance, as most of its customers, including its large enterprise customers, had small licenses, such that UiPath could only generate meaningful revenue and profits from them if they substantially expanded their licensing and use of UiPath Robots.  Senior UiPath executives, including Defendant Gupta, regularly called out UiPath's dropping expansion rate, and Microsoft's edging and bundling strategies, as significant problems.  Microsoft's edging, bundling, and related tactics were also shutting UiPath out from even having the opportunity to bid for new customers, including the large enterprise customers on which it depended.

172.    *In addition*, on August 25, 2021, Director of Product Marketing Diego Lomanto emailed Defendant Gupta, CRO Hansen, and others "as a follow-up request from the recent QBR"—quarterly business review meeting—regarding competition with Microsoft.  The email summarized the results of "a loss analysis where Microsoft was listed as a competitor in SFDC records."  A PowerPoint presentation attached to the August 25, 2021 email detailed the analysis of 459 deals over the previous six and one-third quarters then marked in the SDFC database as involving Microsoft and which UiPath had lost.  The PowerPoint presentation showed that such losses involving Microsoft had increased every quarter after Q1 2021 (ending April 30, 2020), and had approximately tripled from Q4 2021 (ending January 31, 2021) to Q2 2022 (ending July 31, 2021).  Also, the PowerPoint presentation noted the losses to Paypal and Omnicom on the

unattended deals discussed above. It concluded that "[p]ricing was a major factor in a large portion of lost deals"—the second highest reason given was "technical features" of the competing Robots—and that the "Microsoft threat is real." Defendant Dines also received the August 25, 2021 email with the PowerPoint presentation.

173. On August 30, 2021, Gupta replied to the foregoing email and loss analysis, and, emphasizing its significance, added Defendant Dines and head of Investor Relations Turcotte, among others. Even based on the limited picture from the SFDC data, Gupta wrote "I am surprised at the number of losses and potential losses." Finding those losses concerning, Gupta reiterated that UiPath had to beat Microsoft, and should drop its prices to do so unless he, Dines, and CRO Hansen said otherwise, instructing "do we know for the losses were their [sic] escalations – e.g. I have not received any pricing requests to go below to win and am surprised that we even lost on technical features. I think it is critical for us to see this on a frequent basis and should we have a 'never lose' mindset and ensure if we lose on pricing it is agreed to by Thomas/Daniel/Ashim." Further recognizing the significance of Microsoft's winning, Gupta wrote "@DanielDines @BrandonDeer @KelseyTurcotte we cannot say that we are not losing to MS and need to work with Kelsey on how we should be discussing MS in our investor/analyst calls."

174. A November 15, 2021, email to Defendant Dines also demonstrated the negative impact Microsoft was having on UiPath's ability to win customers. The email and an attached memorandum were in preparation for a meeting Dines was having the next day with Microsoft to discuss its partner co-selling relationship with UiPath. The memorandum recounted that "'Free' Power Automate causes FUD [fear, uncertainty, and doubt] for UiPath deals. (CIOs [chief information officers] need to 'see what PA can do' before moving forward with UiPath.) The result of this is declining and/or delays in Cosell business. (We don't have the same access to

customers)."  As a result, the memorandum detailed that Dines' strategy at the meeting was to ask the following:  "Microsoft stops offering Power Automate. . . and fully backs UiPath (e.g.: Adobe Marketing Cloud)", or at a minimum  "Microsoft keeps Power Automate, but visibly backs and prioritizes UiPath RPA"—Microsoft had already rejected that latter proposal before.  There was no reason for Dines to make these requests of Microsoft, and risk alienating important sales partners, if Power Automate was not significantly harming UiPath's ability to win customers.

175.    Dines' December 2021 Statement was false and misleading because it omitted the information set forth above, including that by then Microsoft was negatively impacting UiPath, that there had been negative material changes in UiPath's win rates with and without Microsoft, that the win rates generated from SFDC actually undercounted Microsoft's impact, that UiPath's so called "wins" against Microsoft were often due to unsustainable price cuts and customer support, and that UiPath was increasingly losing business to Microsoft due to its edging, bundling, and related tactics.  Thus, UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

### 3.    *March 30, 2022 Earnings Call*

176.    After the market closed on March 30, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 4Q and FY 2022, which ended October 31, 2021, and held an earnings call.  While the press release and earnings call noted disappointing guidance (*see infra,* §V.C), Defendants obscured and minimized this information with a series of false and misleading statements and omissions.

177.    When asked about competition, Dines stated that:

*We are not seeing really any increase in the competition.  On the contrary, we are seeing less competitive pressure in the deals.*  We are – so we can comment, if you are interested on various major players that we are seeing in the business.

*And in terms of the – our traditional specialized competitors, we are really seeing less and less of them.  We are replacing Blue Prism and [A]utomation [A]nywhere in many customers.  And speaking about the new entrants like Microsoft and ServiceNow, we are – we really – we are not seeing them that much.*  I can comment on both, specifically, if you are interested.

[Emphasis added.]

178.    Gupta then made the same competition point in dismissing Microsoft as a competitor:

And then just on the numbers basis, I think it's really important.  We see – *when you look at our win rates, we continue to look and analyze win rates between where Microsoft and where some of these large players are playing and where they're not.  We don't see them a lot.*

But even when we do, our win rate has no difference, compared to where they are not playing.  So we're really – the trend of continuing to feel us is the dominant player in the industry.  Right now, that is continuing from the data that I see and that we see as a team.

[Emphasis added.]

179.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

180.    The statements denying any increase in competition and claiming that Microsoft was not appearing in deals omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

**B.    Other False and Misleading Statements and Omissions Giving Rise to Liability and Subject to Appeal**

1.    *Securities Act Violations*

a.    Materially False and Misleading Statements and Omissions in UiPath's April 21, 2021 Offering Documents

181.    UiPath's Offering Documents included multiple untrue statements and omissions concerning then-existing problems, conditions, and trends that misled investors regarding the Company's growth, demand among both enterprise and mid-market customers, the success of its land-and-expand strategy, sales, competitive position, harm from Microsoft, promotion of ARR, discounting and total addressable market ("TAM").  Additionally, UiPath's Offering Documents issued misleading risk warnings regarding multiple supposedly hypothetical risks that had ***already*** come to pass.

182.    The Offering Documents included the following two graphics about UiPath's ARR in the introduction:

***Graphic No. 1***



*Graphic No. 2*



183.    In touting ARR, the Offering Documents explained that "ARR is ***the key metric*** we use in managing our business because it illustrates our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers." [Emphasis added.]

184.    The Offering Documents similarly touted "the success of our land-and-expand business model" and claimed that UiPath's ARR demonstrates the Company's "ability to expand within our customer base," as well as UiPath's "rapid growth":

> Many of our customers expand the scope and size of use cases of our platform across their organizations as they quickly realize the power of our platform.  We believe that the ***success of our land-and-expand business*** model is centered on our

ability to deliver significant value in a very short time. We grow with our customers as they identify and expand the number of business processes to automate, which increases the number of robots deployed and the number of users interacting with our robots. ***Our ability to expand*** within our customer base is demonstrated by our dollar-based net retention rate, which represents the rate of net expansion of annualized renewal run-rate, or ARR, from existing customers over the last 12 months. . . . ***We have experienced rapid growth.*** Our ARR was $351.4 million and $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively, representing a growth rate of 65%. Approximately 30% of this growth rate was due to new customers and 70% of this growth rate was due to existing customers.

[Emphasis added.]

185.    In a similar vein, the Offering Documents claimed that:

***Historically***, once our platform is deployed, our customers have ***significantly expanded their use of our platform*** by engaging with our customer success team ***as well as increasing use and spend across our product categories and pivoting into enterprise agreements for the entire platform***.

[Emphasis added.]

186.    The Offering Documents also repeatedly emphasized UiPath's focus on both mid-

market and enterprise customers:

We have an efficient go-to-market model, which consists primarily of an enterprise field sales force supplemented by a high velocity inside sales team focused on small and mid-sized customers as well as a global strategic sales team focused on the largest global customers.

187.    In a section titled "Our Focus on Driving Operational Efficiency and Hyper-

Growth," the Offering Documents painted a bullish picture of the Company's current and future

growth prospects:

In fiscal year 2021, we continued our focus on demonstrating the operational leverage in our business model, while prioritizing investments that will allow us to continue to achieve best-in-class growth and business scale and to capitalize on our significant market opportunity. We have made incredible progress in building a world-class business. Today, we are a company committed to solving for both growth and efficiency and ***have accelerated our path to profitability while continuing to deliver hyper-growth***.

[Emphasis added.]

188.    In discussing the Company's TAM, the Offering Documents repeatedly claimed that UiPath's "current global market opportunity" is "more than $60 billion, which we expect will grow as automation adoption increases and customers continue to further explore the use cases that our platform addresses."

189.    The Offering Documents also contained a number of "risk factors" that purported to warn investors about hypothetical risks that could materialize *in the future*, including:

- "Our recent rapid growth ***may not*** be indicative of our future growth," and included the following statement:

   Even ***if*** our ARR and revenue continue to increase, we expect that our ARR and revenue growth rates will decline in the future as a result of a variety of factors, including the maturation of our business, increased competition, changes to technology, a decrease in the growth of our overall market, or our failure, for any reason, to continue to take advantage of growth opportunities. Overall growth of our business depends on a number of additional factors, including our ability to:  price our products effectively so that we are able to attract new customers and expand sales to our existing customers . . .

- "Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners. Declines in renewals or the purchase of additional licenses by our customers ***could*** harm our future operating results," and included the following statement:

   We also provide some customers the opportunity to use our automation platform and products for free prior to purchasing a license. . . . In order for us to maintain or improve our results of operations, it is important that our customers renew or expand their licenses with us and our channel partners. We cannot accurately predict our renewals and dollar-based net retention rate given the diversity of our customer base, in terms of size, industry, and geography. Our renewals and dollar-based net retention rate may decline or fluctuate as a result of a number of factors, many of which are outside our control, including the business strength or weakness of our customers, customer usage, including the ability of our customers to quickly integrate our products into their businesses and continually find new uses for our products within their businesses, customer satisfaction with our products and platform capabilities

and customer support, the utility of our platform to cost-effectively integrate with third-party software products, our prices, the capabilities and prices of competing products . . .

- "*If* we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected," and included the following statement:

    In addition, as our market matures, our products evolve, and competitors introduce lower cost or differentiated products that are perceived to be alternatives to our platform and products, our ability to sell licenses for our products could be impaired. Similarly, our license sales could be adversely affected if customers or users within these organizations perceive that features incorporated into competitive products reduce the need for our products or if they prefer to purchase other products that are bundled with solutions offered by other companies that operate in adjacent markets and compete with our products.

- "The markets in which we participate are competitive and, *if* we do not compete effectively, our business, financial condition, and results of operations *could* be harmed," and listed the following as competitors who this hypothetical applied to, without calling anyone out:

    including Appian Corporation, Automation Anywhere, Inc., Blue Prism Group PLC, Celonis Inc., EdgeVerve Systems Limited, Kofax Inc., Kyron Systems Inc., Microsoft Corporation, NICE LTD., NTT Ltd., Pegasystems Inc., and WorkFusion, Inc.

- "*If* we fail to continue to differentiate our platform and products from those offered by our competitors, then our business, results of operations, and financial condition may be harmed," and only after so stating that their business was not currently being harmed due to their differentiation did the Offering Documents note:

    Some of our competitors offer their on-premises or cloud solutions at a lower price, which has resulted in, and may continue to result in, pricing pressures.

- "Our key operating metric, ARR, and certain other operational data in this prospectus are subject to assumptions and limitations and *may* not provide an accurate indication of our future or expected results," and included the following statement:

- "*If* the estimates and assumptions we have used to calculate the size of our addressable market opportunity are inaccurate, our future growth rate may be limited."

62

[Emphasis added.]

190. Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

191. First, the statements regarding ARR, the purportedly successful land and expand model, growth, and profitability, omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots and Microsoft's success at exploiting those weaknesses to win customers UiPath needed. UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers. As a result, UiPath was attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases. UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR. Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

192. Second, the statements regarding the efficiency of UiPath's go-to-market model for enterprise and mid-market customers omitted the undisclosed information set forth above, as well as the fact that the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market. Further,

owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.

193.    Third, the statements regarding UiPath's purported $60 billion TAM implied that there was strong demand for its Robots, while omitting that, for the reasons set forth above, the actual much weaker demand could not support that, and the commoditization of the RPA market was driving down pricing, further reducing the realistic TAM.

194.    Fourth, the purported risk disclosures omitted that the issues they described as merely hypothetical were then actual, significant problems that were harming UiPath, as set forth above.  For example, it was not just a possibility that UiPath could be harmed by anyone from an undifferentiated list of potential competitors, rather UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies and rush out its IPO.

> b.    The Offering Documents Failed to Adequately Disclose Material Known Trends and Uncertainties in Violation of SEC Regulations

195.    UiPath's Offering Documents failed to disclose information required to be disclosed therein by Item 303 (17 C.F.R. §229.303).  Item 303 requires the disclosure of "any known trends or uncertainties that have had or that [the] registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations" of the registrant.

196.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  Management's Discussion and Analysis of Financial Condition and

Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

197.    Therefore, Item 303 required disclosure of UiPath's saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, losing substantial customers to Microsoft, actual stagnating growth notwithstanding the impression created by ARR, stagnating demand from new and existing customers, increased costs to prop up growth, and increased resort to ramping contracts, discounts, and related tactics; as well as the impact these undisclosed trends were having on UiPath's ARR, revenue, cost of revenue, gross margin, and net income.

198.    Further, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, also imposes an independent duty on Defendants to ensure that the "Risk Factors" section of the Offering Documents discusses "the most significant factors that make [the offering] . . . speculative or risky" and that each risk factor "adequately describes the risk." However, the Offering Documents did not properly disclose the risks identified above.

### 2.    Exchange Act Violations

199.    Throughout the Class Period, in numerous SEC filings and public statements, Defendants issued materially false and misleading statements and omissions that misrepresented and/or concealed from investors the Company's actual growth, demand among both enterprise and

mid-market customers, the success of its land-and-expand strategy, sales, competitive position, harm from Microsoft, promotion of ARR, discounting, and TAM, among other things.

200.    Defendants' actionably false and misleading statements and omissions are separately enumerated below.

### a.    April 21, 2021 Offering Documents

201.    Plaintiff realleges the false and misleading statements and omissions contained in the Offering Documents and noted in §V.B, above.

### b.    June 8-9, 2021 Earnings Press Release, Call, Form 10-Q

202.    After the market closed on June 8, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 1Q 2022, which ended April 30, 2021, stating that during the quarter, UiPath had achieved ARR of $652.6 million, a 64% year-over-year increase, and revenue of $186.2 million, a 65% year-over-year increase.  While the press release and earnings call noted a drop in certain performance metrics (*infra*, §V.C.), Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including Defendant Dines' claim on the call that UiPath experienced an "***exceptionally strong*** start to fiscal year 2022 . . . a testament to our leadership position in enterprise software automation."  [Emphasis added.]

203.    On that day's earnings call, Dines reiterated UiPath's "***ARR growth***," adding that "***[w]e continue to grow multiples of the market and take market share***."  Similarly, Defendant Gupta repeated that "we run and manage our business on ARR, ***which is most representative of the underlying performance of our business***," and later explained on the call that:

> [ARR] really gives you a representation of ***the true growth of our company and the true demand for – from our customer base.*** So our messaging, our emphasis, which is consistent between external and internal, is around ARR. ***We've proven***

> *the stickiness and the strength of our product* as well as our balance sheet. So we view ARR as the primary focus of all of our sales contracts.

[Emphasis added.]

204. On the same call, Gupta also claimed that UiPath had:

> *yet again delivered meaningful growth at scale*. Given *our total addressable market of over $60 billion*, the continued expansion of our automation platform and *our validated lead in the market*, we believe there remains ample room for us to continue to drive durable long-term growth. As a market leader, we know the inflection point in the adoption of automation is now as customers are choosing their long-term strategic partner. And as our results underscore, *we are consistently winning these competitive evaluations* . . . .

As a result, Gupta explained, "*customers [are] expanding automation across multiple departments and increasingly buying multiple parts of our automation platform*, leveraging our expanded cloud deployment offering and adding test automation and process discovery capabilities. *This is what a world-class land-and-expand model looks like in practice and how it has contributed to our strong year-over-year growth*." In sum, Gupta stated, "*[o]ur strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel*." [Emphasis added.]

205. During the question-and-answer portion of the call, Gupta explained the supposed momentum of the Company's ARR: new customers.

> I just want to start by emphasizing the strength of our quarter. $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR. *When you look at that growth, it was really founded on the fact that we're continuing to add customers at a really fast pace.* So our customer count is now greater than 8,500 customers. That's up more than 600 sequentially and 2,400 year-over-year. Quite frankly, this has exceeded our expectations, and we're looking forward as *our pipeline continues to be strong.*

[Emphasis added.]

206. In highlighting the Company's NRR and "land and expand" approach, Gupta repeatedly emphasized the "stickiness" of UiPath's customer demand:

So net dollar retention rate essentially is the calculus that says, how much does a customer continue to expand after their initial land or their initial purchase of automation? And that is fueled by the fact that they -- many of our customers start with single points of automation *and then rapidly expand across different processes, different departments and different employee bases. And so that creates more demand for our platform -- for the UiPath platform and robots, and that translates to more ARR dollars for us. . . . [W]e have a lot of confidence in not just the durability of it, but the stickiness and the demand from our customers.*

[Emphasis added.]

207. When asked about UiPath's sales expenses, Gupta reemphasized "the large demand

and increasing demand" in the Company's "pipeline":

We continue to be hiring at a rapid pace to support, frankly, *the large demand and increasing demand in our pipeline, the demand from our customers to help them on their automation journey and the demand for our partner -- from our partners as well. So that increase in demand means that we're going to have an investment-first mindset as we look at this*. And our leadership position gives us a lot of confidence to invest.

[Emphasis added.]

208. In response to an analyst question about "the competitive threat that Microsoft

brings," Dines dismissed it entirely:

*I would start by saying that we are very differentiated [from Microsoft], first of all, in our philosophy towards automation.* We have a unique platform that aims to emulate people and their work. Microsoft has built a low-code/nocode platform whose main goal is to provide new applications and analytics to the people. *They are like comparing apples to oranges* . . . *And by the way, we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments.*

\*    \*    \*

*We consistently have proven, and we have beaten our competitors with our technology.* If you go there and if you can show that you are able to implement in half time, imagine the exponential return on investment that happens when you deploy at scale. *And by the way, we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments.*

Later on the call, in the midst of emphasizing UiPath's alleged TAM, Gupta similarly downplayed UiPath's competition:

> [*W*]*e continue to feel in the discussions here the TAM $60 billion dollars is real*, every single industry, every single department, every single process, every single employee.  We see that enrich in really the pipeline of what we look at.  *So you can see also customers migrating away from our competitors and to us.*  And that is not just necessarily just about the strength of our individual components, but that is the strength of our entire platform.

[Emphasis added.]

209.    The following day, UiPath filed its 1Q 2022 Form 10-Q with the SEC, which was signed by Gupta.  The Form 10-Q reiterated the financial information stated in the 1Q 2022 press release and earnings call.

210.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

211.    First, the statements regarding ARR, the Company's purportedly successful land and expand model, and its supposedly strong growth, demand, pipeline, and overall performance, omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.  As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting

and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases. UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR. Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

212.    Second, the statements denying that Microsoft was a competitive threat and claiming that UiPath was consistently beating its competitors including Microsoft with its technology omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

213.    Third, the statements regarding UiPath's purported $60 billion TAM implied that there was strong demand for its Robots, while omitting that, for the reasons set forth above, the actual much weaker demand could not support that, and the commoditization of the RPA market was driving down pricing, further reducing the realistic TAM.

<em>c.    September 7-8, 2021 Earnings Press Release, Call, Form 10-Q</em>

214.    After the market closed on September 7, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 2Q 2022, which ended July 31, 2021, and held an earnings call. While the press release and earnings call noted a slowdown in License

revenue and ARR, as well as the existence of discounting of UiPath's products prior to the IPO (*infra*, §V.C), Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including Defendant Dines' claim on the call that "***The momentum in our business continued in our second fiscal quarter*** as ARR increased 60% year-over-year to $726.5 million, driven by record net new ARR of $73.9 million." Similarly, Defendant Gupta stated that "I am pleased with our second quarter results, which yet again delivered ***meaningful growth at scale***, driven by our market-leading automation platform that drives fast time-to-value and tangible benefits." UiPath's supposed "growth," Gupta explained, was "***driven by increased adoption of our core product portfolio, Automation Cloud, as well as new product offerings***." In fact, Gupta claimed, UiPath's "***customers [continue to] expand [their] platform adoption, add users and deploy more software robots***," resulting in a net retention rate of 144%. As a result, Defendants raised UiPath's FY 2022 guidance from a prior revenue range of $850 million – $855 million to $876M million – $881 million. [Emphasis added.]

215.    Again, Gupta emphasized the importance of UiPath's ARR and its "land-and-expand" business model: "We run the business and evaluate our performance based on ARR. ***This quarter's strong results were driven once again by a world-class land-and-expand go-to-market model*** . . . As I have emphasized repeatedly, ***ARR is the key metric*** for measuring UiPath, and it lays a strong foundation for the company as we scale." [Emphasis added.]

216.    When asked during the question-and-answer portion about competition, Dines dismissed the prospect entirely:

> ***We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one – that is the winning angle. All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.***

***This is our bread and butter.*** We have built it for a long time. And starting from this angle, we – ***it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space***.

[Emphasis added.]

217.    When Gupta was questioned about his partial disclosure of UiPath's use of "ramping" contracts (*infra*, §V.C), he connected that practice to "larger demand" for "longer-term commitments from some of our customers":

So when I talk about an annual ramping contract, one of the things that is really positive for us is digital transformation is a long-term trend. And what has happened with the strength of UiPath's platform is automation is a staple for the long-term requirements for customers to transform the way they work in digital transformation.

So what that means is instead of buying simple annual contracts, ***what we see a larger demand for is getting larger-term commitments from some of our customers.*** But the way they look at that is instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3. And those -- the license deliveries would happen into those years as we go down.

And so one of the things that we look at is that we like that because that is better ROI for our customers. And I -- when we think about the impact on financial metrics, two things. One is, remember, we -- and I repeat this, we really drive our company to ARR. ***From an ARR perspective, there is no impact that is there***. Based on the way the contracts are structured, if license delivery happens in the out years, then that does have -- that creates variability in revenue because we only can recognize the revenue upon delivery of the license. And so that is kind of the way that I think about it from a modeling perspective on revenue. But again, I stress ARR really, there's no impact, and that's how we drive the business.

[Emphasis added.]

218.    The following day, UiPath filed its 2Q 2022 Form 10-Q with the SEC, which was signed by Gupta. The Form 10-Q reiterated the financial information stated in the 2Q 2022 press release and earnings call.

219.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

220.    First, the statements regarding ARR, the Company's purportedly successful land and expand model, and its supposedly strong overall performance, growth, and demand, including demand for ramping contracts, omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.  As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

221.    Second, the statement claiming that big software companies—a reference to Microsoft—cannot do what UiPath does with its technology omitted the information set forth

above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

> d.    *October 14, 2021 Morgan Stanley Spark Conference*

222.    After the market closed on October 14, 2021, Defendants presented at the Morgan Stanley Spark Conference.  In response to a question about how the Company determined its oft-claimed $60 billion TAM, Defendant Gupta claimed it had been verified in multiple ways, stating in pertinent part as follows:

> ***So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus.  And we did it very simply.  We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there.  We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.***

> Qualitatively, when you look at it, I live the TAM because I was a customer.  So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain.  So it's really relevant to every single department, every single process and every single employee.  ***When you look at it both qualitative and quantitatively, you can see the massive market that it really is***.

[Emphasis added.]

223.    Again, when asked about Microsoft's competitive threat, Dines dismissed the software giant as a competitor, claiming that "***Microsoft doesn't even compete***" with UiPath's core unattended robot offerings specifically and posed little threat to UiPath overall:

> So – and I have high respect for Microsoft, especially under Satya.  It's a great company.  ***And we don't compete really with Power Platform.***  Power Platform, it's a big animal.  ***We compete within – not even with Power Automate, really.***  Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company.  ***It's a product that was never really proven in large enterprise deployments.  It's something that Microsoft sees more like in a personal productivity gain***.

\*        \*        \*

Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

**But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality.**

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

**So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear.**

[Emphasis added.

224.    Similarly, Dines also dismissed the potential competitive threat from enterprise

providers adding automation features to their native program suites:

**Servicetrace. At least until this point, we really don't compete with ServiceNow or Salesforce. We simply don't compete with them at this point. And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies. And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.**

**So we – in case of ServiceNow, it's also even more starking difference between our go-to-markets. They are primarily an IT shop. We sell primarily to business**

> *lines, to CFO, to operations.  So I see clearly that it's not conflicting.  We are actually customers to each other, we and ServiceNow.  So we more partner than compete.  We don't compete right now at this point in time.*

[Emphasis added.]

225.    When asked about the "effectiveness" and "ROI" of UiPath's technology, Dines claimed that the Company's customers were earning such an "enormous return on investment" that UiPath was not experiencing any "pressure on the pricing of [UiPath's] software":

> This is the type of technology that is really meant to get huge return on investments. This is not a kind of a personal productivity space. This is an enterprise-grade software that when deployed, provides enormous return on investment.
>
> We have customers like SMBC Bank that said that the return on investment is $0.5 billion. *So this is why particularly we have not seen really pressure on the pricing of our software.* With pricing in the grand scheme of total cost of ownership, it's only maybe 5%. So it doesn't really matter.

[Emphasis added.]

226.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

227.    First, the statements regarding the absence of pricing pressure on UiPath omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.  As a result, UiPath was falling

76

back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases. UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR. Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

Second, the statements denying that Microsoft was impacting UiPath, and denying that large software companies impact UiPath, omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

228. Third, the statements regarding UiPath's purported $60 billion TAM implied that there was strong demand for its Robots, while omitting that, for the reasons set forth above, the actual much weaker demand could not support that, and the commoditization of the RPA market was driving down pricing, further reducing the realistic TAM.

> e. *December 8-9, 2021 Earnings Press Release, Call, Form 10-Q*

229. After the market closed on December 8, 2021, the Defendants issued a press release attached to a Form 8-K announcing financial results for 3Q 2022, which ended October 31, 2021, and held an earnings call. The Defendants continued to emphasize UiPath's purportedly strong ARR ($818.4 million, an increase of 58 percent year-over-year) and on the call that day,

Defendants Dines and Gupta proclaimed the Company's supposed "momentum," "continued growth," and "*we see considerable demand for our automation platform*." [Emphasis added.]

230.    Growth in the quarter ended (3Q 2022) and the quarter in progress (4Q 2022), Dines explained on the call, was driven by "demand" from "really very engaged partners":

> [W]e are very pleased with what we are seeing in front of us. *We are seeing a strong Q4. It's – the demand is there. We are seeing really very engaged partners.* So overall, we are very pleased with the direction where our business is going.

[Emphasis added.]

231.    Similarly, Gupta emphasized the purported strength of UiPath's pipeline:

> *In summary, we are pleased with our third quarter results as the team's ongoing execution continues to drive meaningful growth at scale. The opportunity in front of us is enormous. We have a strong pipeline*, and we feel very good heading into the end of our first fiscal year as a public company.

[Emphasis added.]

232.    Again, Gupta directed analyst and investor attention to UiPath's ARR and its land-and-expand business model:

> *We have a highly recurring subscription business driven by a true land-and-expand model with customers deploying more robots, adopting more platform products and expanding use cases as they realize the considerable value of automation*.
>
> *    *    *
>
> We run the business and evaluate our performance based on ARR . . . We have a structured process in place to calculate and report ARR. Because it is invoice based, we believe that it is the most accurate and reliable measure of our true business activity. *It most closely aligns to long-term cash flow and best aligns to renewals.* And given our strong dollar-based gross retention rate, which was 98% in the third quarter, *ARR is most reflective of customer commitment regardless of deployment model . . . We manage the business on ARR as it more accurately reflects customer commitment period-over-period, which lays the right foundation for the company.*

[Emphasis added.]

233.    When asked about competition during the question-and-answer portion of the call,

Dines once again dismissed the prospect:

> In the last quarter, ***we have not seen any material moves in terms of the competitive landscape***. And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position. And I would quote them saying that when it comes to real enterprise automation, real scaled enterprise automation, ***customers are choosing UiPath***.
>
> ***And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases. And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases***.
>
> So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation. We are the clear leader. And ***we continue to win deals in very large scores because of our technology and our platform***.

[Emphasis added.]

234.    In discussing the Company's NRR, Gupta again emphasized UiPath's ability to

grow and expand:

> ***[T]he other thing we see is we do see continued momentum.*** I talked about our dollar-based net retention rate being very strong. ***One of the drivers of that is cross-company deals, where multiple functions are finding automation***. And I think that's a really important thing as a former customer to just emphasize as people continue to learn about UiPath, is our platform is horizontal.
>
> ***So we are talking to CHROs, COOs, customer call center leaders, CEOs, across the board, even CROs in terms of how they want to use automation. And our best customers are using -- are able to replicate what they do in one function and replicate those wins across functions. And that is really a core part of our dollar-based net retention rate and why we have conviction about the size of our TAM.***

[Emphasis added.]

235.    And when asked specifically about Microsoft, Dines was similarly dismissive:

Speaking about the current situation. As I said before, IDC has underscored very well where we are. ***In terms of real enterprise traction, UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration.***

*        *        *

***So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers.***

What is going to happen in the next couple of years? First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer and personnel productivity. This is a small part of our overall TAM. So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now.

[Emphasis added.]

236.    When asked about sales and marketing expenses, Dines emphasized the purported high-performance of UiPath's "velocity" team, which was the Company's term for its mid-market sales team:

Now on more general terms, I continue to say we really invest across the company, particularly in go-to-market, where we invest in field, we invest in velocity. ***And velocity is one of our best-performing things out there in terms of sales productivity.***

[Emphasis added.]

237.    On December 9, 2021, UiPath filed its 3Q 2022 Form 10-Q with the SEC, which was signed by Gupta. The Form 10-Q reiterated the financial information stated in the 3Q 2022 press release and earnings call.

238.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

239.    First, the statements regarding ARR, NRR, the purportedly successful land and expand model, and supposedly strong growth, demand, and overall performance, omitted the

substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  As a result, UiPath was attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

240.    Second, the statements regarding UiPath's go-to-market model and that the velocity, or mid-market, component was among the best performing parts of that model omitted the undisclosed information set forth above, as well as the fact that the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.

Third, the statements denying any change in the competitive landscape and any impact from Microsoft omitted the information set forth above, and that UiPath was then suffering specific

and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

> f.    *March 30 & April 4, 2022 Earnings Press Release, Call, Form 10-K*

241.    After the market closed on March 30, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 4Q and FY 2022, which ended October 31, 2021, and held an earnings call.  While the press release and earnings call noted disappointing guidance (*see infra*, §V.C), Defendants obscured and minimized this information with a series of false and misleading statements and omissions, including their emphasizing UiPath's supposedly strong ARR – with Defendant Gupta again stressing "I want to reinforce that we run and manage the business to ARR, which is where we believe investors should be focused" – and Defendant Dines declaring UiPath's "continued growth at scale."  As Dines explained in relevant part:

> Fourth quarter net new ARR grew 72% year-over-year, reaching a record $107 million.  This drove total ARR to $925 million, an increase of 59% year-over-year. ***Our continued growth at scale reflects broad-based adoption of our end-to-end automation platform and our focused execution.***  Automation is critical to digital transformation and to unlock new levels of innovation, agility and productivity.
>
> ***Our land-and-expand model continues to drive best-in-class dollar-based net retention of 145%.***

That day, the Defendants also issued FY 2022 ARR and revenue guidance, exceeding a billion dollars in each metric, at ranges of $1.2 billion – $1.21 billion and $1.075 billion – $1.085 billion, respectively.  [Emphasis added.]

242.    On the call, Defendants repeatedly claimed that the guidance reduction was due to "macro" issues, including the war in Ukraine.  For example, :

> So on the guidance, you guys know that we always guide looking at what is in front of us. And right now, we are seeing the impact of the war in Ukraine.

And as you know, we have a sizable business in Europe, and it's more than 30% of our business, and we are seeing uncertainty in Europe. ***In the last month, we have all experienced some deterioration on the global macroeconomical [sic] climate.*** And we have accounted for kind of normal distractions caused by the leadership transition.

[Emphasis added.]

243.    Later on the call, in responding to an analyst question about UiPath's guidance, Dines emphasized "[d]emand" for UiPath's solutions, as well as the Company's supposed leadership among "the pack," *i.e.*, UiPath's competitors:

> ***The business opportunity is here.  Demand is here.  We are bullish for the business for the rest of the year.  We've been capable of distancing ourselves from the pack.  We are the undisputed leaders in the automation.  And overall, we are all seeing really good – great business prospects.***

[Emphasis added.]

244.    In adding to Dines' point about demand competition, Gupta stated:

> ***The remaining balance that we see there is, we look at our pipeline, and we have a very strong pipeline, as Daniel mentioned.  There's a number of large deals, which we're excited about.  We've won those deals, in the sense of they're not being baked off by competition.***

[Emphasis added.]

245.    On April 4, 2022, UiPath filed its FY 2022 Form 10-K with the SEC, which was signed by both Dines and Gupta.  The Form 10-K reiterated the financial information stated in the 4Q & FY 2022 press release and earnings call.  Additionally, the Form 10-K contained a number of "risk factors" that purported to warn investors about hypothetical risks that could materialize ***in the future***, similar to those set forth in the Offering Documents, including:

- "Our recent rapid growth ***may not*** be indicative of our future growth."

- "Our business depends on our existing customers renewing their licenses and purchasing additional licenses and products from us and our channel partners.

Declines in renewals or the purchase of additional licenses by our customers **could** harm our future operating results."

- "**If** we are unable to attract new customers, our business, financial condition, and results of operations will be adversely affected."

- "The markets in which we participate are competitive and, **if** we do not compete effectively, our business, financial condition, and results of operations **could** be harmed."

[Emphasis added.]

246. Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

247. First, the statements regarding ARR, the Company's purportedly successful land and expand model, and its supposedly strong growth, demand, pipeline, and overall performance, omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed. UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers. Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market. Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team. As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases. UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's

growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR. Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

248.    Second, the statements claiming that macroeconomic issues were responsible for UiPath's guidance and disappointing performance omitted that the actual cause of that performance were the substantial undisclosed problems UiPath was then suffering from, as set forth above.

Third, the statements denying any increase in competition and claiming that Microsoft was not appearing in deals omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

249.    Fourth, the purported risk disclosures omitted that the issues they described as merely hypothetical were then actual, significant problems that were harming UiPath, as set forth above. For example, it was not just a possibility that UiPath could be harmed by declines in renewals, rather UiPath was then suffering specific and significant harm from customers declining renewals or reducing their number of licenses and the resulting churn.

g.    *June 1 & 3, 2022 Earnings Press Release, Call, Form 10-Q*

250.    After the market closed on June 1, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 1Q 2023, which ended April 30, 2022, and

held an earnings call in which the Defendants continued to tout the Company's ARR ($977 million) and NRR ($52 million), as well as UiPath's supposedly continuing growth.  Defendant Dines, for example, remarked on the call that:

> This year, we expect to cross the $1 billion mark in both ARR and revenue . . . Our market opportunity continues to be significant as the amount of many on working organizations and need for agility is only increasing.  **We continue to win in the market, given the measurable return on investment we create for our customers and the breadth and depth of our platform.**

[Emphasis added.]

251.    In fact, Defendant Gupta claimed that, "[a]s a result of our strong first quarter," the Defendants were raising full year ARR and revenue guidance, from previously issued ranges of $1.2 billion to $1.21 billion (ARR) and $1.075 billion to $1.085 billion (revenue) to $1.22 billion to $1.225 billion (ARR) and $1.085 billion to $1.090 billion (revenue).

252.    When questioned about the Company's increased guidance and allegedly better outlook, Gupta stated in relevant part:

> We talked about the large deals.  **We just – we monitor our pipeline very closely and, of course, the top deals that are there.  And we're pleased with the momentum and the movement.**  And I think that relates to the fact that our customers themselves are starting to get a handle in terms of navigating the environment, which takes some time to digest.
>
> **In terms of what else has changed, I would say, everything else strategically with the business remains on course.**  So our cloud business remains strong.  We're very optimistic about the customer response and the metrics around our cloud business.  And we – one of the other areas is I think we see – we continue to see opportunities for efficiencies in our company.  And that's why we've also increased our operating margin targets for the year.  As we look – as we see opportunities both in emerging enterprises as we talked about some of the sales realignment that Daniel referenced in the earlier comments.

[Emphasis added.]

253.    Later in the call, when questioned about the strength of UiPath's pipeline, Gupta stated in relevant part:

We actually were talking about the large deals and uncertainty about the size of the deals and the duration of those deals. And we – as we've commented this quarter, those deals are taking shape. They're progressing through the pipeline. We've adjusted our guidance to kind of reflect a moderate amount of optimism in terms of the conversion of those deals, especially in the second half.

In terms of Europe and in the public sector, I – we didn't – to my knowledge, we didn't make any specific comments like those were examples that then we were giving about anecdotes. We continue to hear anecdotes around there is pressure in Europe that I think is just understandable given the climate and the war there. *But we're pleased with the movement in our pipeline. And we're also pleased with the way our sales team is executing in this environment.*

[Emphasis added.]

254.    And in response to a similar question about the "types of customers in [UiPath's] pipeline," Gupta emphasized its "broad-based" nature and UiPath's advantages over its competitors:

*It's broad-based*, right? We have both local governments. We have small enterprises. We have large enterprises, Fortune 500. *Our pipeline continues to show strength and interest of expansion and adoption across our platform and across all the segments.*

*Continuing, including flanking and replacing our competitors, those are deals that we also see more and more of, especially as we have our latest releases in our product, and customers are seeing the breadth of our platform.* So I wouldn't – I would say no pattern that is different than history. We feel very good about it across our verticals, with the major verticals and focus that I mentioned.

[Emphasis added.]

255.    On June 3, 2022, UiPath filed its 1Q 2023 Form 10-Q with the SEC, which was signed by Gupta. The Form 10-Q reiterated the financial information stated in the 1Q 2023 press release and earnings call.

256.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

257.    First, the statements regarding ARR, NRR, and the purported strength of UiPath's overall performance, pipeline, demand, and successful growth omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  As a result, UiPath was attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

258.    Second, the statements regarding the supposed broad categories of UiPath customers and the sales team's strong execution omitted the undisclosed information set forth above, as well as the fact that the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.

> h.    *June 2, 2022 Cowen Technology, Media, and Telecom Conference*

259.    On June 2, 2022, Defendants presented at the Cowen Technology, Media, and Telecom Conference.  According to Defendant Dines, "the outlook for automation, I think, has increased a bit.  ***We are seeing a positive momentum.***"  Defendant Gupta built on this theme, explaining:

> The fundamentals of our company feels strong.  I mean we've talked about a large – we're in the early stages of a large and growing market.  ***We've talked about our total – our TAM of being $60 billion plus, and that automation is ubiquitous.  I think that's not an area of debate anymore.  You can look at our 10,000-plus customers, customers greater than $1 million and the speed at which we've scaled that crossing 155, meaning, north of that number, and even customers greater than 100,000 is showing the potential***.  And that is just in the last 3 to 5 years of accelerated hyper growth.

[Emphasis added.]

260.    When questioned about UiPath's oft-touted ARR and vaunted "land-and-expand" business model, Gupta stated in relevant part:

> ***So we landed at 138% still when you look across the peer group of software companies, whether at a smaller scale or at our scale crossing $1 billion here.  This quarter, we feel great about where we stand there.***  That includes the absorption of FX in Russia.  So we're really closer to 140% million, depending which way you swing the round right there.
>
> ***Expansion is a major – is going to be the growth engine for our company.  And when you look at it, it's just part of the land and expand motion of somebody coming in and really understanding our platform, plugging it in, getting a few use cases up and running, seeing the paybacks of 6 months, seeing ROIs.***  Like a major automotive company that, in their first automation, saved 2,000 hours.  That translates to dollars that they can reallocate across the company.
>
> ***And then it becomes – the flywheel starts moving, more pipeline of automations come and more opportunities allow it, and then they go deeper and wider across our platform.  So the land and expand motion, we see that as continuing to evolve strength.***  And then as the platform evolves, if you – again, 2 years ago, we didn't have companies adopting process mining and process discovery.  Major food and beverage company started with RPA, expanded into process discovery.  Test automation is now making its way more into that.

*So these are all upsell opportunities*.  More chances for our sales team to sell *a platform that has immense value to our customers* and really drive that dollar-based net retention rate.

[Emphasis added.]

261.    When questioned about UiPath's competition – including from Microsoft and

ServiceNow – Dines again largely dismissed them as competitors, stating in relevant part:

*Now going to Microsoft and ServiceNow.  They are very different type of companies in their relation to the RPA market and the automation market. Microsoft has built, technically speaking, a platform for citizen developers.  This is what Power Automate is.  It's a simple-to-use platform but it lacks the power to scale up when you really need more complex use cases.*

*So Microsoft has two type of technologies.*  One is for pro dev, where they have all the Azure suites, Visual Studio; and then its Citizen Developer, which is Power Platform.  But actually, they don't address well what is in between, which is more like this technical business users that have a bit of coding concepts and they can – and in our world, they deliver [module].  They need a bit more sophisticated tools than Power Platform offers, but not as sophisticated as Visual Studio.  So it's this layer.  And this is how we scale this company based on this population.

So therefore, Microsoft competes with us in the personal productivity space, where it's driven by citizen developers, and more on the low end of the market, where they can penetrate better through their channels. And in our big accounts, people realize the power of having the same program, even for citizen developers for business users because you can take elements of automation and then you can have a professional developer working directly on them. It's the same onboarding program and it's, frankly, much more powerful tools talking about.

Now with ServiceNow, we have not seen yet in a material way ServiceNow. Right now, we -- it's less than 1% in the opportunities that we have in our CRM system where we are seeing ServiceNow. Also, you need to think of ServiceNow as what is the persona their sales team is keen to sell. So persona is more of an IT persona, while automation and RPA requires a bit more of business skill. So we sell more into the CFO line of businesses rather than IT. So we are seeing both Microsoft and ServiceNow more partners than competitors.

[Emphasis added.]

262.    Unfortunately for investors, the statements in the preceding paragraphs were

materially false and misleading, for the reasons set forth immediately below.

263.    First, the statements regarding ARR and the Company's purportedly successful land and expand model omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers.  Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.  As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

264.    Second, the statements denying that Microsoft was impacting the part of the market that UiPath focuses on omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to

support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

265.    Third, the statements regarding UiPath's purported $60 billion TAM implied that there was strong demand for its Robots, while omitting that, for the reasons set forth above, the actual much weaker demand could not support that, and the commoditization of the RPA market was driving down pricing, further reducing the realistic TAM.

i.    *June 7, 2022 BofA Global Technology Conference*

266.    On June 7, 2022, Defendants presented at the BofA Global Technology Conference.  Again, Defendant Dines praised the Company's 1Q 2023 performance and position for supposed continued success in 2Q 2023.

> ***Well, it was a very good Q1 for us.  We've bitten [sic] all the metrics in our guide. And we've been able to raise the guide despite the FX impact.  We've basically absorbed the FX impact in our guide for Q2.***
>
> ***Overall, we are seeing signs of macro improvement.***

[Emphasis added.]

267.    Again, Dines emphasized that the Defendants' view of UiPath's supposedly enormous TAM remained unchanged and that UiPath remained "the clear leader in this space."

> ***Look, our view from a year ago, at the time of our IPO has not changed.  It's a very big addressable market.  We are looking at $60 billion TAM.  We're the clear leader in this space.***  And we have progressed a lot from [sic].  RPA was just an entry gate for us in the big enterprise world.  ***But we are offering an end-to-end process automation platform at this point and this platform is getting a lot of traction***.  It helped us to really increase our market share in the automation category overall.

[Emphasis added.]

268.    And again, Dines downplayed Microsoft's competitive threat:

So, historically, we competed to mostly with 2 companies, they are Automation Anywhere and Blue Prism. Now Blue Prism faded out over time very quickly. So

we have not seeing [sic] them in the new opportunities so much. And 3 years ago, Microsoft announced their intention to get into RPA space. And they were followed by a slew of other enterprise companies. SAP has -- 3 years ago -- SAP was actually the first that entered this space. And then ServiceNow, Salesforce. So everybody announced intentions to be an RPA and they usually bought a small company to integrate. That was basically the strategies we've seen in the market.

Now in terms of where we are today in the market, according to Gartner, we are the only company that last year's get [sic] 6 points of market share. And we get more revenue than I think almost everyone in the RPA space combined. ***So it's -- whilst it's really in the RPA space, it's not like we are having a competitor that is hurting us.***

***Microsoft. Again, Microsoft entered the space 3 years ago, right? According to Gartner, they have 2% market share. And we are seeing Microsoft in deals. But as we split the industry into enterprise automation, that means automation built by professional developers deployed enterprise-wide. This is not where Microsoft plays. They build power platform it's citizen developer platform. It's not for creating enterprise automation.***

***On the personal automation, our tool is really way more advanced and this is only a fraction personnel automation***. And it makes a lot of sense if you feel for when you build an automation program for an enterprise. It makes a lot of sense to have the same technology power in personnel automation and enterprise. So you can progress also a lot of your citizen developers may be into professional developers.

So we are -- this is -- so right now, if we look at our opportunities, it's Microsoft and Automation Anywhere that we are seeing the most. The other company's sales services [sic] now we are not seeing. It's less than 1% of our opportunity. And we'll see how things go over time. ***But right now, given our investments in and our the progress of innovation, I really feel confident***.

[Emphasis added.]

269.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading, for the reasons set forth immediately below.

270.    First, the statements regarding UiPath's purportedly strong performance omitted the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed.  UiPath was therefore having significant difficulty

both landing new customers and expanding business with existing customers.  Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team.  As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

271.    Second, the statements denying that Microsoft was impacting the part of the market that UiPath focuses on and denying that Microsoft was hurting UiPath omitted the information set forth above, and that UiPath was then suffering specific and significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, thereby prompting UiPath to alter its business strategies.

272.    Third, the statements regarding UiPath's purported $60 billion TAM implied that there was strong demand for its Robots, while omitting that, for the reasons set forth above, the

actual much weaker demand could not support that, and the commoditization of the RPA market was driving down pricing, further reducing the realistic TAM.

> j.      *September 6 & 8, 2022 Earnings Press Release, Call, Form 10-Q*

273.    After the market closed on September 6, 2022, the Defendants issued a press release attached to a Form 8-K announcing financial results for 2Q 2023, which ended July 31, 2022, and held an earnings call in which the Defendants revised down UiPath's guidance, though they blamed it on macroeconomic issues, and noted that the company would be repositioning its sales approach, which they also downplayed various misstatements and omissions (*infra*, §V.C.).

274.    On that day's earnings call, Defendants continued to blame "macroeconomic" factors for UiPath's reduced guidance.  For example, Gupta explained:

> **Let me now turn to guidance. First, we guide to what we see in the pipeline, which continues to fluctuate given the choppy macroeconomic environment, which we anticipate will continue.** Second, more than half of our business is outside the U.S., and we price in local currency, including euro and yen. And as a result, there is a material FX headwind for both ARR and revenue that has significantly increased as we move through the year.
>
> Lastly, going forward, as Rob said, profitability is a core pillar of our go-forward strategy. **While the reduction in our top line near-term forecast reflects the FX headwind, of the macroeconomic environment and our internal repositioning,** we are committed to our goal of achieving non-GAAP profitability and positive adjusted free cash flow in fiscal year 2024.

Gupta would repeat the same excuse multiple times later in the call.  [Emphasis added.]

275.    On September 8, 2022, UiPath filed its 2Q 2023 Form 10-Q with the SEC, which was signed by Gupta.  The Form 10-Q reiterated the financial information stated in the 2Q 2023 press release and earnings call.

276.    Unfortunately for investors, the statements in the preceding paragraphs were materially false and misleading.  The statements claiming that the Company's guidance and disappointing performance resulted from macroeconomic issues, FX headwinds, and repositioning

omitted that this performance actually resulted from the substantial customer churn and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed. UiPath was therefore having significant difficulty both landing new customers and expanding business with existing customers. Also, the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers, however UiPath was having substantial difficulty getting any traction in the mid-market. Further, owing to these undisclosed problems, UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following 18 months, including turning over its leadership team. As a result, UiPath was falling back on attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases. UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR. Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

> k.   *September 7, 2022 Evercore ISI Technology, Media & Telcom Conference*

277.   On September 7, 2022, Defendants presented at the Evercore ISI Technology, Media & Telcom Conference. While Defendants noted certain information about the repositioning mentioned the night before and about Microsoft, Defendants obscured and minimized this

information with additional false and misleading statements and omissions, including Defendants'

misstatements from the previous day regarding the purported "macroeconomic" reasons for the

Company's guidance reduction (*infra*, §V.C).  Further, in Gupta's response to a question about

UiPath's TAM, he responded in relevant part:

> Look, ***I think at $1 billion of scale, profitability is, especially with our gross
> margins, well within reach***.  And I think one of the – I think what's healthy about
> the current environment is profitability allows us to play offense, right?  Because
> you get – you have more scrutiny on ROI.  You're saying, I'm going to focus in
> areas that have higher returns.  And as that focus comes into an organization, and I
> already feel it as we've kind of brought new leadership in different areas.  As you
> get more focus, actually, you can accelerate change faster.  Like I just think about
> like what Rob has been talking about between pricing, repositioning segmentation.
> ***Those are all changes that actually we are talking about as accelerants of growth,
> but they drive massive levels of efficiency.***

[Emphasis added.]

278.    Unfortunately for investors, the statements in the preceding paragraph were

materially false and misleading, for the reasons set forth immediately below.

279.    First, the statements regarding profitability omitted the substantial customer churn

and stagnating demand that UiPath was then experiencing, due to the expense and difficulty of

UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win

customers UiPath needed.  UiPath was therefore having significant difficulty both landing new

customers and expanding business with existing customers.  Also, the enterprise customers who

had fueled UiPath's earlier hyper growth had largely made their purchases already, which led

UiPath to attempt to expand into mid-market customers, however UiPath was having substantial

difficulty getting any traction in the mid-market.  Further, owing to these undisclosed problems,

UiPath revamped its sales strategy multiple times in the lead up to the IPO and over the following

18 months, including turning over its leadership team.  As a result, UiPath was falling back on

attempting to prop up its growth with undisclosed discounting and related tactics, as well as

ramping contracts which were actually a concession to let customers buy fewer Robots while making it appear that they were still making larger purchases.  UiPath was also pointing investors to ARR, which painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR.  Moreover, UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability. In truth, due to the foregoing circumstances, UiPath's growth was stagnating.

280.    Second, the statements regarding "macroeconomic" issues omitted that undisclosed information as well.

### C.    The Truth Gradually Emerges

281.    The truth slowly emerged through several partial corrective events, which Defendants continued to obscure and minimize with a stream of material misrepresentations and omissions.

282.    On June 8, 2021, after the market closed, UiPath reported its 1Q 2022 financial results, representing the quarter ended April 30, 2021.  As further detailed in §IV, that quarter UiPath's total revenue growth rate declined by substantial amounts on YoY and sequential bases, while its total cost of revenue and Sales & Marketing expense increased significantly, resulting in its gross margin and net income dropping for a large net loss.  This performance was a materialization of the significant undisclosed problems and risks that UiPath was then facing, including from saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, Robots that were too complex and expensive, losing substantial customers to Microsoft, and stagnating demand from new and existing customers, as well as

increased costs and discounts to try to combat those problems. *E.g.* §§V.A-B. However, this materialization of the risks was obscured by multiple positive misrepresentations and misleading statements that Defendants made at the same time (*supra*, §V.A), as well as by their reporting that UiPath's revenue beat expectations, and that its ARR increased 64% year-over-year—the misleading metric they told investors to focus on.

283. On this news, UiPath's common stock price fell to a close of $68.71 on June 9, 2021 from the prior day's closing price of $76.00, a decline of approximately 9.59%. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed risks and problems set forth above.

284. On September 7, 2021, after the markets closed, UiPath released its 2Q 2022 financial results for the quarter ended July 31, 2021. For that quarter, UiPath's YoY ARR growth rate dropped by about four points, Defendants announced guidance for the remainder of FY 2022 indicating that that ARR growth rate would remain at about that same level for the rest of the year, and the YoY growth rate for its License revenue dropped by an even larger amount. On that day's earnings call, Defendants also announced that UiPath had been engaged in regular discounting dating back to before the IPO, which Defendants claimed had been positive for UiPath, and that UiPath would now switch to "ramping" contracts, which they claimed was supposedly even more positive. As framed by Gupta during the call:

> Looking at our pipeline, which is strong across geographies, ***we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts***.
>
> \*    \*    \*
>
> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention rate is 98%, ***we don't feel kind of compelled to trade any type of discount for long for getting the cash in the door right today***. We're able to make better and better economic decisions from the position of strength.

[Emphasis added.] The ARR, guidance, and revenue data noted above was a further materialization of the significant undisclosed problems and risks that UiPath was then facing, as set forth above, which had now begun to impact ARR, despite Defendants' efforts to prop ARR and sales up, and so also implicated the risks of Defendants' use of ramping, and of ARR to obscure UiPath's true performance. *E.g.* §§IV, V.B. However, that materialization was obscured by multiple positive misrepresentations and misleading statements that Defendants made at the same time (*supra*, §IV, V.A-B), including claiming that demand was strong and creating the impression that the guidance was conservative. Likewise, the partial correction regarding discounting and ramping was obscured by the misstatements and omissions, including those it was intertwined with, which omitted that the discounting was due to the undisclosed problems along with the extent of the discounting, and that the actual reason for those contracts was that customers were committing to purchase fewer UiPath Robots as well as the unlikelihood that the ramp in subsequent years would occur.

285.    On this news, the price of UiPath's common stock fell from a close of $62.46 on September 7, 2021, to $56.45 on September 8, 2021, a decline of approximately 9.62%, before falling again to close at $54.40 on September 9, 2021, on above-average trading volume. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed problems the Company was facing. That day, September 7, 2021, analyst BMO Capital Markets acknowledged that UiPath's share price fell because of the guidance reduction, but latched onto the Company's misstatements, claiming that "management is being a bit conservative on the ARR" and therefore saw the "pullback in the stock as an opportunity."

286.    For the Company's 3Q 2022 results, announced on December 8, 2021, UiPath announced performance that was largely similar to the previous quarter, beat expectations, and continued to make material misrepresentations and omissions. *Supra*, §V.A-B.

287.    On March 30, 2022, after the markets closed, UiPath issued a press release announcing its financial results for the quarter ended January 31, 2022 (4Q 2022) and the fiscal year that ended on the same date (FY 2022).  While UiPath's financial results for 4Q 2022 were largely similar to the previous quarter, UiPath also issued the following guidance: ARR for 1Q 2023 of $960 million to $965 million; ARR for FY 2023 from $1.2 billion to $1.21 billion; 1Q 2023 revenue in the range of $223 million to $225 million; and FY 2023 revenue in the rage of $1.075 billion to $1.085 billion.  This guidance was disappointing and beneath analysts' consensus. On the same day, UiPath filed with the SEC a separate release on Form 8-K announcing the abrupt departure of Thomas Hansen, UiPath's Chief Revenue Officer, who was responsible for developing relationships with the Company's current and prospective customers, expanding UiPath's partnership network, and fostering the Company's developer community.  The release also announced that UiPath was hiring Chris Weber, former Corporate V.P. of Microsoft's Corporate and Small & Medium Sized Business commercial team, to serve as the Company's first-ever Chief Business Officer where he would be responsible for leading UiPath's global go-to-market strategy and execution, and for guiding the Company's worldwide sales, services, and other go-to-market operations, including its partner organization.  The guidance and personnel change were a further materializations of the significant undisclosed problems and risks that UiPath was then facing set forth above, which were now having a larger impact on ARR despite Defendants' attempts to prop it up and were forcing Defendants to bring in sales executives familiar with Microsoft as well as mid-market customers. *E.g.* §§IV, V.A-B.  However, they were obscured by

multiple positive misrepresentations and misleading statements that Defendants made at the same time, including purported macroeconomic issues that delayed several deals being responsible for the guidance while UiPath's underlying demand supposedly remained strong. *Supra*, §§IV, V.A-B.

288.    Some analysts took note.  For example, that day, BMO Capital Markets issued a report on UiPath headlined "Harbinger or Not?" explaining it was "surprised by the magnitude of the guidance change" and that in light of UiPath's "disappointing ARR/revenue guide . . . [o]ur view is bruised," although the analyst "continue[d] to believe that PATH has durable IP leadership in a growing market."  Similarly, Canaccord Genuity issued a report the following day proclaiming their belief that "UiPath is in a pretty good spot," but labeling the "reset in growth expectations" as "a bit of a surprise and a bummer to us."

289.    On this news, the price of UiPath's common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, a decline of $7.45 per share, or more than 25%, on heavy trading volume.  But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed problems the Company was facing.

290.    On September 6, 2022, after the market closed, UiPath reported its 2Q 2023 financial results.  For that quarter, UiPath's revenue growth was 24% year-over-year and its ARR growth was 44% year-over-year, which were both a step down from the previous quarter.  UiPath also revised downward its FY 2023 ARR guidance, which Defendants had just issued the previous quarter, to a revised range of $1.153 billion to $1.158 billion, indicating a new low growth rate. The guidance revision was a further materialization of the significant undisclosed problems and risks that UiPath was then facing as set forth above.  *E.g.* §§IV, V.A-B.  However, it was obscured

by multiple positive misrepresentations and misleading statements that Defendants made at the same time, including purported macroeconomic issues and a changed sales strategy being responsible for the guidance while UiPath's underlying demand supposedly remained strong. *Supra*, §§IV, V.A-B.

291.     On the earnings call that day, Enslin disclosed that UiPath's "top line metrics have slowed, and we need to evolve how we manage our business."  As a result, he explained:

> In the short term, ***we are strategically repositioning the company to increase velocity, efficiency and customer centricity.*** This includes evaluating -- elevating customer conversations, selling business outcomes and helping organizations realize the transformational benefits of automation. We have the opportunity to be the essential automation goal standard for customers delivering technology that is integral to their business strategy.
>
> To get there, we are aligning around 4 strategic objectives. . . . This includes branding and marketing around business outcomes that resonate with the C-suite, simplifying our sales motion to lower costs, building strategic partnerships that elevate our brand and serve as distribution channels and coalescing around partners that can really move the needle.

[Emphasis added.]   This partial correction was obscured by Defendants concurrent misrepresentations and omissions, including the purported "macroeconomic" issues and their claim that demand remained strong while the primary obstacle the Company faced was its approach to sales.

292.     At  the Evercore Conference the following morning, September 7, 2022, Enslin disclosed that when dealing with a customer or prospective customer, UiPath regularly found itself addressing people "low down in an organization . . . [who] can't take [UiPath's Robots] broader," and so UiPath was attempting to "reposition" itself to reach the organization's decision-makers, *i.e.*, "into the top suite of companies," including the CIO, CFO, and CEO, who can place bigger orders.  In addition, Enslin finally admitted that Microsoft was impacting UiPath, although he obscured the extent of the impact, stating in relevant part:

And then the question everyone asked and so rather than just not ask Microsoft. Where is Microsoft in the space. And the challenge with Microsoft is not that they're in enterprise automation. They're certainly in personal automation and companies use them for citizen type environment.

The challenge for us [with Microsoft is] that they are in a broader contractual arrangement where customers first perceive it to be part of the solution[,] *which certainly does have an impact on how we sell and how we position ourselves in certain companies.* And that's also the reason why we have to position the platform and get the branding right for the platform.

[Emphasis added.] Again, these partial corrections were obscured by the multiple positive misrepresentations and misleading statements that Defendants made at the same time, including those set forth in the preceding paragraph and the full, significant extent to which Microsoft was winning customers UiPath needed. *Supra*, §§IV, V.A.

293. Analyst Canaccord Genuity released a report on UiPath on September 7, 2022 headlined "A path of significant resistance," characterizing the earnings report and guidance as "largely disappointing," downgrading UiPath's common stock from a "BUY" rating to a "HOLD" rating, and lowering its UiPath price target from $25.00 to $15.00. According to the report, "[t]he rapid decline in [UiPath's NRR] is cause for concern, and ARR guidance of ~25% growth suggests further deterioration," and "we expect that it could be multiple quarters before we start to see more stability in the go-to-market."

294. On this news, the price of UiPath's common stock fell from $15.59 per share on September 6, 2022 to $13.84 per share on September 7, 2022, a decline of 11.22%, on heavy trading volume. But UiPath's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed problems the Company was facing.

295. Finally, on the last day of the Class Period, September 27, 2022, just before markets closed, UiPath hosted an Analyst/Investor Day, during which Enslin conceded that "We haven't

been efficient in how we sell, and we aren't delivering the platform in a way -- in ways that clearly

articulate the holistic value automation can deliver." In revealing the significant, longstanding

problems with UiPath's sales, and substantively describing the changes UiPath would attempt to

make to fix those problems, Weber emphasized the Company's need to increase its focus on mid-

market businesses and execute on the "expand" portion of its "land-and-expand" model:

> You can also see the coverage ratios. So in the enterprise, we have on average
> globally, 1 account exec to 50 accounts. That's average. I will tell you in some
> areas, it's even higher. And then in our – what we call emerging enterprise, which
> is the corporate mid-market and SMB, our average ratio globally is about 1:150. I
> will tell you in our ability to capitalize on growth and the opportunities in these
> segments, we have to change these ratios. ***And so 1 of the biggest things that we're
> going to do is focus a higher density of resources on the customers who represent
> the highest propensity***.

> By the way, I think this model on the left has worked up until now in terms of it's
> been a great strategy to sort of have a land grab to get acquisition, new logos, et
> cetera, where I think we run into headwinds have an opportunity is ***how do we
> expand in those accounts once we land them. It's going to take a different
> coverage ratio and a different coverage ratio on those accounts that have the
> largest propensity to grow***.

[Emphasis added.]

296. In discussing UiPath's partners later in the presentation, Weber similarly conceded

a lack of "reach and scale" among mid-market businesses and that the Company's sales approach

was not working to drive growth:

> It's all about usage, consumption and adoption. That is where we want them to
> build their businesses around UiPath. We think that's where they can build the
> healthiest business for themselves. And it's also the biggest impact we can have on
> our customers. Now if the partners want to bring us deals fantastic, we love that. If
> they want to resell, we want to support that, ***particularly where we don't have the
> reach and scale in that SMB segment. But we're going to fundamentally refocus
> the partner efforts on those partners who have, I'll call it, super powers around
> usage adoption and consumption. That is our quickest way to scale the things
> we've talked about within our sales force***, not only around expansion within
> current customers, the ability to drive new acquisitions and new acquisitions that
> are sticky.

[Emphasis added.]

297. Additionally, at the same presentation, Defendants revealed slower-than-expected FY 2024 revenue and net new ARR.

298. Analysts reacted with alarm. The following day, J.P.Morgan honed in on the Company's announced "**lower-than-expected FY24 ARR growth target of 18%, below consensus of ~27%**" [emphasis in original] and the industry's "competitive landscape":

> Though management emphasized a focus on "reaccelerating" growth, we believe it will take time and there is some wood to chop given the expected deceleration in its medium-term ARR trajectory, and see a material improvement in the company's glidepath taking multiple quarters to materialize, ***particularly as the competitive landscape continues to evolve***.

SMBC's report of the same day took an even more skeptical approach, explaining that UiPath's:

> ***platform strategy will likely be difficult to execute in a crowded market*** with macro headwinds, and we're not confident that better sales execution will be a sufficient "repositioning" action. ***We think PATH's issues have morphed from outsized investor expectations to a need for a full-blown corporate turnaround as the company repositions itself.*** We're encouraged that PATH is working to hit more check-boxes in the big and broad automation space to become a go-to enterprise vendor, beyond early adopters of scaled-up RPA. PATH's move to re-engineer its go-to-market function— including a new focus on higher-level buyers—looks smart, ***but it may not solve the deeper issues around RPA commoditization***.

And on September 29, 2022, Canaccord Genuity, reflecting on its prior September 7, 2022 report, recalled previously "feeling a little shellshocked by results." Now, the analyst noted, "***investors got a legitimately sizable amount of new information***," as it reduced its UiPath common stock price target to $14.00. [Emphasis added.]

299. On these final corrective disclosures, the Company's stock sank further the following day, September 28, 2022, closing at $12.94 per share, down 3.72% against the prior day's closing price of $13.44 on heavy trading volume. The following day, September 29, 2022, UiPath's stock fell a further 2.86%, closing at $12.57.

300.    After the Class Period, additional revelation of UiPath's substantial problems continued.  On December 2, 2022, Defendants announced that UiPath was "piloting [its] first solution accelerator to provide [customers] a starting point for their automation journey," which Enslin claimed would "provide customers with the technical know-how to help them complete the implementations significantly faster," effectively conceding customer implementations to date were too complex and taking too long.

301.    On March 16, 2023, UiPath disclosed that Weber, who had been brought in to lead UiPath's global go-to-market strategy and execution, as well as to guide worldwide sales, services, and other go-to-market operations, leveraging his experience from Microsoft, particularly in the mid-market segment, had stepped down as the Company's Chief Business Officer after only a year on the job.

302.    Analysts also articulated the systematic obstacles that had undermined UiPath since before the IPO.  For example, on November 3, 2022, Oppenheimer downgraded UiPath from "Outperform" to "Perform," citing persistent competitive and internal pressures on improving UiPath's business, as well as the slow adoption of UiPath's solution as an enterprise-wide platform.  In its report entitled, "UiPath: Lingering Issues Make an Improving Business Story Look Distant; Downgrade to Perform Rating," Oppenheimer concluded that notwithstanding UiPath's new go-to-market strategy, the path forward to an improving business story remained unclear because, at least in part, UiPath still "does not handle the last mile of data" but rather "that data is typically held within the platform of the mega application software vendors such as Microsoft, ServiceNow, Salesforce, Workday, Oracle, and SAP . . . [all of which] over the past two years . . . have acquired a RPA solution, built out this functionality within the platform, and currently offer RPA capabilities to the market."  Moreover, because "most of these mega platform suppliers do

not charge for the RPA functionality and instead offer it as part of selling the other platform solutions and technologies[,]"  Oppenheimer explained that UiPath continues to: (a) face "pricing pressure;" (b) experience "weakened win rates;" and (c) observe "faster commoditization trends of [its] RPA technology."

303.    Ultimately, as a result of Defendants' misleading statements and omissions Plaintiff and the Class suffered billions of dollars in losses and economic damages under the federal securities laws.

### D.    Additional Scienter Allegations

304.    In addition to the facts pleaded above, the following additional facts support a strong inference of Defendants' scienter.

> *1.    Defendants Dines and Gupta Knew About UiPath's Undisclosed Issues Negatively Impacting Customer Demand and Churn, Microsoft's Negative Impact, Misleading ARR, and the Company's Ramping Contracts*

305.    Multiple CWs confirmed that Defendants Dines and Gupta knew of all of the undisclosed issues negatively impacting UiPath alleged herein.

### a.    Demand and Churn

306.    In CW1's marketing role, CW1 had access to internal UiPath dashboards that tracked customer churn.  CW1 recounted that UiPath's c-suite – which included Defendants Dines and Gupta – had access to the same dashboards that CW1 regularly reviewed and therefore had the ability to review the same reports regarding UiPath's ongoing customer churn that CW1 had access to.  In fact, CW1 recalled that certain reporting dashboards were created "specifically for the audience" of c-level executives.

307.    As CW1 explained, UiPath's executives – including Defendants Dines and Gupta – "absolutely knew" that UiPath Robots were not meeting customer needs, leading to churn.  "They

saw the same reports I was looking at," CW1 explained. Further, CW1 recounted that UiPath executives, including Dines, attended and led all-hands Company-wide meetings that discussed UiPath's churn.

308.    In CW2's role as an Account Executive for UiPath's mid-market segment, CW2 had access to multiple platforms, including Clarity, which CW2 used to track progress toward CW2's quotas, and Salesforce, which CW2 used to track sales and ARR. As set forth above, CW2 recounted personally missing sales quotas and other sales executives doing so as well on a regular basis. CW2 stated that "everyone" at UiPath had access to these two platforms.

b.    Microsoft

309.    CW1 also recalled attending an all-hands meeting led by Defendant Dines in mid-2020 to address the competitive challenge following Microsoft's May 2020 Softomotive acquisition. That acquisition made UiPath feel "threatened" and led to a "big shift in strategy" in which UiPath made "entire dedicated campaigns and tactics to combat" Microsoft, CW1 recalled.

310.    CW4, a former Global Vice President of Value Engineering, also stated that UiPath's c-suite was aware of Microsoft's impact. In early 2021, CW4 recalled attending a Zoom meeting with multiple senior executives, including Defendant Dines, to discuss how to respond to Microsoft's Robots. At that meeting, Dines asked CW4 to work with the value engineering team to devise a value proposition, based on the total cost of UiPath Robots, to prove to customers that UiPath's Robots were more cost effective than Microsoft's in the long term. Ultimately, CW4 explained, the value engineering team was unable to do so because "Microsoft was obviously cheaper."

311.    CW5, a former UiPath Enterprise Account Executive, also confirmed that UiPath's executives, including Dines, were aware of Microsoft's impact, particularly because CW5 recalled

Dines, at an all-hands meeting, "screaming over the fact that Microsoft was giving it away" and that UiPath was not "standing up for [themselves]" or showing clients what UiPath could do. Thus, Dines "absolutely knew the threat of Microsoft," CW5 stated.

c.    ARR

312.    CW1 also recounted that UiPath publicly presented ARR figures that included non-recurring revenue, a fact that Defendants did not disclose to investors. CW1 explained that all of the ARR inputs were stored in UiPath's Salesforce platform and that all of this data was available to UiPath's CFO Gupta, who oversaw the Salesforce team. This account of UiPath's executives having access to the Salesforce platform corroborates CW2's recollection that "everyone" had access to the Salesforce platform. Additionally, CW1 recalled that UiPath's finance team circulated a deck explaining ARR and the inclusion of one-time revenue therein, and that team reported to Defendant Gupta as well. And when CW1 flagged the incorrect inclusion of one-time revenue in ARR "to finance and the Salesforce admin" – both under Gupta – CW1 was told in response, that it had "already been rubber-stamped."

313.    CW1 also stated that UiPath used these ARR "miscalculations" to make up for the customer churn it was experiencing, and that Defendants were "a little too smart" to simply miscalculate ARR by accident. And, in CW5's words, Defendant Gupta, who CW5 traveled with for business, was the "genius" behind the stock price, who "wanted that stock up."

d.    Ramping

314.    CW5 also recounted that Defendants Dines and Gupta were personally involved with some customers who had ramping contracts, explaining that UiPath assigned executive sponsors to certain large customers. This included assigning Gupta to two large accounts that CW5 managed, both of which involved ramping contracts.

110

> ### 2. *The Offering Documents Provided Motive and Opportunity for Defendant Dines to Sell his UiPath Common Stock at Inflated Prices*

315.    By reason of Defendants' material misstatements and omissions in UiPath's Offering Documents, UiPath's common stock was artificially inflated at the time of the IPO, a fact Defendant Dines took full advantage of in order to sell approximately $77.5 million-worth of UiPath common stock to unsuspecting investors.

316.    The following table shows Dines' heavy IPO insider sales:

| Date | Defendant | Shares Sold | Price per Share Sold | Gross Proceeds |
|------|-----------|-------------|----------------------|----------------|
| April 23, 2021 | Dines | 1,383,168 | $56.00 | $77,457,408 |

317.    Dines' insider sales are probative of his scienter and is part of Defendants' scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5. While Defendants were issuing (or causing the issuance of) materially false and misleading statements about the Company's business and concealing (or causing the concealment of) negative information and trends, Dines, UiPath's CEO, had access to confidential information and was aware of the truth about the Company and its business, including saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, Robots that were too complex and expensive, losing substantial customers to Microsoft, stagnating growth, and stagnating demand from new and existing customers, as well as increased costs, ramping, discounts, and reliance on ARR to try to combat those problems.

> ### 3. *The Class Period Statements Provided Motive and Opportunity for Defendants Dines and Gupta to Sell Their UiPath Common Stock at Inflated Prices*

318.    By reason of Defendants' material misstatements and omissions, UiPath's common stock was artificially inflated throughout the Class Period, a fact Defendants Dines and Gupta took

full advantage of in order to collectively sell over ***$19 million***-worth of UiPath common stock to unsuspecting investors after engineering an unusually short post-IPO lock-up period.

319.   The following table shows the Class Period sales:

| Date | Defendant | Sale Method | Shares Sold | Price per Share Sold | Gross Proceeds |
|---|---|---|---|---|---|
| June 17, 2021 | Gupta | Open Market | 19,000 | $70.68 | $1,342,994 |
| June 28, 2021 | Gupta | Open Market | 10,625 | $70.38 | $747,833 |
| Aug. 24, 2021 | Gupta | 10b5-1 | 26,404 | $62.00 | $1,637,048 |
| Sept. 09, 2021 | Gupta | 10b5-1 | 20,000 | $56.10 | $1,122,000 |
| Nov. 04, 2021 | Gupta | 10b5-1 | 40,000 | $56.48 | $2,259,280 |
| Nov. 12, 2021 | Dines | 10b5-1 | 20,964 | $56.39 | $1,182,095 |
| Nov. 16, 2021 | Dines | 10b5-1 | 24,778 | $56.03 | $1,388,219 |
| Dec. 10, 2021 | Gupta | Open Market | 111,250 | $43.74 | $4,865,619 |
| Jan. 03 2022 | Gupta | Open Market | 24,546 | $43.26 | $1,061,973 |
| Aug. 15 2022 | Gupta | 10b5-1 | 140,000 | $20.70 | $2,897,580 |
| Sept. 11, 2022 | Gupta | 10b5-1 | 60,000 | $14.59 | $875,498 |
| **Total Shares Sold** 497,567 | | | **Total Gross Proceeds** $19,380,139 | | |

320.   Moreover, despite allegedly making certain of the above-listed trades pursuant to Rule 10b5-1 trading plans, ***neither the plans nor their contents are public***.[1]  Given such a dearth of information, Courts in this Circuit accord no deference to undisclosed Rule 10b5-1 trading plans when holistically considering a plaintiff's motive and opportunity scienter allegations.  In fact, here, the more persuasive inference is that the plans were adopted during the Class Period, and therefore Defendants timed their scheduled trades to capitalize on the inflation in UiPath's stock price in order to reap the highest possible share price gain.

321.   Further, adding to the suspiciousness of the trading, (i) over one-third of Defendant Gupta's sales were open-market trades, including several of his largest sales and (ii) he sold over 76,000 shares in the aftermath of the expiration of the early lock-up period, discussed above.

---

[1]      The existence of the Rule 10b5-1 trading plans are only referenced in certain of the Form 4s Defendant Gupta filed with the SEC to report his sales.

322.    In any event, Defendants Dines and Gupta's insider sales are probative of their scienter and are part of their scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  While Dines and Gupta were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, they had access to confidential information and were aware of the truth about the Company and its business, including UiPath's saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, Robots that were too complex and expensive, losing substantial customers to Microsoft, stagnating growth, and stagnating demand from new and existing customers, as well as increased costs, ramping, discounts, and reliance on ARR to try to combat those problems.  Notably, Dines and Gupta were addressing these topics in false and misleading statements, while omitting the truth.  Dines and Gupta's sales were unusual in their amount and in their timing.

4.    *The Company's Equity Incentive Plan Provided Motive and Opportunity for Defendants Dines and Gupta to Issue Material Misstatements and Omissions*

323.    On April 9, 2021, UiPath's Board adopted a "2021 Equity Incentive Plan," which became effective on the date of the IPO and provided for the grant of a series of awards, including tens of millions of dollars-worth of incentive stock options, to certain UiPath employees, including Defendants Dines and Gupta, "following the achievement of certain pre-established performance goals during a designated performance period."  The Board was given discretion to choose among "any one of, or combination of" a series of "Performance Goals" as a basis for granting awards, including: "***stock price***;" "margin (including gross margin);" "sales or revenue targets;" "increases in revenue or product revenue;" "market share;" "customer satisfaction;" "investor relations,

analysts and communication;" "number of users, including unique users;" "individual performance goals;" "and other measures of performance selected by the Board or Committee."

324.    Dines and Gupta's conduct, in light of the significant potential awards available to them, is probative of their scienter.  While Dines and Gupta were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, they had access to confidential information and were aware of the truth about the Company and its business, including UiPath's saturated enterprise customers, limited traction with mid-market customers, churn with both of those groups, Robots that were too complex and expensive, losing substantial customers to Microsoft, stagnating growth, and stagnating demand from new and existing customers, as well as increased costs, ramping, discounts, and reliance on ARR to try to combat those problems.

5.    *Internal UiPath Documents Show Defendants' Knowledge of and Access to the Undisclosed Information that Contradicted their Public Statements*

325.    **First**, numerous documents show that Defendant Dines and Gupta knew that UiPath was seeing Microsoft regularly compete, including in the unattended space, as of the October 2021 Statement, as detailed above in ¶¶132-136, 141-144, 146-148, 150, 152, 155, and 160.  Such documents are summarized below.

326.    To begin with, by August 30, 2021, Defendants Dines and Gupta received a presentation noting that UiPath had lost the unattended Paypal deal to Microsoft, and had lost the Omnicom deal to Microsoft, which was unattended as well.  Also, on August 26, 2021, head of Investor Relations Turcotte forwarded Defendant Gupta an email chain that noted UiPath's unattended losses to Paypal and Omnicom.

327.    Records in UiPath's Salesforce system and records stored by executives in the Competition Team, which Defendants Dines and Gupta had access to, also showed that Microsoft

had unattended Robots and that as of the October 2021 Statement, UiPath had over 200 closed deals involving Microsoft and unattended Robots.

328.     In addition, Defendants Dines and Gupta participated in meetings and received regular updates regarding Microsoft's competition in the unattended space through edging, bundling, and related tactics.

329.     On April 7, 2020, Defendant Dines received an email from SVP Klayko and the co-head of the Competition Team stating that Microsoft was the "single largest threat" to UiPath.

330.     On September 15, 2020, Defendant Dines received a competitive strategy report and underlying survey from the CSO, in which, among other things, Defendant Gupta and the Executive Committee stated that Microsoft was UiPath's most feared competitor and a top threat due to its deployment of edging, bundling, and pricing tactics.

331.     On October 27, 2020, Defendant Dines received an email from SVP Klayko describing a renewal deal with a major customer that was seeking to drastically cut its payments to UiPath, in the face of competition from Microsoft and its reduced use of UiPath Robots.  It also explained that this was part of a trend of customers decreasing rather than expanding their use of UiPath Robots in the face of heightened competition.  Defendant Dines replied, "I share the concern" regarding this trend.

332.     On February 26, 2021, CRO Hansen provided an update to the Board, which included Defendant Dines, and described the competitive concern from Microsoft due to edging and how UiPath's growth was faltering, especially with regard to customer expansion.

333.     On April 12, 2021, Defendant Dines received an email and memorandum from CSO Moayed "on how to combat Microsoft on the pricing front," with a "pricing weapon" to stave off Microsoft's edging.

334.    On April 29, 2021, Defendant Dines, Defendant Gupta, and the Executive Leadership Team attended a "MS compete session" that was a "[c]all to action" to save UiPath and plan a response to Microsoft's wide deployment of edging, bundling and related tactics, because UiPath then had no organic defense to those tactics.

335.    On May 25, 2021, CSO Moayed emailed Defendant Dines, Defendant Gupta, CRO Hansen, and others a memorandum which further set out a proposal for UiPath to offer a reduced-priced attended product to combat Microsoft's edge tactics.

336.    On May 26, 2021, Thomas Hansen prepared an update to the Board, which included Defendant Dines, and reiterated that "Microsoft continue to be our biggest competitive threat" and that UiPath "launched a quarterly training focused on Microsoft compete."

337.    On June 2, 2021, the Board, which included Defendant Dines, received an update on UiPath's Q1 FY 2022 results, which noted UiPath's "Microsoft Competitive Urgency," and UiPath's high discounting levels, many renewal extensions, and widespread failure to meet sales quotas and billing goals.

338.    By June 10, 2021, the co-head of the Competition Team had drafted a PowerPoint presentation titled "Product Marketing – Competitive – H1 Review – H2 Priorities," noting that UiPath had  launched a "Microsoft Competitive playbook with input and reviews from exec LT," which included Defendant Dines.

339.    In September 2021, Defendant Gupta gave a Quarterly Report to the Board, which included Defendant Dines, highlighting that UiPath's competitive position, performance, and strategy were all declining and that "Microsoft is more present than before[.]"

340.    *Second*, numerous documents also show that Defendants Dines and Gupta knew that the difference between UiPath's win rates with and without Microsoft had materially changed

and deteriorated as of the December 2021 Statement, as detailed above in ¶¶166-167, 169, 172-175.  Such documents are summarized below.

341.    With respect to the SFDC data and related win rates showing the foregoing material change, Defendants Dines and Gupta received that information in a presentation on December 8, 2021.

342.    That December 8, 2021 presentation also noted problems with the quality of the SFDC data, which were also frequently discussed among UiPath's top executives.

343.    As set forth above, Defendants Dines and Gupta also received considerable information regarding the facts that by the December 2021 Statement: even when UiPath was "winning" against Microsoft, it often did so through self-defeating pricing and sales practices; and UiPath was also losing ever more business to Microsoft on account of its edging, bundling, and related tactics, which was negatively impacting UiPath's expansion among customers and its new business.

344.    Further, on August 25, 2021, in response to a recent QBR, Defendant Gupta received an email and PowerPoint presentation with a "loss analysis where Microsoft was listed as a competitor in SFDC records."  Defendant Gupta replied to this email, adding Defendant Dines, and stating that he was surprised by the number of such losses, that UiPath should not be losing on price to Microsoft without his and Dines' approval, and that "we cannot say that we are not losing to MS and need to work with Kelsey on how we should be discussing MS in our investor/analyst calls."

345.    On November 15, 2021, Defendant Dines received an email and attached memorandum in preparation for his meeting the next day with Microsoft regarding its partner co-

selling relationship with UiPath. This memorandum detailed how Microsoft was negatively impacting UiPath deals and prepared Dines to request that Microsoft stop selling Power Automate.

346. All of the information that Defendants Dines and Gupta knew of which contradicted the October and December 2021 Statements, as set forth in this Section, was also widely discussed by senior UiPath executives who reported to and regularly interacted with Dines and Gupta.

### E. Loss Causation/Economic Loss

347. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein). During the Class Period, Plaintiff and Class Members purchased or otherwise acquired UiPath's Class A common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein. The price of the Company's Class A common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and/or materialized, and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

348. Before the end of the Class Period on September 27, 2022, investors had been unaware of the following material facts about UiPath that had been known to Defendants:

(a)   the substantial customer churn, stagnating demand, and stagnating growth that UiPath was then experiencing, due to the expense and difficulty of UiPath's complex Robots, and Microsoft's success at exploiting those weaknesses to win customers UiPath needed;

(b)   UiPath was suffering significant harm from Microsoft, which was winning customers UiPath needed to support its growth by exploiting UiPath's weaknesses, and prompting UiPath to alter its business strategies;

(c)    UiPath's significant difficulty both landing new customers and expanding business with existing customers;

(d)    the enterprise customers who had fueled UiPath's earlier hyper growth had largely made their purchases already, which led UiPath to attempt to expand into mid-market customers;

(e)    UiPath was having substantial difficulty getting any traction in the mid-market;

(f)    UiPath was attempting to prop up its growth with undisclosed discounting and related tactics, as well as ramping contracts that let customers buy fewer Robots while making it appear that they were still making larger purchases;

(g)    ARR painted a misleadingly positive picture of the Company's growth by annualizing certain revenue that given the foregoing circumstances had a low probability of occurring or renewing, and by allowing Defendants to include undisclosed one-time revenue in the calculation of ARR;

(h)    UiPath was actually increasing its spending just to prop up its sales, and not to support strong demand, which meant that UiPath was moving even further away from profitability;

(i)    the impact these undisclosed obstacles were having on UiPath's ARR, revenue, expenses, net income, and gross margin; and

(j)    UiPath's TAM was far less than $60 billion given these undisclosed obstacles.

349.    Defendants' misrepresentations and omissions and fraudulent statements, as alleged in herein, misrepresented and concealed the true adverse material facts from the market during the Class Period, misleading investors about the true state of UiPath's business and the obstacles it was facing.

119

350.    As alleged in §V.C., *supra*, these material facts were gradually revealed to investors via a series of partial corrective disclosures and the materialization of the undisclosed risks.

351.    The market reacted swiftly and negatively to each of these disclosures, resulting in significant losses for investors.

F.    **Applicability of the Fraud-on-the-Market and *Affiliated Ute* Presumptions of Reliance**

352.    The market for UiPath's common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to UiPath.  Plaintiff and Class Members have been damaged thereby.

353.    During the Class Period, the artificial inflation of the value of UiPath's common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class Members.  As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed and/or materialized, it drove down the value of the Company's common stock, causing Plaintiff and other Class Members that had purchased or otherwise acquired UiPath's common stock at artificially inflated prices to be damaged as a result.

354.    At all relevant times, the market for UiPath's common stock was efficient for the following reasons, among others:

(a) UiPath's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, UiPath filed periodic public reports with the SEC and/or the NYSE;

(c) UiPath regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) UiPath was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

355. Based on the foregoing, during the Class Period, the market for UiPath's common stock promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of UiPath's common stock. Under these circumstances, the market for UiPath's common stock was efficient during the Class Period and, therefore, investors' purchases and acquisitions of UiPath's common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

356. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements

and/or omissions, which concealed, throughout the Class Period the undisclosed information set forth herein, including in §§V.A-B.

357.    Because this action involves Defendants' failure to disclose and omission of material adverse information regarding the Company's business, operations, and prospects – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VI.    NO SAFE HARBOR

358.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be untrue or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be untrue or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially untrue or misleading at the time each such statement was made.

359.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those untrue or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was

materially untrue or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of UiPath who knew that the statement was untrue, misleading, or omitted relevant information when made.

## VII.   CLASS ACTION ALLEGATIONS

360.   Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between October 15, 2021 and September 27, 2022, inclusive.[2]  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

361.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, UiPath's common stock was actively traded on the NYSE.  While the exact number of Class Members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, millions of UiPath common stock were actively traded on the NYSE (an open and efficient market) under the symbol "PATH."   Record owners and other members of the Class may be identified from records maintained by UiPath or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

---

[2]     The dismissed Class Definition, which Plaintiff preserves for appellate purposes, is: all persons and entities that purchased or otherwise acquired UiPath's common stock between April 21, 2021 and September 27, 2022, inclusive, including all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's IPO, and were damaged thereby.

362. Plaintiff's claims are typical of the claims of Class Members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.

363. Further, Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

364. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the Defendants violated the Exchange Act;

    (b)    whether statements made by Defendants to the investing public and the Company's shareholders during the Class Period omitted or misstated material facts about the business, operations, and prospects of UiPath;

    (c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted or misstated material facts about the business, operations, and prospects of UiPath; and

    (d)    whether the Defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)    whether the price of UiPath's common stock was artificially inflated; and

    (f)    to what extent Class Members have sustained damages and the proper measure of damages.

365.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for Class Members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   COUNTS

### COUNT I
**Violation of §10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

366.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against UiPath and the Individual Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between October 15, 2021 and September 27, 2022, inclusive.

367.    In the Offering Documents and throughout the Class Period, UiPath and the Individual Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiff and Class Members, as alleged herein; (ii) artificially inflated and/or maintained the market price of UiPath's common stock; and (iii) caused Plaintiff and Class Members to purchase or otherwise acquire UiPath's common stock at artificially inflated prices.

368.    Each of the listed Defendants here, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of

UiPath's common stock during the Class Period. Defendants' material misrepresentations and omissions are alleged in §§IV, V.A-B, *supra*.

369. As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, UiPath and the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

370. As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

371. UiPath and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

372. The facts alleged herein give rise to a strong inference that UiPath and the Individual Defendants each acted with scienter. UiPath and the Individual Defendants each knew, or recklessly disregarded, that the Class Period statements set forth in §§V.A-B, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

373.    By virtue of the Individual Defendants' positions of management and control within UiPath, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at conferences and management and Board of Directors meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as UiPath officers and directors.

374.    The Individual Defendants were aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

375.    As a result of the Individual Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of UiPath's common stock was artificially inflated throughout the Class Period.  Unaware that the market price of UiPath's common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by UiPath and the Individual Defendants, at the times such statements were made, or relying upon the integrity of the markets in which UiPath's common stock traded; and in the absence of material adverse information that was known, or recklessly disregarded, by UiPath and the Individual Defendants, but not disclosed to the public, Plaintiff and Class Members purchased or otherwise acquired UiPath's common stock at artificially inflated prices.

376.    Had Plaintiff and the other Class Members known the truth regarding the problems that UiPath was experiencing, which was not disclosed by UiPath and the Individual Defendants,

Plaintiff and other Class Members would not have purchased or otherwise acquired UiPath's common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

377.    As a direct and proximate result of UiPath and the Individual Defendants' wrongful conduct, Plaintiff and the other Class Members suffered damages in connection with their respective purchases and sales of UiPath's common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding UiPath and the Individual Defendants' conduct was revealed and/or the undisclosed risks materialized, causing the price of UiPath's common stock to decline, resulting in economic losses to Plaintiff and the Class.

378.    By reason of the foregoing, UiPath and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in UiPath's common stock during the Class Period.

### COUNT II (Subject to Appeal)
### Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants)

379.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  This claim is asserted against the Individual Defendants for violations of §20(a) of the Exchange Act, 15 U.S.C. 78t(a), on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock between April 21, 2021 and September 27, 2022, inclusive.

380.    UiPath is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

381.    During their tenures as officers or directors of UiPath, the Individual Defendants were controlling persons of the Company within the meaning of §20 of the Exchange Act.  By

reason of their positions of control and authority as officers or directors of UiPath, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

382.    As more fully described above, in their capacities as senior corporate officers of the Company, the Individual Defendants caused UiPath to conduct the IPO, signed the Offering Documents pursuant to which the IPO was conducted, signed each Form 10-Q and/or Form 10-K, and had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.    The Individual Defendants prepared, or were responsible for preparing, the Company's Offering Documents, press releases, and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls.    The Individual Defendants controlled UiPath and each of its employees.    As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of UiPath within the meaning of §20 of the Exchange Act.

383.    The Individual Defendants were able to, and did, control the content of the Offering Documents and the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.    The Individual Defendants were provided with copies of the documents, as alleged herein, containing material misrepresentations and omissions prior to their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected.    Accordingly, the Individual Defendants are responsible for the accuracy of the Company's public reports and releases.

384.     By virtue of their positions as controlling persons of UiPath, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other Class Members suffered damages in connection with their purchases or acquisitions of the UiPath's common stock during the Class Period.

**COUNT III (Subject to Appeal)**
**Violation of §11 of the Securities Act**
**(Against All Defendants)**

385.     Plaintiff realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of UiPath and the Individual Defendants to defraud Plaintiff or the Class.

386.     This Count is based on UiPath and the Individual Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the IPO.

387.     This Count is asserted against UiPath and the Individual Defendants for violation of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's April 21, 2021 initial public offering.

388.     As alleged in §V.B, *supra*, the Offering Documents contained false statements and omissions of material fact.

389.     As an issuer of the registered securities, UiPath is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

390.     None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

391.     Class Members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities.  As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damages in connection with its purchase of UiPath's common stock sold through the IPO.

392.     This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

393.     By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to members of the Class who purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents.

**COUNT IV (Subject to Appeal)**
**Violation of §15 of the Securities Act**
**(Against the Individual Defendants)**

394.     Plaintiff realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or the Class.

395.    This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are specifically excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the IPO.

396.    This Count is asserted against the Individual Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons and entities that purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents issued in connection with UiPath's April 21, 2021 initial public offering.

397.    UiPath is strictly liable under §11 for untrue statements and omissions of material fact in the Offering Documents.

398.    During their tenures as officers or directors of UiPath, the Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their positions of control and authority as officers or directors of UiPath, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

399.    As more fully described above, the Individual Defendants caused UiPath to conduct the IPO and signed the Offering Documents pursuant to which the IPO was conducted.  Moreover, in their capacities as senior corporate officers of the Company, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and in the IPO. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of UiPath within the meaning of §15 of the Securities Act.

400.    By virtue of the conduct alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to members of the Class who purchased or otherwise acquired UiPath's common stock pursuant or traceable to the Offering Documents.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A.    declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    awarding compensatory damages in favor of Plaintiff and all other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.    awarding such other and further relief as the Court may deem just and proper.

## X.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 29, 2025                              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ Max R. Schwartz*
Thomas L. Laughlin
Max R. Schwartz
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
mschwartz@scott-scott.com

jjacobson@scott-scott.com

*Counsel for Lead Plaintiff Paul Severt*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*s/ Max R. Schwartz*
Max R. Schwartz
