UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                       :    23cv7908 (DLC)
                                       :
In re UiPath, Inc. Securities          :
Litigation                             :    OPINION AND
                                       :         ORDER
--------------------------------------- X

APPEARANCES:

For lead plaintiff:

Max R. Schwartz
Jeffrey P. Jacobson
Lana V. Levin
Scott+Scott Attorneys at Law LLP
230 Park Avenue, 24th Floor
New York, NY 10169

Amanda F. Lawrence
Jessica M. Casey
Scott+Scott Attorneys at Law LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415

For defendants:

Edmund Polubinski
Daniel Schwartz
Patrick Blakemore
Marie Killmond
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

DENISE COTE, District Judge:

     This putative class action brings claims of securities

fraud against UiPath, Inc. ("UiPath") and two of its senior

executives.  The lead plaintiff alleges that the defendants

artificially inflated the price of UiPath's stock by

misrepresenting difficulties that UiPath was encountering in competing with Microsoft.

An Opinion of November 4, 2024 ("November 2024 Opinion") largely granted the defendants' motion to dismiss the Second Amended Complaint ("SAC"), leaving two alleged misstatements from March 2022 in the case.  In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d 498 (S.D.N.Y. 2024).  At the end of document discovery, with consent of the defendants, the lead plaintiff filed a Third Amended Complaint ("TAC").  Incorporating documents produced in discovery, the TAC reasserts claims regarding two earlier alleged misstatements that had been dismissed in the November 2024 Opinion.  The defendants have moved to dismiss the TAC in its entirety, arguing, among other things, that the documents it incorporates undermine allegations of falsity and scienter as to all four statements.  For the reasons set forth below, the defendants' motion is granted.

## Background

The following facts are alleged in the TAC or are taken from documents integral to the TAC.  These allegations are accepted as true, and all reasonable inferences are drawn in the lead plaintiff's favor.

Founded in 2005, UiPath was one of the first companies to offer robotic process automation software ("RPA" or "Robots"),

which automates IT tasks that would otherwise need to be carried
out manually.  The two individual defendants are Daniel Dines,
who served as UiPath's CEO and Chairman of its Board of
Directors, and Ashim Gupta, who served as UiPath's CFO.

The TAC is lengthy.  Most of its allegations need not be
described, however, because the claims that arose from most of
its allegations were dismissed in the November 2024 Opinion and
are not supported by any new arguments.  The only allegations at
issue concern four statements, made between October 14, 2021 and
March 30, 2022, that allegedly understated competitive threats
that UiPath faced from Microsoft.  This summary describes
allegations that concern those four alleged misstatements or are
otherwise relevant to this motion.

I.   Competition Between UiPath and Microsoft

By 2020, UiPath was having difficulty maintaining its
growth.  The demand for UiPath's Robots was waning among large
enterprises, who were its most important customers.  UiPath
attempted to target mid-market customers, but many of them
preferred cheaper and simpler Robots provided by its
competitors.

Compared with its competitors, UiPath was especially
focused on developing "unattended" Robots.  Unattended Robots
have advanced and flexible capabilities, require less human

involvement to perform specific tasks, and tend to be more expensive.  Despite requiring less human involvement to perform specific tasks, unattended Robots tend to require more advanced coding and configuration to be properly customized, deployed, and orchestrated in a way that meets an organization's needs. By contrast, "attended" Robots are simpler, require more direct human involvement to perform specific tasks, and tend to be less expensive.  Attended Robots are sometimes described as "LowCode" or "NoCode" because they can be deployed by a user with little or no programming knowledge.

In general, unattended Robots are more likely to be appropriate for larger organizations that have bespoke needs and sophisticated in-house technical staff, while attended Robots are more likely to be appropriate for smaller organizations with routine use cases.  Some organizations, however, use a combination of unattended and attended Robots.

In recent years, Microsoft emerged as the primary competitive threat to UiPath.  Microsoft had gradually entered the RPA market beginning around 2015, but it became a more serious competitor when it acquired Softomotive, another RPA developer, in May 2020.  After that acquisition, Microsoft upgraded its own RPA software line, Power Automate.  Microsoft offered attended Robots that were simple, easy to implement,

sufficient for common use cases, and available at low prices.
By 2021, UiPath viewed Microsoft as its primary competitor.

UiPath was also aware that Microsoft was using a tactic
called "edging," which involved selling Microsoft Robots to
customers that already used some Microsoft products.  This
tactic could be effective because other Microsoft products are
extensively used by many companies.  Moreover, Microsoft's
Robots were easy to integrate with other Microsoft software, and
Microsoft bundled Robots with other products at low prices or
for free.  Microsoft also had the benefit of its existing
customer relationships when marketing its Robots.  In response
to competitive pressure from Microsoft, UiPath began to discount
its pricing, update sales and marketing strategies, and offer
new training focused on competition with Microsoft.

The TAC incorporates documents that contain UiPath's
internal assessments of the competitive threat it faced from
Microsoft.  These documents confirm that UiPath's leadership was
beginning to view Microsoft as a primary competitive threat by
the beginning of 2021.  For example, after UiPath was asked to
compare its offerings to Microsoft's as part of a sales pitch,
its Chief Revenue Officer wrote in a January 10, 2021 email that
Microsoft "over the past few months is clearly becoming our
threat #1, we need to take this super serious please."  The same

day, its Chief Marketing Officer responded, "they are, no question, our #1 threat."

The documents incorporated into the TAC also reflect, however, that throughout 2021 UiPath believed it could compete with Microsoft because its Robots had a more complete and advanced set of features than Microsoft's.  For example, an April 29, 2021 presentation described common customer feedback that "UiPath is a premium solution, but [Microsoft's] Power Automate is good for day-to-day things."  A July 2021 presentation explained that UiPath positioned itself as enabling "enterprise-wide automation."

UiPath identified "orchestration" as one particular advantage it had over Microsoft.  Orchestration refers to the ability to coordinate multiple IT automation tasks by integrating various types of software, as opposed to independently automating and managing IT tasks.  This is a relatively advanced feature that is primarily associated with unattended Robots.  In his January 10, 2021 email, UiPath's Chief Marketing Officer argued that UiPath should emphasize that Microsoft had "ZERO orchestration (today)."

The TAC also incorporates internal analyses from 2021 of how UiPath was faring when it competed against Microsoft for sales.  One example of this is a presentation prepared by

UiPath's "sales excellence team" and emailed to Dines, Gupta, and others on August 31, 2021 (the "August 2021 Presentation"). A series of "headlines" is listed on the first slide of the presentation, and was also reproduced in a cover email that was sent to Dines and Gupta.  Those headlines include the following:

1. We are seeing an uptick in <u>Microsoft activity</u>, but it <u>is still a very low % of overall opportunities across all geos</u>

2. <u>Of the 15K opportunities closed in Q2, Microsoft was listed as a competitor in 636.</u>  Of those UiPath won 463 and closed lost 173 where Microsoft as listed as one of several competitors.  Of the 173, Microsoft was identified as the sole competitor in 59 opportunities (ASP [average sales price] $27K). <u>Microsoft only closed won 38 of these according to SFDC [SalesForce] data (rep input).</u>  FYI: when an opportunity is closed lost, it doesn't necessarily mean that the customer transacted with another competitor

3. <u>Where we do compete head-to-head, we win 95% of the time</u> (qualitative statement per Geo Leadership)

(Emphasis in original.)

The day after the August 2021 Presentation was emailed to Dines and Gupta, UiPath's VP of Product Marketing sent a reply email on which Dines and Gupta were again included.  He provided the following assessment about what message UiPath should present to the public:

[M]y takeaway is that we can say that they are not showing up in deals in a material way and when they do show up, our win rate is extremely high.  This data shows that they are present in ~4% of our opportunities (636/~15,000) and we lose to them 4.4%

of the time (I know that was a qualitative statement
by Geo leaders but their math works out -- 38/636.  If
you ask me that's <u>more believable</u> than a blanket
statement that we never lose.

(Emphasis in original.)

The TAC also incorporates a presentation titled "Microsoft
Compete: December 2021 Update," which was forwarded to Dines,
Gupta, and others on December 8, 2021 (the "December 2021
Presentation").  The underlying email chain discussed how UiPath
fared when competing with Microsoft for sales.  An initial
response to that question was, "Anecdotal from the sales leaders
is that they're really seeing no change in the dynamic and not
hearing that we're losing significantly to [Microsoft]."  The
December 2021 Presentation addressed that topic using data from
Salesforce, a system in which UiPath tracked information about
deals it was pursuing.

An "executive summary" was included on the first slide of
the December 2021 Presentation, and was also reproduced in the
cover email that was forwarded to Dines and Gupta.  The
executive summary stated:

<u>Microsoft is not a material competitor to UiPath in
Q3.  When we did compete, it was typically in the SMB
[small and medium business] space and focused on
non-platform automation.  The platform is our
differentiator and is reflected in our status as star
performer and leader on the Everest Peak Matrix and
Gartner RPA Magic Quadrant, respectively</u>

- Involvement has increased slightly in the past few quarters but is still less than 10% of all deals

- Microsoft has not been able to push into larger opportunities vs UiPath over the last 3 quarters

- Competition does not impact our win rates.  When we do compete head-to-head, UiPath wins in the larger deals

- When we go head-to-head with our top 3 competitors, we see [Blue Prism] and [Automation Anywhere][1] 3-5x more than Microsoft, respectively

- For the rare Enterprise losses to Power Automate, some of them are potentially already returning to UiPath

- We also partner with Microsoft and sell through their Azure Cloud platform

However, Microsoft is investing in their automation solutions and UiPath will continue to actively monitor their offerings and GTM strategy

- Power Automate is currently an inferior product, but customers recognize this is changing with Microsoft rolling out communications to support recent product improvements

- Recent CIO focus groups indicated that Microsoft is potentially well positioned for front office automation based on the stickiness of workplace automation

(Emphasis in original.)

    The December 2021 Presentation includes a slide titled "Microsoft competition does not impact our win rates and UiPath wins in the larger head-to-head deals."  This slide has a double

---

[1] Blue Prism and Automation Anywhere have historically been UiPath's primary competitors.

line graph comparing UiPath's "win rate" per quarter for deals
with and without Microsoft involved.  This graph indicates that
UiPath had a higher win rate with Microsoft involved from Q1
2021 through Q2 2022, but not in Q3 2022.[2]  In Q2 2022, the win
rate was 54.1% with Microsoft and 51.4% without Microsoft.  In
Q3 2022, however, UiPath's win rate with Microsoft was 49.9%,
slightly lower than its win rate without Microsoft, 53.7%.  This
graph is accompanied by a disclaimer that this information is
"directionally accurate but not absolute."

II.  Statements at Issue

As noted, only four statements are at issue on this motion,
all relating to competition with Microsoft.  These statements
are described next.

A.    October 2021 Spark Conference

On October 14, 2021, Dines and Gupta were interviewed at
the Morgan Stanley Spark Conference.  The interviewer asked a
question focused on how UiPath would "stay ahead" of Microsoft:

> So debate #2 that I hear most often is the competitive
> debate.  And honestly, it's not about [A]utomation
> [A]nywhere.  It's not about Blue Prism, the guys that
> are in your core market.  It's about Microsoft, number
> one, that with their Power Platform, they're just
> going to run you over, they're going to crush you on
> price.  Tableau is to Power BI what UiPath is to Power
> Platform.  How does UiPath stay ahead of Microsoft?
> How do you maintain pricing and keep that innovation

---

[2] References to specific quarters are based on UiPath's fiscal
year and do not align with the calendar year.

gap versus what Microsoft is able to bring into the marketplace?

In responding, Dines drew a distinction between Microsoft's attended Robot technology, which he described as a "citizen developer" tool, and UiPath's unattended Robot technology "for professional developers." He stated that Microsoft did not "compete" in the unattended Robot space. He argued that Microsoft's offering focused on a narrow set of use cases, and expressed optimism about UiPath's ability to compete with Microsoft. His full response is as follows:

> So -- and I have high respect for Microsoft, especially under Satya. It's a great company. And we don't compete really with [Microsoft's] Power Platform. Power Platform, it's a big animal. We compete within -- not even with Power Automate, really. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.

> So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to -- for professional developers. This is not -- Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business.

> Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like

in-app type of automation.  Microsoft Power Automate
Desktop doesn't work well with SAP, with Salesforce,
with ServiceNow.  So it works within Microsoft Office
technologies.

But these are very few use cases, low-value use cases.
In most of the processes that we are automating, we
are seeing like 3 more, 3-plus different types, big
categories of applications.  So at this point, in
reality, I think people are more scared about what
Microsoft can do in our space than it's really the
reality.

And there is also something that is very specific
about this technology, which is not specific in case
of Tableau or in case of Slack.  This is an enterprise
technology that generates huge return on investment.
License pricing, if you use the technology that costs
you $5 million a year and you generate $100 million in
return on investment a year, would you take a
technology that cost you $1 million and will generate
only $20 million?  I don't think.

So it's a very -- and we can make a very simple return
on investment, total cost of ownership, time to value.
It's kind of easy because look, when you go to a
customer and I -- and they go to automation, they have
to do something meaningful and measurable.  So we have
the -- use Power Automate, use UiPath, automate this
process, put whoever you want to automate and if they
see -- Microsoft sometimes can struggle 3 weeks to do
something we can deliver in 2 hours.  We've built this
for many years.  It's not an easy technology to build.
So then the return on investment case, it's so clear.

(Emphasis supplied.)

As is further discussed below, the parties disagree over

how to interpret Dines' response.  According to the lead

plaintiff, Dines's response indicated that UiPath's unattended

business was insulated from competition from Microsoft, which

the lead plaintiff contends was materially misleading.

According to the defendants, Dines' response described a
difference in software functionality between Microsoft and
UiPath.

B.    December 2021 Earnings Call

UiPath held an earnings call on December 8, 2021.  During
the call, an analyst asked Dines to comment on UiPath's
competition with Microsoft:

> Daniel, I wanted to revisit with you on the
> competitive landscape.  Could you speak specifically
> to Microsoft and how you see Microsoft as a competitor
> both now and over the course of the next year or two?
> And the dynamics that I was thinking about in terms of
> UiPath as a pure play vendor with cross functionality
> and many different application areas versus Microsoft,
> more of a Microsoft-centric versus -- but Microsoft
> has pretty deep reach.

Dines's response included the following statement, which
the lead plaintiff contends was materially misleading:

> Our own data, if we take into account the deals where
> Microsoft is participating versus the deals where
> Microsoft is not participating, we are not seeing
> material changes in our winning rate.

C.    March 2022 Earnings Call

UiPath held an earnings call on March 30, 2022.  When asked
about competition, Dines made the following comments:

> We are not seeing really any increase in the
> competition.  On the contrary, we are seeing less
> competitive pressure in the deals.  We are -- so we
> can comment, if you are interested on various major
> players that we are seeing in the business.
>
> And in terms of the -- our traditional specialized
> competitors, we are really seeing less and less of

13

them.  We are replacing Blue Prism and [A]utomation
[A]nywhere in many customers.  <u>And speaking about the
new entrants like Microsoft and ServiceNow, we are --
we really -- we are not seeing them that much.</u>  I can
comment on both, specifically, if you are interested.

(Emphasis supplied.)

Gupta then made the following comments when discussing

Microsoft as a competitor:

And then just on the numbers basis, I think it's
really important.  We see -- when you look at our win
rates, we continue to look and analyze win rates
between where Microsoft and where some of these large
players are playing and where they're not.  <u>We don't
see them a lot.</u>

<u>But even when we do, our win rate has no difference,
compared to where they are not playing.</u>  So we're
really -- the trend of continuing to feel us is the
dominant player in the industry.  Right now, that is
continuing from the data that I see and that we see as
a team.[3]

(Emphasis supplied.)

The lead plaintiff contends that Dines' and Gupta's

statements that UiPath does not "see" Microsoft "that much" or

"a lot" when competing for sales were materially misleading.

The lead plaintiff also contends that Gupta's description of

---

[3] The transcript of the March 30, 2022 earnings call incorrectly
identified Dines as having made this statement.  As a result,
the November 2024 Opinion dismissed claims against Gupta.  <u>In re
UiPath, Inc. Sec. Litig.</u>, 755 F. Supp. 3d at 513 n.6.  In a
letter of March 27, 2025, the defendants reported that they had
listened to the recording of the call and determined that Gupta
was the speaker.  Thus, by consent of the parties, an Order of
March 27 permitted claims to be reasserted against Gupta.

UiPath as having a similar win rate regardless of whether it is
competing against Microsoft was materially misleading.

III. Corrective Disclosures

The TAC asserts that competition from Microsoft caused
UiPath's growth to stall and harmed its profitability, and that
a series of partial corrective disclosures revealed the poor
performance that resulted from competition with Microsoft.  Most
of the disclosures to which the lead plaintiff points concern
revenue guidance and have little or no direct bearing on the
four alleged misstatements.  The following are some of the
disclosures on which the lead plaintiff relies.

On September 6, 2022, Robert Enslin, who became Co-CEO with
Dines on May 16, 2022, stated that UiPath's "top line metrics
have slowed, and we need to evolve how we manage our business."
He further stated that UiPath was "strategically repositioning
the company to increase velocity, efficiency and customer
centricity."  At the Evercore Conference the next day, Enslin
stated that UiPath was attempting to "reposition" itself to
reach organizational decision-makers rather than lower-level
employees who did not have authorization to broaden the
company's implementation of UiPath's Robots.

On September 27, 2022, UiPath hosted an Analyst/Investor
day, during which Enslin stated, "We haven't been efficient in

how we sell, and we aren't delivering the platform . . . in ways
that clearly articulate the holistic value automation can
deliver."  Enslin further stated that while UiPath's model "has
worked up until now" in terms of getting "acquisition" of new
customers, UiPath had to develop in terms of "expand[ing] in
those accounts once we land them."  He explained that UiPath
planned to increase its ratio of account executives to
mid-market customers in order to "focus a higher density of
resources on the customers who represent the highest propensity"
to increase their use of UiPath products.

IV.  Procedural History

        This action was filed on September 6, 2023 as a putative
class action.  A lead plaintiff was appointed on December 1 and
he filed his first amended complaint on January 26, 2024.  In
response to a motion to dismiss, the lead plaintiff filed the
SAC on March 26.

        The SAC asserted multiple claims under the securities laws
and challenged a variety of the defendants' statements about
UiPath's business.  The November 2024 Opinion dismissed most of
the SAC's claims, however, and the case moved forward only as to
the two statements regarding competition with Microsoft that
were made by Dines and Gupta on the March 30, 2022 earnings
call.  In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d at 513.

16

All surviving claims are brought under § 10(b) of the Securities
Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),
and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

A schedule for pretrial proceedings was set out in an Order
of November 19, 2024 and was modified by an Order of January 31,
2025. Pursuant to that schedule, the parties made progress on
fact discovery, which was due to be completed on July 25.
UiPath has stated that it completed document production in May.
Meanwhile, the lead plaintiff filed a motion for class
certification on February 28, and the defendants filed an
opposition to that motion on April 29.

Then, on May 29, the lead plaintiff filed a motion for
leave to amend the SAC. The motion attached the TAC, which
reasserts claims regarding Dines' statements at the October 14,
2021 Spark conference and the December 8, 2021 earnings call.
In support of these claims, the TAC includes new allegations
based on documents produced in discovery. If the TAC withstands
dismissal, it has the effect of expanding the potential class
period by more than five months.

The defendants opted to consent to the amendment and to
move to dismiss the TAC. The defendants contend that the
documents incorporated into the TAC not only fail to support the
reasserted claims regarding the October 2021 and December 2021

17

statements, but also provide a basis for dismissing the two statements that had survived in the November 2024 Opinion. An Order of June 4 granted leave to file the TAC, and the lead plaintiff filed the TAC on June 9. The Order of June 4 also stayed discovery. An Order of June 9 set a briefing schedule for the defendants to move to dismiss the TAC. That Order and an Order of September 11 adjourned other deadlines, including the remaining briefing on the motion for class certification.

On June 26, the defendants moved to dismiss the TAC, arguing that dismissal is warranted for all four statements that remain at issue.[4] The lead plaintiff filed an opposition on July 29 and the defendants filed a reply on August 19. There are many exhibits attached to these filings, including emails, presentations, and other documents, most of which were produced by UiPath in discovery and are referenced in the TAC.

## Discussion

Most of the governing legal standards were set forth in the November 2024 Opinion, but they are repeated here for ease of

---

[4] The TAC also repeats claims that are unrelated to those four statements, which were previously in the SAC and were dismissed by the November 2024 Opinion. The lead plaintiff does not defend those other claims in his opposition to the motion to dismiss. Those other claims remain dismissed both for the reasons described in the November 2024 Opinion and because they have been abandoned on this motion.

reference.  To survive a motion to dismiss for failure to state
a claim, a complaint must plead "enough facts to state a claim
to relief that is plausible on its face."  Green v. Dep't of
Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In
determining if a claim is sufficiently plausible to withstand
dismissal," a court "accept[s] all factual allegations as true"
and "draw[s] all reasonable inferences in favor of the
plaintiffs."  Melendez v. City of New York, 16 F.4th 992, 1010
(2d Cir. 2021) (citation omitted).  In securities fraud actions,
a court

> may also consider any written instrument attached to
> the complaint, statements or documents incorporated
> into the complaint by reference, legally required
> public disclosure documents filed with the SEC, and
> documents possessed by or known to the plaintiff upon
> which it relied in bringing the suit.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation
omitted).

Under SEC Rule 10b-5, it is unlawful to "make any untrue
statement of a material fact or to omit to state a material fact
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading . . .
in connection with the purchase or sale of any security."  17
C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  To state a

claim for relief under § 10(b) and Rule 10b-5, a plaintiff must
properly allege:

> (1) a material misrepresentation or omission by the
> defendant; (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale of a
> security; (4) reliance upon the misrepresentation or
> omission (5) economic loss; and (6) loss causation.

In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417
(2d Cir. 2023) (citation omitted).

Complaints alleging securities fraud violations are subject
to a heightened pleading standard pursuant to the PSLRA and Rule
9(b), Fed. R. Civ. P.  The PSLRA requires a complaint alleging
misstatements or omissions to "specify each statement alleged to
have been misleading, [and] the reason or reasons why the
statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Rule 9(b)
requires that the plaintiff "state with particularity the
circumstances constituting fraud."  Altimeo Asset Mgmt. v. Qihoo
360 Tech. Co. Ltd., 19 F.4th 145, 150 (2d Cir. 2021) (citation
omitted).

Determining whether a statement is misleading requires
"considering not only [its] literal truth but also its context
and manner of presentation."  Gimpel v. The Hain Celestial Grp.,
Inc., No. 23-7612, -- F.4th --, 2025 WL 2749562, at *10 (2d Cir.
Sept. 29, 2025) (citation omitted).  "A statement is materially
misleading when the defendants' representations, taken together

and in context, would have misled a reasonable investor."
Altimeo Asset Mgmt., 19 F.4th at 151 (citation omitted).  "To be
material, a statement must, in the view of a reasonable
investor, have significantly altered the total mix of
information available."  Plumber & Steamfitters Loc. 773 Pension
Fund v. Danske Bank A/S, 11 F.4th 90, 100-01 (2d Cir. 2021)
(citation omitted).

      In the context of a securities fraud claim, "[s]cienter may
be established by alleging facts (1) showing that the defendants
had both motive and opportunity to commit the fraud or (2)
constituting strong circumstantial evidence of conscious
misbehavior or recklessness."  New Eng. Carpenters Guaranteed
Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 48 (2d Cir.
2023) (citation omitted).  "[R]ecklessness is highly
unreasonable conduct representing an extreme departure from the
standards of ordinary care and approximating actual intent,
rather than merely a heightened form of negligence."  Gimpel,
2025 WL 2749562, at *15 (citation omitted).  Allegations of
motive and opportunity and allegations of conscious misbehavior
or recklessness should be "viewed holistically and together."
New Eng. Carpenters Guaranteed Annuity & Pension Funds, 122
F.4th at 48 (citation omitted).  Under the PSLRA,

          a plaintiff must allege facts giving rise to a strong
          inference that the defendant acted with scienter,

> where a "strong inference" means that the inference
> must be more than merely plausible or reasonable -- it
> must be cogent and at least as compelling as any
> opposing inference of nonfraudulent intent.

Gimpel, 2025 WL 2749562, at *13.

As explained below, the TAC fails to plausibly allege that any of the four statements at issue on this motion were material misrepresentations, or that they were made with the requisite scienter.[5]  It is unnecessary to reach the defendants' alternative argument that the TAC fails to adequately allege loss causation.  The only one of the four statements which requires any extended discussion is the October 2021 statement, which will be addressed first.

I.    October 2021 Statement

The TAC alleges that Dines made an actionable misstatement at the October 14, 2021 Spark Conference, when he said the following:

> So now, if you look at our business, how it is today,
> we have unattended space, we have attended space.  For
> unattended space, you need a professional tool to --
> for professional developers.  This is not -- Microsoft
> doesn't even compete in this space.  We've never seen
> them in a competitive situation for unattended robots.
> So this is half of our business.

---

[5] The lead plaintiff only seeks to demonstrate scienter through conscious misbehavior or recklessness.  TAC offers no new allegations that the defendants had motive and opportunity to commit fraud, and the lead plaintiff has also abandoned any such argument in opposing this motion.

(Emphasis supplied.)  In considering the motion to dismiss the SAC, the Court found that this statement, among others, "describe[d] UiPath's Robots as more complex that Microsoft's" and was not adequately alleged to be misleading.  In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d at 512.  The allegations and documents incorporated into the TAC lead to the same conclusion, and also undermine any inference of scienter as to this statement.  Viewed in context, Dines' statement consists of entirely reasonable comments regarding differences in software functionality between UiPath and Microsoft Robots.

The October 2021 statement was made in the final session of a day's long conference about software companies.  The interviewer, who oversees software equity research at Morgan Stanley, shifted focus to UiPath and asked Dines and Gupta to provide the audience with the story behind UiPath and to explain the fundamental problem it was built to solve.  In the interview that followed -- whose transcript covers ten pages -- Dines and Gupta explained, inter alia, that UiPath's business was comprised of both "unattended automation that runs in data centers" and "bots that work on people's desktop."  They also argued that attended and unattended automation address different needs: while a "professional developer" needs "the best tool out

there," a "citizen developer" needs "the easiest tool to use"
and "something that address[es] your immediate need."

Dines made the statement that is at issue here after the
interviewer inquired whether Microsoft would eventually "crush"
UiPath on price. The interviewer continued, "How does UiPath
stay ahead of Microsoft? How do you maintain pricing and keep
that innovation gap versus what Microsoft is able to bring into
the marketplace?" Dines responded at length, explaining what he
considered UiPath's strengths to be. Throughout his response,
Dines continued to rely on the distinction between unattended
and attended Robots.

Dines began by noting that he used to work at Microsoft and
considered Microsoft to be a "great company." He argued,
however, that Microsoft's RPA product "was never really proven
in large enterprise deployments" and that it is "something that
Microsoft sees more like in a personal productivity gain."
Dines continued, that, in contrast with Microsoft, as of "today"
UiPath was in both the attended space and the unattended space,
with unattended Robots making up half of its business. Dines
explained that Microsoft did not offer unattended Robots -- a
"professional tool . . . for professional developers" -- and
thus did not compete directly in the unattended space. He
described Microsoft's automation product as an attended

24

offering, and as "a citizen developer tool" that "competes only
for like 1 in 10 of the use cases out there."  He further
explained that Microsoft's strategy was to "build something that
works well within [the] Microsoft ecosystem."

Dines' response was a mixture of opinion, professional
judgment, and factual assertion.  He was explaining in what
areas of software functionality Microsoft was and was not
competing directly with UiPath as of the date of the interview.
In the part of his response that the lead plaintiff claims was
misleading, he was making the point that Microsoft was focused
on attended automation and was not offering unattended
automation that was directly competitive with UiPath's
unattended Robots.  His statement that "[w]e've never seen them
in a competitive situation for unattended robots" meant that
UiPath had never had to compete against Microsoft for a sale in
which a customer was selecting the best unattended Robots for
their business.  Dines was not denying that UiPath and Microsoft
were competitors, nor was he saying that competition with
Microsoft only affected UiPath's attended business.

The TAC fails to plausibly plead that Dines' statement was
false or misleading.  To the contrary, it is a central theme of
the TAC and the documents it incorporates that UiPath was
significantly focused on relatively complex unattended Robots,

which catered to professional users, while Microsoft focused on
relatively simple attended Robots.  There is little indication
in the TAC that Microsoft was offering unattended Robots as of
October 2021 -- and certainly no indication that any unattended
Robots that Microsoft offered at this time had comparable
functionality to UiPath's unattended Robots.  Many UiPath
documents on which the TAC relies reflect UiPath's assessment
that Microsoft was not technologically at parity with UiPath's
unattended Robots.  Instead, UiPath considered Microsoft's
technology to be "immature" and an "inferior" product.  For
example, a July 2021 presentation stated that Microsoft's
orchestration feature would only be introduced in "public
preview" mode in October 2021.[6]

The TAC identifies essentially three reasons for alleging
that Dines' statement was false.  First, the TAC asserts that as
of October 2021, UiPath was "regularly seeing" Microsoft compete
with it in the unattended space, including in "at least 213
deals with unattended Robots" in the almost two-year period
before October 2021.  The documents incorporated into the TAC
demonstrate, however, that those "deals involving unattended
Robots" were sales opportunities in which UiPath was hoping to

---

[6] Before that, an April 2021 presentation described Microsoft's
"orchestrator" feature as being an "inbound" offering that was
only available in "private preview" as of that time.

sell unattended Robots.  The TAC does not plausibly allege that Microsoft had developed Robots that could fairly be described as unattended at the time, much less unattended Robots of comparable sophistication to UiPath's unattended Robots.

Next, the TAC contends that Dines' statement was false since UiPath had already lost major deals with PayPal and Omnicom due to Microsoft offering unattended Robots.  For this allegation, the TAC relies on UiPath's internal analysis of deals it had lost when Microsoft was listed as a competitor, which was contained in an August 2021 presentation titled "Power Automate Losses."[7]  This presentation attributes the loss of the PayPal deal to "a combination of technical and pricing," adding that "[i]n PayPal's evaluation, Microsoft's unattended was close enough to parity with UiPath" and Microsoft's price was "much lower."  As for the Omnicom deal, the presentation indicates that "Microsoft leveraged strong executive relationships to box UiPath out of this opportunity and persuaded them to choose" Microsoft's Power Automate product.

---

[7] The TAC also claims that a June 2021 email chain indicates that Microsoft was licensing unattended Robots, but that is a misreading of the email chain.  The email chain discusses the need to obtain licenses for Microsoft 365, a separate Microsoft product, when using UiPath's Robots, as opposed to licensing of any unattended Robots offered by Microsoft.

This presentation, and the other references to UiPath's losses to PayPal and Omnicom incorporated into the TAC, do not plausibly plead the falsity of Dines' statement.  For instance, in the discussion of the loss to PayPal it is unclear whether "Microsoft's unattended" refers to unattended Robots that Microsoft had already developed at that time, unattended Robots that Microsoft had promised to deliver in the future, or simply a proposal for addressing use cases that UiPath would have addressed through unattended Robots.  Once again, there is no indication that any unattended Robots offered by Microsoft were competitive with UiPath's at this time; if anything, PayPal's reference to "Microsoft's unattended" being "close enough" suggests that Microsoft's solution was still inferior.  The presentation also indicates that pricing and established relationships, as opposed to equivalent functionality, were major factors in the loss of these opportunities.  This is corroborated by the August 2021 Presentation, which describes the losses of the PayPal and Omincom deals in a slide stating "we lose to Power Automate typically due to political decisions or pricing on smaller deals."

Finally, the TAC asserts that Dines' statement was misleading because Microsoft was making inroads in competing for customers who might otherwise buy UiPath's unattended Robots.

The TAC especially points to Microsoft's "edging" tactic, that is, obtaining a foothold with customers and bundling Microsoft's Robots, often for free. But that is also consistent with Dines' statement, which did not deny that UiPath was facing competition from Microsoft.

In opposition to this motion, the lead plaintiff adds the contention that Dines' October 2021 statement was misleading because Dines was conveying that UiPath's unattended business was "insulated" from competition with Microsoft. This overlooks the context surrounding Dines' statement and is not a fair characterization of what he said. He was speaking to a sophisticated audience and he frankly acknowledged Microsoft's strength as a competitor.

Largely for the same reasons that the TAC does not adequately allege that the October 2021 statement was misleading, the TAC also does not allege particularized facts giving rise to a strong inference that Dines acted with scienter. The TAC does not identify any documents that Dines saw that contradicted his October 2021 statement. There is no indication that Dines believed or was informed that Microsoft offered unattended Robot functionality that was comparable to or competitive with UiPath's as of October 2021.

29

II.  December 2021 Statement

        The TAC also alleges that Dines made an actionable
misstatement on the December 8, 2021 earnings call, when he said
the following:

>        Our own data, if we take into account the deals where
>        Microsoft is participating versus the deals where
>        Microsoft is not participating, we are not seeing
>        material changes in our winning rate.[8]

The TAC does not plausibly plead that this statement was
misleading or made with scienter.

        Dines' December 2021 statement was an accurate description
of UiPath's internal data, which the TAC incorporates by
reference.  To assist with the December 8, 2021 earnings call,
UiPath management forwarded Dines and Gupta the December 2021
Presentation.  The December 2021 Presentation concluded that
"Microsoft is not a material competitor to UiPath in Q3" and
that Microsoft's "[c]ompetition does not impact our win rates."

---

[8] The SAC explained that this statement was followed by an
additional sentence in which Dines said that Microsoft "doesn't
have a meaningful impact on our ability to win customers."  The
lead plaintiff primarily focused on that latter part of the
statement in opposing the motion to dismiss the SAC.  In the
November 2024 Opinion, the Court found that this was a
"statement of opinion" that was "too vague and general to be
actionable."  In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d at
512-13.  In the TAC, however, the lead plaintiff focuses on the
earlier part of the statement, in which Dines said that "we are
not seeing material changes in our winning rate."

The December 2021 Presentation also included a slide that specifically addressed UiPath's win rates with and without Microsoft.  The title of the slide reads, "Microsoft competition does not impact our win rates and UiPath wins in the larger head-to-head deals."  The slide includes a graph showing that UiPath's win rate in deals in which Microsoft was a competitor had remained remarkably stable over the seven quarters represented in the presentation's graph, ending that seventh quarter 0.3 percentage points higher than in the first quarter measured in the graph.  UiPath's win rate in deals without Microsoft, however, had increased significantly over the seven quarters.  Thus, compared to UiPath's win rate without Microsoft, its win rate with Microsoft had been 1 percentage point higher in Q4 2021, 3 percentage points higher in both Q1 2022 and Q2 2022, and 3.8 percentage points lower in Q3 2022. At the same time, the average selling price for the deals involving Microsoft in Q3 2022 that UiPath won was very substantially higher than those it lost, and that had been the case in Q2 2022 as well.  There is nothing in this data or anywhere else in the documents incorporated into the TAC to suggest that Dines' December 2021 statement was inaccurate.

The TAC recharacterizes Dines' December 2021 statement in order to assert that it was misleading.  It reads the statement

as focusing on changes in the differential between win rates in deals with and without Microsoft, when the statement did not do that.  And, beyond that misreading, it construes Dines' statement as a comparison of that differential between two quarters -- Q2 2022 and Q3 2022 -- when it was not.  Dines described UiPath's data overall and he did not say anything to indicate that he was describing only an update from the latest quarter.[9]

The TAC also contends that Dines' December 2021 statement was misleading because the UiPath data on which he relied was imprecise and did not sufficiently reflect various competitive challenges from Microsoft.  But Dines did not deny that UiPath was facing vigorous competition with Microsoft.  And while the December 2021 Presentation acknowledges that the data it relies on is not exact, it also states that the data is "directionally accurate."  Win rates remained a relevant metric and the TAC has

---

[9] In opposition to this motion, the lead plaintiff asserts that the quarters preceding Q3 2022 should not be considered because they reflect "the period when Microsoft was just beginning to build its RPA business," whereas Q3 2022 "reflected a different landscape."  But the TAC does not indicate that Q3 2022 was so transformational.  To the contrary, the December 2021 Presentation states that "[t]here has been no noticeable uptick in pressure from Microsoft in Q3" in any of UiPath's three geographic regions.  More generally, the TAC describes that UiPath was already beset by serious competition from Microsoft by late 2020 and early 2021.

failed to plead that it was misleading for Dines to describe them as he did.

Even if the TAC had described a misleading statement, it has failed to plead particularized facts that give rise to a strong inference that Dines acted with scienter in his description of UiPath's win rate.  He accurately described the information his management team provided to him in advance of the earnings call.

III. March 2022 Statements

Finally, the TAC alleges that Dines and Gupta made actionable misstatements on the March 30, 2022 earnings call. Specifically, it points to the following statements:

- Dines: "[S]peaking about the new entrants like Microsoft . . . we are not seeing them that much."

- Gupta: "We don't see [Microsoft] a lot.  But even when we do, our win rate has no difference, compared to where they are not playing."

While the November 2024 Opinion found that the SAC adequately alleged that these were actionable misstatements based on statements by confidential witnesses, In re UiPath, Inc. Sec. Litig., 755 F. Supp. 3d at 513, that ruling is no longer possible.  In light of the documents incorporated by reference into the TAC, the TAC does not adequately plead that the March 2022 statements were false or misleading, or that they were made with scienter.

Gupta's statement that "our win rate has no difference"
requires little discussion.  The TAC does not adequately allege
falsity or scienter as to that statement for the same reasons
that it does not adequately allege those elements as to Dines'
December 2021 statement.  The TAC does not plead that the
detailed analysis of UiPath data in December 2021 was obsolete
by March 2022.  And, like Dines, Gupta viewed the December 2021
Presentation.

The remainder of the March 2022 statements assert that
UiPath did not encounter Microsoft "that much" or "a lot" when
competing for sales, and the TAC fails to plead that these
characterizations were false or misleading.  They are in fact
entirely consistent with the December 2021 Presentation, which
reports that Microsoft competed for fewer than 10% of all of
UiPath's potential deals between Q1 2021 and Q3 2022.  While
that number had gradually trended up, it was still only 9.47% in
Q3 2022.  The December 2021 Presentation also reflects that, in
Q3 2022, when UiPath went head-to-head with one of its top three
competitors, it encountered Automation Anywhere approximately
55% of the time, and Blue Prism approximately 35% of the time.
Microsoft was a distant third, with UiPath encountering it

approximately 10% of the time.[10]  Those numbers had not
significantly changed between Q1 2021 and Q3 2022.  The TAC does
not indicate that there was a change in these metrics between
the December 2021 Presentation and the March 2022 statements.[11]

Setting aside the December 2021 Presentation, other
documents incorporated into the TAC are also consistent with the
characterizations that UiPath was not seeing Microsoft "that
much" or "a lot."  For example, on September 1, 2021, UiPath's
VP of Product Marketing had told Dines and Gupta "my takeaway is
that we can say that they are not showing up in deals in a
material way and when they do show up, our win rate is extremely
high."  That assessment was grounded in both a quantitative
assessment of the data available to UiPath at that time, which
is also captured in the August 2021 Presentation, and

---

[10] The December 2021 Presentation explains that because this
metric only reflects deals where one of those top three
competitors was involved, it does not align exactly with the
metric of how often Microsoft competed against UiPath (for
example, 9.47% in Q3 2022).

[11] The defendants attach a March 2022 presentation prepared in
advance of the March 2022 earnings call, which has <u>not</u> been
incorporated by reference into the TAC.  That presentation
indicates that the win rate without Microsoft had increased to
56.2% and the win rate with Microsoft had increased to 54.7% in
Q4 2022, and that Microsoft competed for 11.12% of all of
UiPath's potential deals in Q4 2022.  Because this presentation
has not been incorporated by reference into the TAC, it is
unnecessary to consider it on this motion.

qualitative assessments by employees responsible for UiPath's three geographic regions.

To be sure, the TAC includes the same statements by confidential witnesses that previously staved off dismissal of claims regarding the March 2022 statements in the November 2024 Opinion. Several of those statements are not relevant to the observations that UiPath didn't see Microsoft "that much" or "a lot" to support a finding of falsity. Two statements by CW1, however, are more relevant.

CW1 worked in marketing at UiPath until January 2022, first as a Senior Manager and then as a Director of Global Marketing Operations & Analytics, and he reported to UiPath's Chief Marketing Officer. CW1 stated that UiPath was "losing out" to Microsoft by 2021 and that UiPath "did not typically win" in competition against Microsoft. But CW1's characterizations of UiPath's success in competing with Microsoft must now be considered along with the concrete data and analysis contained in the December 2021 Presentation. An inference of falsity is no longer possible now that the TAC incorporates data and analysis that speak far more directly and reliably to the matters at issue, and undercut CW1's relatively vague statements.

Given the documents now incorporated into the TAC, it is also not possible to find that the TAC adequately pleads scienter as to the March 2022 statements.  Once again, the documents reflect that Dines and Gupta fairly characterized the relevant data, and that they characterized it in the same way as the UiPath employees who were most knowledgeable about competition with Microsoft.  The "executive summary" that accompanied the December 2021 Presentation stated that "Microsoft is not a material competitor to UiPath in Q3," that Microsoft's "[i]nvolvement has increased slightly in the past few quarters but is still less than 10% of all deals," and that "[w]hen we go head-to-head with our top 3 competitors, we see [others] 3-5x more than Microsoft."

The lead plaintiff argues that the TAC adequately alleges scienter because Dines and Gupta were knowledgeable about Microsoft's competition with UiPath.  This observation has little weight, as Dines and Gupta did not deny that UiPath faced a significant competitive threat from Microsoft.  With respect to the actual contents of the March 2022 statements that are at issue here, the TAC fails to plead particularized facts that

give rise to a strong inference that Dines or Gupta acted with scienter.[12]

## Conclusion

The defendants' June 26, 2025 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:    New York, New York
          October 2, 2025

                                   _____
                                   DENISE COTE
                                   United States District Judge

---

[12] Because the TAC does not adequately allege a primary violation under § 10(b) and Rule 10b-5, it also does not plead control person liability. See In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th at 429.